UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | |
| BDC Group, Inc., | Chapter 11 |
| Debtor | Bankruptcy No. 23-00484 |

## OPINION AND ORDER

APPEARANCES:

Attorney Austin Peiffer for Debtor
United States Trustee Janet G. Reasoner
Attorney Abram V. Carls for Keystone Savings Bank
Attorney Kristina M. Stanger for Liquid Capital Exchange, Inc.
Attorney Roy Ryan Leaf for Liquid Capital Exchange, Inc.
Attorney Michael Knapp for West Pacific Drilling, Inc.

The matters before the Court are the "First Day Motions" in the bankruptcy case of BDC Group, Inc. This case is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Debtor requests the Court to grant its Motion for Authority to Obtain Credit (Doc. 11) from prepetition creditor Keystone Savings Bank, Motion to Pay Prepetition Wages (Doc. 12), and Motion to Use Estate Property to Pay Critical Vendors (Doc. 15) all over the objections of the United States Trustee and unsecured creditor Liquid Capital Exchange, Inc. Extensive hearings were held on June 15, 20–21, 2023 on these matters and the Court finds that Debtor's motions should be granted.

**I. Statement of the Case**

The primary issue before the Court can be restated as the following — whether to grant Debtor's motion for DIP financing to pay prepetition wages and prepetition claims of critical vendors. The parties have provided excellent arguments on both sides. This is a tough case with strong competing interests and compelling legal support. The Court's position is further complicated by the fact that these matters must be decided immediately with no time for further deliberation.

There are a few key facts and concepts that drive this decision. DIP financing is available. It is possible there are other, more favorable, financing options out there if there were more time to inquire — or if more inquiries were made before the matters came before the Court. But it must be noted that DIP financing is often either very difficult to obtain or entirely unavailable. The fact that it is available here and would allow Debtor's continued operation while it attempts to reorganize is of great importance to the Court.

## II. Analysis

Section 364(b) permits the Court to authorize a debtor in possession to incur unsecured debt other than in the ordinary course of business and also permits such debt to have an administrative expense claim under § 503(b)(1). However, in many instances the benefits afforded by the Bankruptcy Code to the holder of an allowed administrative expense claim under § 503(b)(1) are not sufficiently attractive to induce a party to make a loan or extend credit to a Chapter 11 debtor. Lenders frequently want greater protections than just the allowance of an administrative expense claim under § 503(b)(1). In those circumstances, §§ 364(c) and (d) provide the Court with authority to permit the Chapter 11 debtor to offer additional benefits to induce a party to make a loan or extend credit.

Section 364(c) is relevant here and it reads in part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien . . .

11 U.S.C. § 364(c).

The three factors that courts consider when assessing the merits of a debtor's motion to obtain financing under section 364(c) are:

> (i) whether the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
> (ii) whether the credit transaction is necessary to preserve the assets of the estate; and
> (iii) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender.

*In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) (citing *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011)). "The statute imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Rather, a debtor need only demonstrate that "it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *In re Ames Dep't Stores*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

The main arguments against approving the DIP financing proposed here are that the debtor did not shop around for other sources of DIP financing and that the terms of the DIP financing (mainly the lien on avoidance actions) are unreasonable.

The first argument — that the debtor did not shop around for DIP financing — is supported by the record. However, that alone is not dispositive and speaks to only the first factor. There has been no argument that debtor could have received unsecured financing under section 364(b). The record demonstrates that Debtor discussed DIP financing with Keystone and Keystone did not offer or consider an unsecured DIP loan. If the argument is that debtor should have shopped around for other possible unsecured financing, the Court finds that on this record that would have been futile.

Under the second factor, the Court finds that the DIP financing is critical for the Debtor to continue to operate. Without it, the evidence shows there is a serious risk that Debtor would entirely lose any possibility of reorganizing — and would face an immediate shutdown of all operations. While Debtor did not shop around for other financing, there is similarly no evidence to show or even suggest that such

financing could be obtained. There is nothing in the record to indicate the proposed DIP financing is out of line with what might be available in the market (if any) or that other similarly situated debtors have recently obtained better financing. Even so, the fact that there might or might not be better financing must be measured against the real risk — supported by evidence — that denying the proposed DIP financing would result in the immediate end to any chance of reorganization.

The only relative certainty here is that DIP financing is available and would keep the possibility of reorganization viable. The court finds this fact persuasive.

The financing would be used to pay the prepetition wages of employees — a necessary enticement to keep them working. There is no dispute about the necessity of the majority of the funds requested for that purpose. The only dispute is whether one employee — the owner's daughter — should be paid. The Court concludes, based on the record made, that she should based on the critical functions that she fulfills for the business including insurance and payroll management. The fact that she is the owner's daughter is only an incidental detail.

The other use for the interim financing is for payment of "critical vendors." The payments would be enticement to continue the critical niche work they provide and to prevent them from pursuing their lien and/or collection rights that might jeopardize debtor's relationships with key customers. The court concludes that debtor presented sufficient evidence to establish the standards for critical vendors in this case. While it is uncertain whether the demanding standards from the 7th Circuit laid out in the Kmart case apply, the court finds that even if those demanding standards apply, they have been met. *See In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004).

Debtor provided strong evidence that the vendors identified as critical are in fact critical to keep the business running. This is a business that requires specialized skills and equipment that cannot easily be replaced by other vendors. There are no viable alternatives to most of the vendors identified. They have all expressed an intent to discontinue work with debtor if they are not paid for prepetition work. Debtor's representative further testified that Debtor has no controlling contract that would require them to continue to perform in most cases. Finally, the non-critical vendors not paid for prepetition work by the DIP loan are likely to be paid in full if the reorganization progresses. That is Debtor's intent and it is supported by the budget in evidence.

A key additional factor in the analysis here is one that is somewhat unique to this case. Failing to pay prepetition debts to critical vendors here not only jeopardizes the Debtor's ability to perform going forward, but it also would likely result in loss of work from its largest customers. Those customers have strong market power and would be able to replace debtor if — for example — any existing critical vendors that don't get paid decide to file liens against the customer property. Debtor provided convincing testimony that it would jeopardize all of its key large contracts.

Finally, under the third factor, the Court finds that the terms of this transaction are fair and reasonable considering the totality of the circumstances. The DIP financing is being offered by the primary prepetition lender, Keystone Savings Bank. The super-priorities Keystone would receive here ultimately result in Keystone priming itself — not another first position lender. Keystone already has a blanket security interest covering the available assets. The only additional security sought by Keystone were two more personal guarantees and a first position lien on all avoidance actions to act as security only for the DIP financing — not as additional security for prepetition loan.

The UST and Liquid have objected to the DIP lender demanding and the Debtor offering a security interest on all avoidance actions in the bankruptcy. Both the DIP lender and the Debtor argue that this inducement is warranted here because there is no other additional security to offer the DIP lender — Keystone. Keystone already has the first position on all of the Debtor's assets not otherwise encumbered. Keystone has made its intention known that it would not lend on a DIP basis without some additional security. The avoidance actions are the only other potential assets that could be secured. Therefore, it is reasonable in this case for DIP lender to demand and debtor to offer those avoidance actions as security for DIP financing.

"Implicit in [the § 364] statutory framework is a recognition of certain concepts. The greater the debtor's inability to obtain the necessary post-petition financing, the greater the inducements the debtor may offer to obtain such debt. Similarly, the greater the risk undertaken by the post-petition lender, the more heightened its need becomes to obtain the additional inducements that §§ 364(c) and (d) permit the Court to authorize a debtor to offer." *In re Mayco Plastics, Inc.*, 379 B.R. 691, 698–99 (Bankr. E.D. Mich. 2008).

**III.   Conclusion**

For these reasons, the Court ADOPTS and APPROVES the amended interim order proposed by Debtor.

IT IS SO ORDERED.

Ordered: June 21, 2023

Thad J. Collins
Chief Bankruptcy Judge