## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| IN RE: | Chapter 11 |
|---|---|
| BDC Group Inc., | Bankruptcy No. 23-00484 |
| Debtor-in-Possession. | DISCLOSURE STATEMENT |

# Introduction

The Debtor provides this Disclosure Statement to all of its known creditors in order to disclose that information deemed by it to be material, important, and necessary for its creditors to arrive at a reasonable and informed decision in exercising their right to vote on the Plan of Reorganization filed with the Bankruptcy Court on the 17th day of October 2023 (hereinafter referred to as "the Plan" or "Plan"). A copy of the Plan accompanies this Disclosure Statement.

## THE PURPOSE OF THE DISCLOSURE STATEMENT

Under Bankruptcy Code § 1125, the Debtor has prepared and filed this Disclosure Statement along with the Plan, for the Court's approval and submission to the holders of Claims and Interests. However, before an acceptance or rejection of a Plan may be solicited, the Court must find that the Disclosure Statement contains "adequate information."

"Adequate Information" is defined in Bankruptcy Code § 1125(a)(1) to mean information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of Claims or Interests of the relevant Class to make an informed judgment about the Plan. *In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. Minn. 1989); *In re Metrocraft Publishing Serv., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984).

Read this disclosure statement carefully if you want to know about:

1. Who can vote or object;
2. What the treatment of your claim is, (i.e., if your claim is disputed and what your claim will receive if the plan is confirmed) and how this treatment compares to what your claim would receive in liquidation;
3. The history of the debtor and significant events during the bankruptcy;

4.    What things the court will look at to decide whether or not to confirm the Plan;

5.    What is the effect of confirmation; and

6.    Whether this Plan is feasible.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and Disclosure Statement, the Plan provisions will govern.

The information contained in this Disclosure Statement has been submitted by the Debtor, unless specifically stated to be from other sources. The Debtor has authorized no representations concerning it or its financial affairs, other than those set forth in this Disclosure Statement.

You may not rely upon this Disclosure Statement for any purpose other than to decide how to vote on the Plan. Nothing contained in the Plan or the Disclosure Statement shall constitute an admission of any fact or liability by any party or be admissible in any proceeding involving the Debtor or any other party.

Except as may be set forth in this Disclosure Statement, the Bankruptcy Court has not approved any representations concerning the Debtor or the value of its assets. The Debtor has not authorized any representations or inducement to secure acceptance or rejection of the plan other than as contained herein and approved by the Bankruptcy Court.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another date is specified herein. Neither delivery of this Disclosure Statement nor any exchange of rights made in connection with this Disclosure Statement and plan shall under any circumstances create an implication that there has been no change in the facts set forth in the Disclosure Statement since the date the Disclosure Statement was prepared.

Although the Debtor believes that the contents of the Disclosure Statement are complete and accurate to the best of its knowledge, information and belief, the Debtor is unable to warrant or represent that the information contained therein is without any inaccuracy. Any statements regarding projected amounts of claims and dividends are

estimates of the Debtor based upon currently available information and are not a representation that such amounts will ultimately prove correct.

The Debtor believes that the treatment of creditors under the Plan will result in a greater recovery for creditors than that which is likely to be achieved under the direction of a trustee in a case under Chapter 7 of the Bankruptcy Code. Accordingly, the Debtor believes that confirmation of the Plan is in the best interest of creditors. The Debtor recommends that creditors vote to accept the Plan.

The Bankruptcy Court has not yet confirmed the plan described in this Disclosure Statement. Therefore, the Plan's terms are not yet binding on anyone. However, if the Bankruptcy Court later confirms the Plan, then the Plan will be binding on all creditors in this case.

The Plan is intended to resolve, compromise and settle all claims, disputes, and causes of action between and among all participants and as to all matters relating to these proceedings, except as expressly provided in the Plan. Therefore, approval of the Plan shall effect the discharge and release of the Debtor and settle all claims of creditors, except as expressly provided in the Plan.

If the Bankruptcy Court confirms the Plan, creditors' claims, if and to the extent allowed, will be paid in accordance with the terms of, and at such time(s) specified in, the Plan.

## Defined Terms

For purposes of this Disclosure Statement, all capitalized terms used herein, and not otherwise defined, shall have the meanings set forth in the Plan. A term used, but not defined, in the Plan, but defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, unless the context clearly requires otherwise. The rules of construction used in Section 102 of the Bankruptcy Code shall apply to construction of this Disclosure Statement and the Plan. Headings and captions are used in this Disclosure Statement for the convenience of reference only and shall not constitute a part of this Disclosure Statement for any other purpose.

## Terms Not Defined

A term used but not defined herein, but defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code, unless the context of this Disclosure Statement clearly requires otherwise. References to a code section are references to the Bankruptcy Code, except as otherwise stated.

# Confirmation Requirements: Vote Required for Plan Approval

Persons or entities concerned with the confirmation of the Plan should consult with their own attorneys because the law on confirming a plan of reorganization is very complex. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The proponent *cannot* and *does not* represent that the discussion contained below is a complete summary of the law on this topic.

# Who May Vote or Object?

## WHO MAY OBJECT TO CONFIRMATION OF THE PLAN

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

## WHO MAY VOTE TO ACCEPT/REJECT THE PLAN

A Creditor or Interest holder has a right to vote for or against the Plan if that Creditor or Interest holder has a Claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired Class.

## WHAT IS AN ALLOWED CLAIM/INTEREST

As noted above, a Creditor or Interest holder must first have an Allowed Claim or Interest to have the right to vote. Generally, any Proof of Claim or Interest will be allowed, unless a party in Interest brings a motion objecting to the Claim. When an objection to a Claim or Interest is filed, the Creditor or Interest holder holding the Claim or Interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

The bar date for filing a proof of claim for non-governmental units in this case was August 22, 2023. A Creditor or Interest holder may have an Allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed. A Claim is deemed allowed if (1) it is scheduled on the Debtor's schedules filed with this Bankruptcy Court and amended through the Amended Schedules filed contemporaneously with the Plan and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. The Debtor anticipates the Court will set a new deadline for filing Proofs of Claim for creditors whose claim status has been changed in the Amended Schedules filed on October 12, 2023.

## WHAT IS AN IMPAIRED CLAIM/INTEREST

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is impaired under the Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of general Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

In this case the Debtor believes that all Classes of Claims are impaired and that holders of Claims in each of these Classes are therefore entitled to vote to accept or reject the Plan. Parties who dispute the Debtor's characterization of their Claim or Interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

## WHO IS NOT ENTITLED TO VOTE

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Code §§ 507(a)(2), (a)(3) and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code §§ 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed in Classes, and they are required to receive certain treatment specified by the Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. *Even if your claim is of the type described above, you may still have a right to object to the confirmation of the Plan.*

## WHO CAN VOTE IN MORE THAN ONE CLASS

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim.

## VOTES NECESSARY TO CONFIRM THE PLAN

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any Insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed below.

## VOTES NECESSARY FOR A CLASS TO ACCEPT THE PLAN

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number **and** at least two-thirds (2/3) in dollar amount of the Claims which voted, voted in favor of the Plan. A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest-holders of such Class which voted, voted to accept the Plan.

## TREATMENT OF NON-ACCEPTING CLASSES: ABSOLUTE PRIORITY RULE

As noted above, even if all impaired Classes do not accept the proposed Plan, the Court may nevertheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code. The process by which nonaccepting Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown." The Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all consensual requirements except the voting requirements of § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

# Secured Claims

There are three ways to satisfy the fair and equitable standard with respect to a dissenting Class of Secured Claims. The first way is to provide that Class members retain their security interests (whether the collateral is kept or is transferred by the Debtor) to the extent of their allowed Secured Claims and to give each secured Creditor in the Class deferred Cash payments that aggregate to at least the amount of the allowed Secured Claim, and which have a present value equal to the value of the collateral. This method of satisfying the fair and equitable standard may be complicated by the application of the Bankruptcy Code § 1111(b)(2). The meaning of Allowed Secured Claim" as used in this paragraph will depend on whether the secured Class makes a § 1111(b)(2) election to be treated as fully secured despite the fact that the collateral may be worth less than the amount of the Claim.

## SECTION 1111(B)(2) ELECTION:

The § 1111(b)(2) election converts the Unsecured deficiency Claim into a Claim secured by the collateral of the electing Creditor. If a Creditor so elects, the Debtor must treat the Creditor's entire Claim as a Secured Claim and the Plan must provide for the Creditor to receive, on account of its Claim, payments, either present or deferred,

of a principal face amount equal to the amount of the Claim and of a present value
equal to the value of the collateral.

A second alternative for complying with the fair and equitable standard with respect
to a Class of dissenting secured Creditors is for the Plan to provide for the realization
of the "indubitable equivalent" of their Secured Claims.

The third alternative for satisfying the fair and equitable standard is to provide in
the Plan for the sale of the collateral free and clear of liens, with the liens to attach
to the sale proceeds.

## Unsecured Claims

There are two ways of satisfying the fair and equitable standard with respect to a
dissenting Class of Unsecured Claims. The first way is for the Plan to provide for
Distributions to the dissenting Class worth the full amount of their Allowed Claims.
The Allowed Claims need not be paid in full on the Effective Date of the Plan. If the
Plan provides for deferred payments, an appropriate discount factor must be used so
that the present value of deferred payments equals the full amount of the allowed
Unsecured Claims of the dissenting Class.

The second way to satisfy the fair and equitable test with respect to the dissenting
Class of Unsecured Creditors is for the Plan to provide that all Claims that are junior
to the dissenting Class do not receive or retain any property on account of their
Claims or Interests. Accordingly, if a dissenting Unsecured Creditor Class is to re-
ceive property worth only one-half of its Allowed Claims, the Plan may still be fair
and equitable if all junior Classes are to receive or retain nothing and if no senior
Class is to receive more than 100% of its Allowed Claims.

## Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Debtor will ask the Court to confirm this Plan by cramdown on all Classes of
claims that are Impaired Classes if any Impaired Classes do not vote to accept the
Plan. Bankruptcy Code Section 1129(b) provides that the Plan may be confirmed by
the Bankruptcy Court, even if not accepted by every impaired Class, if (1) at least one
impaired Class has accepted the Plan (determined without including any acceptance
of the Plan by any Insider), and (2) the Bankruptcy Court finds that the Plan does
not discriminate unfairly against, and is fair and equitable to, the rejecting Class(es).
The requirement that the Plan be fair and equitable to an impaired rejecting Class
means that with respect to each such Class of Unsecured Claims, (1) each holder of a

Claim in such Class will receive the allowed amount of such Claim, plus interest, or (2) no holder of a Claim or Interest that is junior to such Class will receive any property under the Plan on account of such junior Claim or Interest. If any impaired Class does not accept the Plan, the Debtor will seek confirmation by the cramdown provisions of Section 1129(b), if all the applicable requirements of Section 1129(a), other than Section 1129(a)(8), have been met.

Creditors may vote on the Plan by filling out and mailing the accompanying ballot to the Bankruptcy Court by the deadline for voting. As a creditor your vote is important. The Plan can be confirmed by the Court if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class voting on the Plan. If the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it.

Debtor is unable to warrant or represent that the information contained herein is without inaccuracy, although great effort has been made to be accurate in all material respects. No representations concerning Debtor (particularly as to the value of its assets, its future business operations, or the value of any commitments to be made under this plan) are authorized other than as set forth in this disclosure statement.

Any representations or inducements made to secure your acceptance, which are other than as contained in this Statement should not be relied on by you in arriving at your decision, and any such additional representations and inducements should be reported to the Bankruptcy Court for such action as may be deemed appropriate.

The information contained in this Statement has not been subject to a certified audit. The records kept by the Debtor depend, for their accuracy, upon bookkeeping performed both internally and by outside services. Every reasonable effort has been made to present accurate figures. The Debtor has employed a Chief Financial Officer, Todd Shores since February of 2021 and is comfortable in its records. While only a certified audit can assure accuracy, the Debtor does not believe that a certified audit is warranted given the employment of Mr. Shores and the relatively small size of the Debtor.

# History of the Debtor

BDC[1] Group, Inc. was incorporated on January 27, 2015. It is owned by Dennis Bruce of Marion, Iowa who serves as its President and only officer and director. It has previously operated in Colorado, Kentucky, Texas, Virginia, and Iowa. Through May of 2023 BDC operated through three business groups described below:

- Outside Plant (OSP) that had been responsible for over 80% of the Debtor's gross for an extended period. The OSB group lays miles of underground cable and fiber-optic cable primarily in Virginia.

- Telecom Site Development (TSD) that provides both new and used Cell phone shelter buildings, the shelter generator and site development. The TSD group does not erect the cell phone towers.

- The On Demand Service (ODS) division lays fiber optics and coax cable for the City of Cedar Rapids on a no-bid contract price that has the price set at pre-negotiated prices. Mediacom is a customer with a $3.5M purchase order.

The Debtor has closed the OSP division in Virginia. It has arranged with its creditors holding Purchase Money Security Interests (PMSIs) in the equipment located in Virginia to allow the creditors to pick up the equipment and sell it. Some of the equipment not needed in Virginia has been returned to Iowa where it is used by the Debtor in its other divisions. Moving forward, the Debtor plans to concentrate its efforts on making money through the TSD division and the OSD Division.

**Past Performance of the Debtor:**

BDC's Accrual Income History from 2019 forward is as follows:

| Year | Total GAAP Income | Net Profit (Loss)[2] |
|---|---|---|
| YTD 9/30/2023 | $10,768,945 | (2,247,982) |
| 2022 | 28,140,612 | (3,195,253) |
| 2021 | 29,948,864 | 1,690,138 |
| 2020 | 12,230,748 | (3,377,930) |
| 2019 | 13,669,943 | 32,503 |

---

1. BDC stands for Building Diverse Communications.

2. BDC's Unbilled POs and GAAP Revenue through September 30, 2023, by division, is set forth in the table below:

# Factors Leading to the Bankruptcy

## UNDERBIDDING OF VIRGINIA CONTRACTS

BDC's Sr. VP of its OSP division in Virginia consistently underbid projects in Virginia. He left the company in July of 2022 after it was clear that his false promises of profitability had cost BDC over $1.5 million

## LITIGATION LOSS

In April of 2022, Debtor lost a lawsuit brought against it by Liquid Capital, a factoring company that had purchased accounts from Triple B Consulting, Inc., a subcontractor used by the Debtor. The jury entered judgment against BDC for $468,131.59 plus punitive damages of $760,000.00. On October 26, 2022, the Court entered judgment against BDC for attorney fees of $641,781.80 and costs of $1,893.05. This verdict was appealed. On December 8, 2022, the Debtor and Liquid Capital settled the case with the appeal being dismissed and BDC agreeing to pay Liquid Capital $1,400,000.00 on an aggressive payment schedule.

## BORROWING FROM SECONDARY LENDERS

Thereafter, BDC began borrowing from secondary lenders as is set forth below so it could try to make the aggressive payments owed to Liquid Capital and continue operations. The loans from the secondary lenders also known as Merchant Cash Advance Lenders are set forth below:

| Date | Lender | Loan Amt. | Weekly Pmt. |
|---|---|---|---|
| 12/15/2022 | PEAC Solutions | $250,000.00 | $3,846.15 |
| 1/12/2023 | Breakout Capital | $500,000.00 | $22,500.00 |
| 1/12/2023 | Breakout Capital | $500,000.00 | $22,500.00 |
| 1/12/2023 | KYF Global Partners | $750,000.00 | $38,942.31 |
| 2/22/2023 | Green Note Capital Partners SPV, LLC | $500,000.00 | $35,225.00 |

| Division | Unbilled POs | GAAP Revenue through 9/30/2023* |
|---|---|---|
| OSP | $2,307,976.00 | $5,920,851.00 |
| TSD | $123,153.00 | $2,376,431.00 |
| ODS | $1,395,337.00 | $2,471,663.00 |
| **Totals:** | **$3,826,466.00** | **$10,768,945.00** |

\* The inclusion of the unbilled POs with the GAAP Revenue shows that the Debtor is profitable. Note that Debtor's direct labor costs and general overhead have been incurred and are already paid when reviewing the unbilled POs.

| Date | Lender | Loan Amt. | Weekly Pmt. |
|---|---|---|---|
| 4/19/2023 | Green Note Capital Partners SPV, LLC | $250,000.00 | $31,718.75 |
| | Totals: | $2,750,000.00 | $154,732.21 |

### REFUSAL OF MIDAMERICAN ENERGY TO PAY ACCOUNT

BDC had been carrying over $900,000 from work it had done for MidAmerica Energy on a project begun in 2019 as a receivable. This receivable is the subject of litigation pending in the Iowa District Court for Linn County as case No. LACV101650 with trial set for June 3, 2024.

### LAWSUITS BY MERCHANT CASH ADVANCE LENDERS AND VENDORS

Before filing, Green Note Capital Partners, SPV, LLC filed suit against the Debtor and its owner, Dennis Bruce in the Supreme Court of the State of New York, Kings County. Since the filing, Breakout Capital and Kyle Enterprises have filed their lawsuits against Dennis Bruce seeking to recover on guarantees. On September 14, 2023, the Debtor filed an adversary proceeding[3] seeking to extend the automatic stay to protect its President, Dennis Bruce.

## Current Operations and Feasibility

The Debtor's largest creditor, Keystone Savings Bank, has provided the Debtor-in-Possession financing since the case was filed. Since filing the operations have provided the following revenues:

| Month | Receipts | Disbursements | ARs | Current Assets | Post Pet. Debt |
|---|---|---|---|---|---|
| July | 1,196,244 | 794,310 | 776,603 | 4,838,746 | 452,223 |
| August | 1,468,806 | 1,234,096 | 681,421 | 4,999,459 | 620,758 |
| September | 992,129 | 974,559 | 782,661 | 5,147,960 | 726,571 |

The Debtor provides the analysis of its Postpetition Operations in the attached Schedule 1 that is split into Charts A, B and C showing the Postpetition Accounts Receivable, Production Packets submitted to Mediacom, and the Aging of the Postpetition Accounts Receivable respectively. The narrative regarding the Debtor's Postpetition ARs provided by the Debtor's Chief Financial Officer, Todd Shores provides:

---

3. *BDC Group Inc. vs. Breakout Capital, LLC; Green Note Capital Partners SPV LLD; KYF Global Partners; Marlin Capital Solutions (nka PEAC Solutions); Kyle Enterprises, LLC; and Sheets Sterling, Inc.* Adversary Proceeding 23-09042 pending in the United States Bankruptcy Court for the Northern District of Iowa.

1. Chart A shows Postpetition AR as of 10/13/23.
   a. The AR balance is $772,432.
2. Chart B shows the value of the production packets BDC has submitted to Mediacom.
   b. BDC must submit these packets to Mediacom and get approval before BDC can submit the bill to Mediacom for its payment. Submitted production packets are like Pre ARs.
   c. The values shown in the Pre ARs rarely change through this approval process, so usually $1 in a production packet becomes $1 of AR.
   d. Mediacom's process of approval historically has averaged 15 days.
   e. Packets over $50,000 must go to Mediacom's COO in NY for approval.
3. Chart A and Chart B together show BDC has approximately $1,011,991 in currently billed ARs and production packets that should be collectable ARs after approval by Mediacom.
   a. BDC is still working and closing jobs each week, so BDC has WIP in addition to the items reported above that has not even made it to production packet status yet.
4. Chart C shows BDC's Postpetition AR aging.
   a. City of Cedar Rapids is a 45-day term customer
   b. Mediacom is a 30-day term customer
      i. Due to their production packet process payment generally comes 30 to 45 days after production packet submission.
   c. Zayo is a 60-day term customer, but its accounting department is tough to reach and regularly gets things entered as 90-day terms so BDC has to regularly email the customer seeking timely payment.
      i. Zayo is another customer that BDC must get pre-approval before invoicing so there is no risk of nonpayment, or the AR amount not being accurate, Zayo just unilaterally extends out its terms of payment.
   d. TSD customers typically pay on 30- to 45-day terms.

Schedule 2 shows the Debtor's Postpetition Accounts Payable prepared by the Debtor's CFO. The CFO's narrative regarding the Postpetition Accounts Payable follows:

1. The Chart attached shows AP Postpetition totaling $610,848.
2. The "Billings" column shows $874,236 in billings associated with that $610,848 in AP.

a. Note: that $874,236 only amounts related to Billed not Paid $596,583 and the Production Packets sent $89,777, are reflected in the total reported in the AR Narrative (bullet point 3 above).

   i. The not billed of $187,876 is based on BDC's contracted revenues and is for the jobs BDC for which BDC has booked the expenses but has not yet finished the job to entitle it to bill out or submit a production packet.

BDC'S CFO'S CONCLUSION REGARDING POSTPETITION OPERATIONS

When the BDC's AR, Production Packets, and Not Billed are add up, BDC has anticipated receipts of $1,199,867 vs AP owed of $610,849 so an anticipated excess operating cash receipts of $589,018 as it relates to AR and AP. This does not guarantee that BDC will bill out for these sums set for 2023 and does not include WIP billables, for which BDC has already paid the corresponding payroll and overhead costs.

1. The costs of administration of the Chapter 11 are high and the debtor will fare much better once it can significantly cut the professional fees and United States Trustee Fees associated with being in Chapter 11.

2. The Debtor provides its projected cash flow through the end of 2024 as Schedule 3.

3. Future Opportunities: The future for underground boring operations is bright as is noted in a recent release from the Iowa Department of Management that published its Official Notice on September 26, 2023, regarding the Notice of Funding Availability #008 for the Empower Rural Broadband Grant Program making available $148,960,000 for broadband expansion in Iowa. The Reorganized Debtor is poised to service the burgeoning need for broadband services throughout Iowa. Further information about this program can be found at the following link: https://ocio.iowa.gov/empower-rural-iowa-broadband-grant-program-notice-funding-availability-008

## Potential Avoidance Actions

The Debtor filed its Report of Potential Avoidance Actions on September 12, 2023 (Doc. 191). It outlines the transfers made to non-related creditors in Exhibit 1 and the Debtor's analysis of defenses is set forth on Exhibit 2 attached to Doc. 191. Under the Plan, the avoidance actions (except the avoidance actions against the critical vendors, Keystone Savings Bank, and Debtor's professionals), are collateral for Keystone Saving Bank under *In re Simply Essentials, LLC*, 78 F.4th 1006, 1009 (8th Cir. 2023) as well as the assignment to Keystone Savings Bank as part of the Debtor-In-

Possession Credit Agreement approved by this Court in its Opinion entered on June 21, 2023 (Doc. 46). These actions are assigned to the Creditor Liquidation Trust for liquidation with the net recovery proceeds being used to retire the pre-petition claims of Keystone Savings Bank and the DIP claim of Keystone Savings Bank. If the claims of Keystone Savings Bank are satisfied, the excess shall be utilized to repay the claim of the SBA on its EIDL loan, the Class 2 Creditor.

## Liquidation Analysis

The Debtor believes that this Plan of Reorganization provides all creditors with at least as much recovery as they would receive if this bankruptcy estate were to be liquidated pursuant to a Chapter 7 bankruptcy. The Debtor's liquidation analysis is attached as Schedule 4. In a Chapter 7 liquidation the unsecured creditors will receive less than $12,000.00 from the Debtor's assets. Under the Plan they will receive at least $90,000.00.

## Tax Impact of Plan of Reorganization

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor and the holders of Claims based upon the Tax Code, the Treasury Regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial or administrative action. Any such change could be retroactively applied in a manner that could adversely affect each Debtor and holders of Claims. In addition, certain aspects of the following discussion are based on proposed Treasury regulations.

The tax consequences of certain aspects of the Plan may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtor has not requested, nor does it intend to request, a tax ruling from the Internal Revenue Service (the "IRS"), nor will any opinion of counsel be obtained by the Debtor, with respect to the federal income tax consequences of the Plan. Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. Further, the federal income tax consequences to the Debtor, holders of Claims and holders of Equity Interests may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or the holders of Claims, and the discussion does not address the tax consequences of the Plan to certain types of holders of Claims and the holder of Equity Interests who may be subject to special rules not addressed herein.

## General Discussion

The discussion set forth below is included for general information only. The Debtor and its counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the plan, with respect to the Debtor, holders of claims or holders of equity interests, nor are they rendering any form of legal opinion or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary is not exhaustive. Holders of claims and holders of equity interests are strongly urged to consult their tax advisors regarding tax consequences of the plan, including federal, foreign, state and local tax consequences.

### FEDERAL INCOME TAX ISSUES RELATIVE TO PLAN

In general, the Debtor does not expect to incur any substantial tax liability as a result of implementation of the Plan.

### CLAIMS FOR ACCRUED INTEREST

Notwithstanding the general rules described above, holders of Claims who receive any consideration under any Plan in respect of Allowed Claims for accrued but not previously taxed interest must treat the amount of such consideration as ordinary income. A holder of a Claim whose Allowed Claim for accrued and previously taxed interest is not fully satisfied generally may take an ordinary deduction for the unsatisfied portion of such Allowed Claim, even if the underlying claim is held as a capital asset. The proper allocation, between principal and interest, of consideration to be distributed under each Plan is unclear. The Debtor intends to take the position that such consideration is allocated to principal, to the extent thereof, before any amount is allocated to accrued but unpaid interest. Creditors should be aware, however, that the IRS may take a different position with respect to the proper allocation.

Holders of claims should consult their own tax advisors about the proper allocation of consideration between principal and interest.

As indicated above, the foregoing is intended to be a summary only and not a substitute for careful tax planning with a tax professional. The federal, state, local and other tax consequences of the plan is complex and, in some cases, uncertain. Accordingly, each holder of a claim is urged to consult such holder's tax advisors concerning the federal, state, local, and other tax consequences applicable under the plan.

Since the Debtor is a Subchapter S corporation, any income tax will be passed through to the Equity Holders of the Debtor, Dennis Bruce, and will not adversely affect the ability of the Debtor to consummate the Plan.

## The Plan

The Plan provides for division of creditors into 17 classes including the current equity that will be eliminated upon confirmation and the payment of the equity by the Plan Sponsor. The specific payment provisions for each class are contained in the Plan. The collateral for Allowed Secured Claims is described in the Plan for the holders of the Allowed Secured Claims.

The Unclassified Claims are those creditors entitled to administrative expense status and Postpetition priority claims of governmental units, which would ordinarily include the claims of the United States Trustee's office for quarterly fees as well as claims for attorney fees. The Administrative Claims will be paid in full on the date of Plan Distribution or upon the date which the debt becomes due and payable in the ordinary course of business, whichever is first.

Class 1 Claim. The Class 1 claim is the Allowed Secured Claim of Keystone Saving's Bank acquired from F&M Bank together with its Purchase Money Security Interest in the AT40 and other equipment owned by the Debtor. Two of the notes are guaranteed by the SBA at a 75% level. Given the fully secured nature of this Class of Creditor, it is not anticipated that the Creditor will be making a claim on its SBA Guaranty.

Class 2 Claim. The Class 2 claim is the Allowed secured claim of the United States of America acting through the Small Business Administration for the Economic Injury Disaster Loan. This claim is secured by a blanket lien on all the Debtor's assets as is set forth in the Plan.

Class 3 Claim. The Class 3 claim is the Allowed Secured Claim held by Ally Bank secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 4 and 5 and in the Plan.

Class 4 Claim. The Class 4 claim is the Allowed Secured Claim of Bank of America secured by its PMSI in collateral owned by the Debtor described in its Proof of Claim 3 and in the Plan.

Class 5 Claim. The Class 5 claim is the Allowed Secured Claim of Caterpillar Financial Services Corp. secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 33 & 34 and in the Plan.

<u>Class 6 Claim.</u> The Class 6 claim is the Allowed Secured Claim of Ditch Witch Financial Services secured by its PMSI in collateral owned by the Debtor described in its Proof of Claim 59 and in the Plan.

<u>Class 7 Claim.</u> The Class 7 claim is the Allowed Secured Claim of East Central Iowa Council of Governments secured by its PMSI in collateral owned by the Debtor described in its Proof of Claim 32 and in the Plan.

<u>Class 8 Claim</u>. The Class 8 claim is the Allowed Secured Claim held by GreenState Credit Union secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 81 to 84 and in the Plan.

<u>Class 9a Claim</u>. The Class 9a claim is the Allowed Secured Claim held by John Deere Construction & Forestry Co. secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 24, 25, and 27 and in the Plan.

<u>Class 9b Claim</u>. The Class 9b claim is the Undersecured Retained Collateral Claim held by John Deere Construction & Forestry Co. secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 28, 29, 30, and 31 and in the Plan.

<u>Class 10a Claim</u>. The Class 10a claim is the Allowed Secured Claim in Oversecured Retained Collateral held by Manchester Leasing Services, Inc. secured by its PMSI in collateral owned by the Debtor described in its Proofs of Claim 45 to 54 and in the Plan.

<u>Class 10b Claim</u>. The Class 10b claim is the Allowed Secured Claim in Undersecured Retained Collateral held by Manchester Leasing Services, Inc. secured by its PMSI in collateral owned by the Debtor described in its Proof of Claim 55 and in the Plan.

<u>Class 11 Claim</u>. The Class 11 claim is the Alleged secured claim of Marlin Business Bank evidenced by an Iowa UCC-1 statement X21038238-5. Marlin did not file a Proof of Claim. Its alleged claim is disallowed.

<u>Class 12 Claim</u>. The Class 12 claim is the GreatAmerica Financial Services' PMSI Secured claim shown on Proof of Claim 56. The Debtor will surrender the collateral to this creditor.

<u>Class 13 Claims.</u> The Class 13 claims are all alleged non-PMSI Secured Claims aside from those of Keystone Savings Bank and the United States Small Business Administration, including but not limited to Kirkwood Community College's contingent

secured claim; Breakout Capital, LLC; Green Note Capital Partners, Inc.; KYF Global Partners, LLC; and Citibank.

<u>Class 14 Claims.</u> The Class 14 claims are all unpaid prepetition wage & benefit claims. These allowed Priority non-Tax Claims will be paid by the Reorganized Debtor in the ordinary course of business as they arise post Effective Date.

<u>Class 15 Claims.</u> The Class 15 claims are the prepetition unsecured claims of critical vendors listed on Doc. 38 filed in this case.

<u>Class 16 Claims.</u> The Class 16 claims are the General Unsecured Claims and the undersecured portions of secured claims in classes 1 through 14 above.

<u>Class 17 Interest.</u> The Class 17 interest is the interest of the shareholder in the Debtor, Dennis Bruce. The interest of this shareholder shall be canceled upon confirmation of the Plan.

<u>Establishment of a Liquidating Trust.</u> On the Effective Date of the Confirmed Plan, a Liquidating Trust will be established to take possession of the Debtor's Bankruptcy Code Chapter 5 avoidance actions except any avoidance actions against critical vendors (see Doc. 56), the Debtor's professionals and Keystone Savings Bank, which are waived. The Liquidating Trust will be administered for the benefit of its beneficiaries: the DIP Facility Claim, then the Class 1 Claims, then the Class 2 Claims, and then the Allowed General Unsecured Claim holders. The Liquidating Trust will liquidate its assets and use the proceeds to satisfy first its costs of liquidation, then DIP Facility Claim, the Class 1 Claim and then *pro rata* by value, then Allowed General Unsecured Claims, as further detailed in the Liquidating Trust Agreement that will be filed as a part of the Plan Supplement to be filed with the Court not less than seven (7) days before the confirmation hearing.

<u>Cramdown:</u> The Plan makes provision to utilize 11 U.S.C. § 1126(c) to cram down the treatment provided for claim holders in accordance with § 1129(b) provided the Plan is found to be fair and equitable and does not unfairly discriminate unfairly with respect to any Impaired Class that votes not to accept the Plan.

<u>New Equity Interest:</u> The ownership interests of the current shareholder, Dennis Bruce, shall be cancelled on the Effective Date of the Plan of Reorganization. The Plan Sponsor, Building Diverse Communications, LLC, owned by Candace Bruce, shall fund the Equity Contribution to the Debtor of $100,000.00 utilizing funds borrowed from a third party. After confirmation of the Plan and contribution of the

Equity Contribution, the Plan Sponsor shall become the sole shareholder of the Re-organized Debtor.

<u>Interest in Purchase of Debtor:</u> The Debtor has received inquiries from four (4) potential purchasers. Each purchaser has indicated it is not interested in purchasing the business before a Reorganization Plan has been confirmed.

## Ongoing Litigation

The litigation that was pending on the Date of Filing against MidAmerican Energy Company, Case No. LACV101650, currently pending in the Iowa District Court in and for Linn County with trial currently scheduled for June 24, 2024. This litigation is a collection action seeking to collect approximately $800,000.00 owed by MidAmerican Energy for work done by Debtor. It is collateral of Keystone Savings Bank and will be assigned to Keystone Savings Bank.

## Special Risk Factors

### INTRODUCTION

This section summarizes some of the risks associated with the Plan and the Debtor's ability to comply with the terms of the Plan. However, this analysis is not exhaustive and must be supplemented by an evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or Equity Interest with such holder's own advisors.

As such, holders of Claims against and Equity Interests in the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in this disclosure statement, prior to voting to accept or reject the respective plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan, its implementation or its success.

### BANKRUPTCY RISKS

**Risks Relating to Confirmation**

For the Plan to be confirmed, each impaired Class of creditors and holders of Equity Interests thereunder is given the opportunity to vote to accept or reject such Plan, except for those Classes which will not receive any distribution under such Plan, and which is, therefore, presumed to have rejected the Plan. There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.

If one or more of the impaired Classes vote to reject the Plan, then the Debtor may request that the Bankruptcy Court confirm such Plan by application of the "cramdown" procedures available under Section 1129(b) of the Bankruptcy Code. There can be no assurance, however, that the Debtor will be able to use the cramdown provisions of the Bankruptcy Code to achieve Confirmation of the Plan.

If the Plan, is determined not to require re-solicitation of any classes of Claims or Equity Interests by the Bankruptcy Court, is not to be confirmed, it is unclear what distribution holders of Claims and Equity Interests ultimately would receive with respect to their Claims and Equity Interest. If an alternative plan could not be agreed to, it is likely that holders of Claims and Equity Interests would receive less than they would have received pursuant to the Plan.

Any objection to the Plan by a member of a class of Claims or Equity Interests could also either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

## Other Bankruptcy Risks

If Administrative Expense Claims or Priority Claims are determined to be Allowed in amounts greatly exceeding the Debtor's estimates, then there may be inadequate cash or other property available on the Effective Date to pay certain Claims under the Plan, and the Plan would not become effective. The Debtor believes, however, that it will have more than sufficient cash to satisfy such Claims.

In addition, the effect, if any, that the Chapter 11 Case may have upon the continued operations of the Reorganized Debtor cannot be accurately predicted or quantified. Although the Debtor's reorganization and emergence from bankruptcy will eliminate some uncertainty about the Reorganized Debtor's future operations, some entities, at least initially, may be uncomfortable doing business with a company that recently emerged from the Chapter 11 process. The Chapter 11 Case could have harmed each Reorganized Debtor's relationships with its customers, suppliers, and employees, resulting in a material adverse impact on such Reorganized Debtor's operations.

BUSINESS RISKS

## Reliance on Key Personnel

The Debtor believes that its success depends on the services of the majority of its present senior management. If the Reorganized Debtor loses the services of its key executives, then its business could be materially adversely affected. The Debtor also

believes that its ability to retain members of its senior management team and key personnel is critical to its future success.

RISKS WITH FINANCIAL PROJECTIONS

The fundamental premise of the Plan is the successful implementation of the Debtor's business plan as reflected in the financial projections attached hereto as Schedule 5 showing the projected balance sheets of the Reorganized Debtor through the end of 2024. The projections are inherently uncertain and are dependent upon the successful implementation of the business plan and the reliability of the other assumptions contained therein. The projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtor and some of which may not materialize. In addition, unanticipated events and circumstances occurring after the date of this Disclosure Statement, including unanticipated changes in applicable regulations or accounting procedures, may affect the actual financial condition, results of operations and cash flows of the Reorganized Debtor in the future.

## Alternatives to Plan

If Plan is not confirmed, then one alternative would be the conversion of the respective Chapter 11 Case to Case under chapter 7 of the Bankruptcy Code, which would require the immediate closure and cessation of the Debtor's business operations and the liquidation of all assets of the Debtor and the Debtor's Estate by a chapter 7 bankruptcy trustee. Due to the nature of each Debtor's business, the assets of BDC have limited value unless they are used in connection with a going concern business conducting underground boring. The Debtor asserts that general unsecured creditors will receive less than $12,000.00 from a Chapter 7 trustee. Under the Plan they will receive at least $90,000.00.

The second alternative to the proposed Plan is the dismissal of this Chapter 11 Case. If that occurs, the Debtor anticipates that holders of Secured Claims may commence replevin proceedings. In addition, the Debtor anticipates that its unsecured creditors may quickly file suit. The court presiding over any particular court proceeding would not have jurisdiction over any other proceeding, and as a consequence each creditor would be free to undertake such collection activity, including lawsuits, as such creditor deemed appropriate, all in what would amount to a "race to the courthouse." These consequences are exactly the types of activities that the bankruptcy process is

designed to avoid. It is only through the bankruptcy process that the Debtor's creditors can be treated collectively in accordance with each creditor's respective rights.

A third alternative if the Plan is not confirmed is that the Debtor, a creditor or another party in interest could attempt to formulate and propose a different plan of reorganization or liquidation. The Debtor does not believe that alternate plans under Chapter 11 of the Bankruptcy Code can be formulated that will provide for greater distributions to creditors and holders of Equity Interests than provided for under the Plan. Further, the Debtor believes that emergence from this Chapter 11 Case as soon as reasonably possible is necessary for the survival and viability of the Debtor's business. Any alternate plan would likely take significant time to formulate and propose, would likely substantially increase the administrative expenses in the Estate as well as jeopardize the viability of the Debtor' business, and significantly delay any distributions to creditors and holders of Equity Interests.

Collectively, these factors clearly evidence that the Debtor's proposed Plan is superior to a liquidation under Chapter 7 of the Bankruptcy Code, dismissal of the bankruptcy case or the filing of an alternate plan of reorganization or liquidation. The Debtor firmly believes that the Plan results in a fair balancing of all parties' rights, and again urges creditors and holders of Equity Interests to vote to accept the Plan.

## Miscellaneous Provisions

The Plan also provides that it may be modified by the Debtor or corrected prior to Confirmation Date without additional disclosure, pursuant to § 1125 of the Bankruptcy Code, provided that the Court finds that such modification does not adversely affect any creditor or class of creditors and is consistent with the Bankruptcy Code. After the Confirmation Date, the Debtor may, with approval of the Court, and so long as it does not adversely affect the interests of the creditors, remedy any defect or omission, or reconsider any inconsistencies in any Plan, or in the order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

Certain substantial risk factors are inherent in most commitments made pursuant to a Plan of Reorganization under Chapter 11. If the Plan is accepted, it is usually because they represent a greater hope for return and dividends to creditors than in liquidation, a Chapter 7 case. All the risk factors inherent in the commitments made pursuant to any Plan of Reorganization in a Chapter 11 case are present in this case.

> **It is important that you exercise your right to vote on the acceptance or rejection of the Plan. The Debtor urges you to vote in favor of the Plan.**

Dated this 17th day of October, 2023.

Respectfully submitted,

AG & BUSINESS LEGAL STRATEGIES

/s/ Joseph A. Peiffer
Joseph A. Peiffer AT0006160
Austin J. Peiffer AT0014402
P.O. Box 11425
Cedar Rapids, Iowa 52410-1425
Telephone:    (319) 363-1641
7Fax:    (319) 200-2059
Email:    joe@ablsonline.com
    austin@ablsonline.com
ATTORNEYS FOR DEBTOR-IN-POSSESSION

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of October, 2023, a copy of the foregoing document was filed with the Clerk of Court for the United States Bankruptcy Court for the Northern District of Iowa using the CM/ECF system, and served electronically on those participants that receive service through the CM/ECF system.

Signed: /s/ Leah M. Watson