## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re | Chapter 11 |
| BDC Group Inc., | Bankr. No. 23-00484 |
| Debtor. | **MOTION FOR RELIEF FROM AUTOMATIC STAY TO TERMINATE EXECUTORY CONTRACT** |

   Zayo Group, LLC ("**Zayo**"), a creditor and counterparty to a *Master Construction Services Agreement* dated as of October 13, 2020, (the "**Contract**,") as amended as of March 31, 2023, and attached, together with related agreements and schedules, to this Motion as **Exhibit A**), an executory contract, with BDC Group Inc. ("**Debtor**"), the debtor-in-possession in this chapter 11 case, respectfully moves the Court for an order under §362(d) of Title 11 of the U.S. Code (the "**Bankruptcy Code**") granting Zayo relief from the automatic stay to permit Zayo to terminate the Contract, which Debtor has materially breached, has not adequately performed, and cannot cure or assume.  In support of this Motion, Zayo respectfully represents:

## BACKGROUND[1]

**A.      Contract**

   1.      Zayo is a global telecommunications network enterprise providing services to build out and maintain high-speed telecommunications and data networks in large public and private applications.  Zayo and Debtor entered into the Contract in October 2020 for the purposes of engaging Debtor to install approximately 2.7 million linear feet of fiber optic telecommunications cables in an existing conduit running adjacent to commercial railroads between Chicago, IL, and

---

[1]    This Court has jurisdiction over this case and this matter under 28 U.S.C. § 1334.  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.  The contested matter commenced by this Motion is a core proceeding in which this Court has jurisdiction to enter final orders under 28 U.S.C. § 157(b)(2)(G).

Omaha, NE, as more specifically described in the *First Amendment to Project Service Agreement #11 (Zayo-869228)* included in **Exhibit A** to this Motion (the "**Project**").

**B.     Debtor's Defaults**

2.      Beginning in July 2022, when Iowa Interstate railroad issued its permit to proceed with the first portion of work, Debtor notified Zayo that Debtor did not have an available crew to begin work, despite having committed during the pre-contract bidding process to having two (2) seven-person fiber installation crews and two (2) three-person excavation crews dedicated to the Project.  Some 54 days later, on September 12, 2022, Debtor commenced work on the Project.  But shortly after, Debtor failed to work consistently on the Project.  For example, the Debtor did no work on the Project for nine (9) consecutive working days through October 5, 2022, eighteen (18) consecutive working days through November 12, 2022, and seven (7) consecutive working days November 28, 2022.

3.      Zayo informed Debtor in writing via email on September 27, 2022, that Debtor was "currently behind schedule" but assured Debtor that "to maintain a positive working relationship, we do not intend to enforce any late delivery damages at this time" despite that "Zayo does not feel confident that the trajectory of the project is in alignment with our internal and external commitments."  On October 13, 2022, Zayo again informed Debtor that Debtor had fallen "drastically behind schedule."

4.      These repeated and lengthy delays caused the first "Priority 1 Section" completion milestone of December 1, 2022, to be missed and required an amendment to the original *Project Service Agreement* (included within **Exhibit A**) extending that milestone to February 28, 2023 (the

2

"**Extended Priority 1 Milestone**").  After recording no production for 23 consecutive working days through February 15, 2023, Zayo again notified Debtor via email on February 22, 2023, that it was "for the second time … currently behind schedule" and of "approaching due dates which BDC is currently not on track to hit."  Debtor never formally responded to that email, missed the Extended Priority 1 Milestone, then failed to record any production for another fifteen (15) consecutive working days through March 16, 2023.

5.    On March 29, 2023, Debtor's crew severed a fiber cable owned by Google, causing a 36-hour outage for Google, exacerbated by Debtor's failure to report the damage when it occurred.  Debtor finally completed the Priority 1 Section on April 1, 2023, some four (4) months after the original due date and two (2) months after the extended due date.

6.    On April 3, 2023, Debtor's "jetting crew" quit,[2] leading to extensive cessation of production: 37 consecutive working days through May 15, 2023; twenty-one (21) consecutive working days through June 28, 2023; and thirteen (13) consecutive working days through October 9, 2023.  Finally, on October 31, 2023, Debtor's jetting crew again left the project.

7.    When Zayo confronted Debtor's management on November 2, 2023, regarding the continued delays, missed deadlines, and crew disruptions, Debtor attempted to cast blame on allegedly uncooperative railroads and, most significantly, on Zayo's alleged failure to pay Debtor's progress invoices.  But as of approximately November 10, 2023, Zayo has paid all Debtor's invoices as required under the Contract.  Zayo is current on all payments required under the Contract and has not otherwise breached the Contract since its inception.

---

[2]    A "jetting crew" uses compressed air to blow a cable through a duct while simultaneously pushing the cable into the duct.

8.      Debtor has repeatedly failed "to prosecute the Services … with due diligence so as to endanger the ultimate scheduled completion thereof," which is an event of default under Section 12.1 of Exhibit C of the Contract.  Additionally, "a failure to meet any milestone or timelines is a default" under that same Section 12.1.  Significantly, several of Debtor's defaults—failures to work for many lengthy periods, leading to missed milestones and deadlines—are impossible for Debtor to now cure.  Debtor's severing of Google's cable is also a *fait accompli* not capable of cure.

9.      Debtor's defaults have caused Zayo to incur significant economic damages.  For example, because Debtor failed to meet the milestones and production deadlines it was obligated to in the Contract, Zayo incurred significantly increased costs for flaggers and other support crew. Zayo paid for field inspections on 78 days in which Debtor performed no work, costing Zayo and average of $450 each day for a total of approximately $35,100.  Mostly significantly, Zayo paid an average of $1,540 per day Debtor did not work, resulting in damages of approximately $120,120.  In all, Zayo has incurred at least $200,000 in actual economic damages owing directly to Debtor's repeated defaults under the Contract.

10.      In addition to these actual damages, Debtor agreed in Section 3.1 of the Contract to liquidated damages of $1,000 for each calendar day Debtor's services under the Contract have not been substantially completed by the scheduled completion date of June 30, 2023. (*See* Section III of the *Project Service Agreement* included in Exhibit A to this Motion.).  As of November 30, 2023, those liquidated damages alone total $153,000.

11.     Additionally, Debtor's failure to pay at least one of Debtor's own subcontractors, Guidance Well Services, LLC, (d/b/a GuideWell), has caused GuideWell to issue, on November 14, 2023, a notice of intent to lien Zayo, Debtor, and the property owner, Iowa Interstate Railroad, LLC.  If Zayo is required to pay GuideWell the $40,798.20 GuideWell alleges it is owed, that amount will be added to the damages Zayo has incurred as a direct result of Debtor's defaults under the Contract, which includes the failure to pay Debtor's subcontractors for work performed under Sections 11.3 and 39.2 of Exhibit C of the Contract and the failure to obtain a lien waiver under Section 35.4 of Exhibit C of the Contract.

12.     Debtor has incurred numerous incurable breaches under the Contract, has imposed the economic costs of those breaches on Zayo, and has demonstrated no ability to continue performing adequately and timely under the Contract.

## RELIEF REQUESTED

13.     In the face of uncured defaults under the Contract (and its incorporated *Project Services Agreement*), Section 12.1 of Exhibit C of the Contract entitles Zayo to terminate the Contract: "if Contractor [that is, Debtor] shall default in the performance of any of its obligations under this Agreement and shall fail to correct such default within seven (7) calendar days following notice thereof from Company [that is, Zayo], Company may, at its option and without prejudice to any other rights or remedies Company may have, hold in abeyance further payments to Contractor and/or terminate any Service or this Agreement …" Debtor has repeatedly and materially defaulted under the Contract, has not cured (and, in most instances, cannot cure) those defaults, and Zayo

5

now wishes to exercise its right to terminate the Contract.  To do so, Zayo must have and should be granted relief from the automatic stay arising under Bankruptcy Code § 362.

14.    Because an executory contract such as the Contract here constitutes property of a debtor's bankruptcy estate,[3] Bankruptcy Code § 362(a)(3), which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," at least arguably precludes a counterparty to an executory contract from terminating that contract without first obtaining relief from the automatic stay.[4]  §362(d)(1) requires a bankruptcy court to "grant relief from the stay … for cause …" When a debtor has repeatedly breached an executory contract and cannot cure some or all of those breaches and, therefore, cannot assume the contract under §365,[5] "cause" exists to lift the automatic stay to permit the counterparty to terminate the executory contract.[6]

15.    Here, Debtor has indisputably defaulted under the Contract in several ways and on numerous occasions throughout 2023.  As noted above, essentially none of these defaults can be

---

[3]    *See, e.g., L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291 (3d Cir. 2000); *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 497 (3d Cir. 1998).

[4]    *See, e.g., Parkview Adventist Med. Ctr. v. United States,* 842 F.3d 757 (1st Cir. 2016) (noting the argument but not ruling on it); *In re Myers,* 633 B.R. 286, 291 (Bankr. D.S.C. 2021) ("Parties attempting to terminate an unexpired lease or executory contract by notice without relief from stay appear to violate 11 U.S.C. § 362(a)(3)"); *In re FirstEnergy Sols. Corp.* 596 B.R. 631, 644 (Bankr. N.D. Ohio 2019) ("Termination of a debtor-in-possession's executory contract … is a violation of the automatic stay imposed by 11 U.S.C. § 362(a)(3)").

[5]    Section 365(b)(1) precludes Debtor from assuming the Contract because the Debtor cannot possibly cure its many defaults as required in § 365(b)(1)(A), to say nothing of Debtor's obvious inability to provide adequate assurance of future performance under the Contract as required in § 365(b)(1)(C).  A chapter 11 debtor's inability to assume an executory contract under § 365(b)(1) likewise constitutes "cause" under § 362(d)(1) to grant relief from the automatic stay to permit the counterparty to terminate the executory contract.  That is precisely the situation here.

[6]    *See, e.g., In re Watts,* 2013 Bankr. LEXIS 4822, *14 (Bankr. N.D. Iowa Nov. 12, 2013) (Collins, C.B.J.) ("Because the Court finds that the lease … is not assumable by Debtors, … the Court finds that cause exists to lift the automatic stay … under § 362(d)(1)"); *In re Haynes,* 2019 Bankr. LEXIS 2419, *14 (Bankr. W.D.N.Y. Aug. 1, 2019) (where debtor could not cure past defaults, cause existed to grant relief from automatic stay under § 362(d)(1) to permit counterparty to terminate executory contract); *In re All Phase Elec. Contr., Inc.,* 409 B.R. 272, 274–75 (Bankr. D. Conn. 2009) (if contract were an executory contract that couldn't be assumed, cause would exist under § 362(d)(1) to grant relief from automatic stay to permit termination of contract).

cured.  Accordingly, "cause" exists to grant Zayo relief from the automatic stay so that Zayo may immediately terminate the Contract and mitigate the extensive damages and delays Debtor's poor performance under the Contract has occasioned.

16.     Even if Debtor could somehow cure the incurable defaults noted above, Debtor would never be able to capture value for the estate by assuming the Contract because Zayo maintains a unilateral right to terminate the Contract without cause at any time under Section 18.1 of the Contract.  Given Zayo's resolve to end its relationship with Debtor, even if Debtor somehow managed to meet all the requirements in Bankruptcy Code §365(b) to assume the Contract, Zayo would immediately terminate the Contract under Section 18.1 and, because the Contract would have been assumed, the automatic stay would not constrain Zayo from doing so.  In this fashion, even an attempt by Debtor to assume the Contract would prove ultimately futile.

### REQUEST FOR HEARING

17.     Debtor's unsatisfactory and untimely performance (or, more precisely, Debtor's *lack* of performance) of its obligations under the Contract has caused extensive and harmful delays in a major, multi-million-dollar, telecommunications, infrastructure project.  Zayo must be able to terminate its relationship with Debtor and immediately install a replacement contractor to finish the extensive work the Debtor has left unfinished.  And, in the interests of this estate and its creditors, Zayo must reiterate that liquidated damages for Debtor's failure to complete the project continue to accrue at a rate of $1,000 per day.  Accordingly, Zayo respectfully requests that the Court conduct a preliminary hearing on this Motion as promptly as possible in accordance with §362(e) of the Bankruptcy Code and Local Rule 4001-1(b) and (f).

## CONCLUSION

18.     For the reasons stated above, Zayo respectfully submits that cause exists under Bankruptcy Code §362(d)(1) to grant Zayo relief from the automatic stay sufficient to permit Zayo to immediately terminate the Contract.  Zayo respectfully requests an order granting such relief and any additional relief the Court deems appropriate under the circumstances.


Dated:  December 7, 2023                    */s/     Jeffrey D. Goetz*
                                              Jeffrey D. Goetz, Esq., IS #9999366
                                              Bradshaw Fowler Proctor & Fairgrave P.C.
                                              801 Grand Avenue, Suite 3700
                                              Des Moines, IA  50309-8004
                                              515/246-5817
                                              515/246-5808 FAX
                                              goetz.jeffrey@bradshawlaw.com

CERTIFICATE OF SERVICE:

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

                                              */s/     Brenda Mozena*

## MASTER CONSTRUCTION SERVICES AGREEMENT

This Master Construction Services Agreement ("Agreement") is made and entered into on October 13, 2020 ("Effective Date") by and between Zayo Group, LLC a Delaware limited liability company, ("Company"), together with its affiliates, having its principal place of business at 1805 29th Street, Boulder, CO 80301, and BDC Group, Inc., ("Contractor"), an Iowa AS A Incorporated, having its principal place of business at 1936 51st Street NE, Cedar Rapids, Iowa, 52402. Terms not otherwise defined herein, shall be defined in Exhibit C, General Terms and Conditions, attached hereto and incorporated herein by reference.

### RECITALS:

A.      Company desires to have portions of a fiber optic network system constructed and installed as described in Exhibit A, Zayo's Outside Plant Manual, and/or Exhibit B, Zayo's Inside Plant/Cabinet Installation Manual.

B.      Contractor represents that it is experienced in the construction and installation of such systems.

C.      Company desires Contractor to install portions of such system on its behalf.

For and in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      SERVICES AGREEMENT

1.1      Company may from time to time request that the Contractor perform services of the kind described in Exhibit A, Zayo's Outside Plant Manual, and/or Exhibit B, Zayo's Inside Plant/Cabinet Installation Manual (the "Services"), and other Services as the parties may agree from time to time. The parties shall execute a Project Service Agreement as projects are offered to and accepted by the Contractor. A form Project Service Agreement is attached as Exhibit D and incorporated by reference herein. The Project Service Agreement shall define the agreed upon Services to be performed by the Contractor, the anticipated duration of such Services, the types of expenses for which the Company shall reimburse the Contractor, and the compensation due the Contractor for such Services. The entire Agreement shall consist of the terms and conditions set forth in this Agreement, together with any exhibits hereto, and any Project Service Agreement(s). Each such Project Service Agreement shall constitute an integral part of the Agreement and shall be read and construed as one with this Agreement.

2.      SCHEDULE

2.1.      Contractor shall complete the Services in accordance with the schedule set forth in the Project Service Agreement(s). Company may require Contractor to alter the schedule with respect to the order of completion of particular segments of the Services. The parties expressly agree that Contractor shall not be entitled to any

increase in the Contract Price nor shall Contractor be entitled to any extension of the completion date as a result of any such schedule alteration by Company.

3.     LIQUIDATED DAMAGES

3.1.   Time is of the essence in the performance of the Services by Contractor. Contractor shall complete the Services for each segment or milestone by the scheduled completion date for such segment or milestone outlined in each Project Service Agreement. Contractor acknowledges that if the Services are not complete for each segment or milestone by the scheduled completion date, Company will suffer damages in an amount which is uncertain or difficult to estimate. Therefore, Contractor agrees that, in addition to all other remedies available to Company, if the Services are not complete by the scheduled completion date, Contractor shall continue to complete the Services, but shall pay to Company as liquidated damages in the amount of one thousand dollars ($1,000) for each calendar day of delay in Substantial Completion of the segment beyond the scheduled completion date. Contractor shall pay such liquidated damages to Company in the form of a reduction in the Contract Price. A failure to meet any timelines is a default hereunder and no notice shall be required of such default.

3.2.   Contractor and Company agree that the amount of liquidated damages is a reasonable pre-estimate of the probable damages to Company.

3.3.   The payment of such damages shall not release Contractor from its obligations to otherwise fully perform under this Agreement.   Upon request by Company, Contractor shall furnish to Company such evidence as Company may require to confirm Contractor's ability to fully perform under this Agreement in the manner and within the time permitted.

4.     CONTRACT PRICE

Contractor shall be paid according to the pricing terms contained in the applicable Project Service Agreement (the "Contract Price").   Contractor shall submit monthly invoices in accordance with the provisions of Section 35.0, Applications for Payment, of Exhibit C, General Terms and Conditions.

5.     PERMITS AND OTHER GOVERNMENTAL APPROVAL

The price quoted for the Services shall include the cost of any licenses, permits and authorizations required to be obtained by the Contractor for the performance of the Services. Contractor shall comply strictly with all laws, regulations, by-laws, codes and orders of all municipal, state, provincial and federal governmental and regulatory authorities governing the performance of the, which include obtaining all required licenses, permits and authorizations required by such governmental and regulatory authorities at the sole cost and expense of the Contractor. The Contractor shall obtain and pay for the full cost and expense of all permits related to the performance of Services, except for any permits that are obtained by and paid for by Company (as previously agreed to in writing by Company) as specifically related to the Services.

6.     GUARANTEE

Contractor warrants and guarantees that the Services will comply with Section 5.0, GUARANTEES, of **Exhibit C,** General Terms and Conditions.

7.     TERM

7.1     This Agreement shall become effective on the date first written above and shall remain in effect until five (5) years from the Effective Date of the Agreement (the "Term"), and new Project Service Agreements may only be entered into during the Term. Notwithstanding the foregoing, certain terms and conditions set forth in the Contract Documents, as defined in Section 8 below, by their nature are intended to survive and shall survive the expiration of the Agreement.

7.2     Schedules for the performance of Services on individual projects shall be mutually agreed to by both parties, prior to the performance of work and shall be stated on a Project Service Agreement.

8.     CONTRACT DOCUMENTS

The following Exhibits are hereinafter referred to as "Contract Documents." They are attached hereto and are incorporated herein by this reference.

Exhibit A: Zayo's Outside Plant Manual
Exhibit B: Zayo's Inside Plant/Cabinet Installation Manual
Exhibit C: General Terms and Conditions
Exhibit D: Sample Project Service Agreement

Should Contractor find or perceive any conflicts in or between these Exhibits A, B, C, and D, Contractor shall advise Company and Company shall determine their application. Precedence to be given these Contract Documents shall be as set forth in Section 46, Order of Precedence, of Exhibit C, General Terms and Conditions.

**** Remainder of Page Intentionally Left Blank ***

Intending to be legally bound, the parties hereto have caused this Agreement to be executed on the date first above written.

**ZAYO GROUP, LLC**

By: _Mike Mooney_

Name: Mike Mooney

Title: General Counsel, Zayo Group

Date: October 14, 2020

**BDC GROUP, INC.**

By: _Dennis Bruce_

Name: Dennis Bruce

Title: Presdident & CEO

Date: October 14, 2020

Exhibit C

GENERAL TERMS AND CONDITIONS

1.0    DEFINITIONS

1.1    "Agreement" means the Master Construction Services Agreement between Company and Contractor.

1.2    "Change Orders" may be any modification to Drawings, Specifications, Scopes of Work, or Purchase Orders and shall not be binding until agreed to in writing by both parties as outlined in their respective sections below.

1.3    "Company" shall mean the corporation, company, partnership, firm or individual named and designated in the Agreement as the party who has entered into the Agreement to receive the Services from the Contractor.

1.4    "Contract Documents" shall mean the document(s) executed by both Company and the Contractor, and includes the documents setting forth this Agreement, the Scope of Work, Project Service Agreement, these General Terms and Conditions and the Emergency Restoration Services Scope of Work.

1.5    "Contract Price" is the price of the Agreement and the related Services outlined in any of the Contract Documents and the Agreement.

1.6    "Contractor" shall mean the corporation, company, partnership, firm or individual named and designated in the Agreement as the party who has entered into this Agreement to perform the Services covered thereby.

1.7    "Contractor's Schedule" shall mean the schedule developed in order to complete the Services in accordance with the schedule set forth in the Project Service Agreement.

1.8    The "Drawings" are the graphic and pictorial depictions of the design, location and dimensions of the Services, generally including plans, elevations, sections, details, schedules and diagrams.

1.9    An "Excusable Delay" is any delay caused by any force majeure as outlined in Section 13 of this Exhibit C.

1.10   The "Final Acceptance" is the concluding acceptance by Company of the Services performed by Contractor.

1.11   "Project Service Agreement" shall mean the individual statements of work developed per project outlining the specific Services and deliverables and agreed to in writing by both parties. These Project Service Agreements may take the form of Exhibit D and/or a Company Purchase Order.

1.12    "Scope of Work" shall mean the description of the Services to be rendered by the Contractor and includes but is not limited to the Drawings and Specifications.

1.13    "Specifications" are the written requirements for materials, equipment, construction systems, standards and workmanship for the work, and performance of related services.

1.14    "Substantial Completion" means the date when the Services, or any designated part thereof, is sufficiently complete, in accordance with the Contract Documents, so that Company can use the Services, or the designated part, for the use for which it is intended.

1.15    "Services" as used herein shall mean the construction services required pursuant to the Scope of Work and each applicable Project Service Agreement.

2.0    APPROVED FOR CONSTRUCTION DRAWINGS AND SPECIFICATIONS; AND INTENT OF DRAWINGS AND SPECIFICATIONS

2.1    The Services shall be performed using only the Specifications provided by Company as part of this Agreement, and written Change Orders pursuant to Section 16.0, CHANGES, hereof. Contractor shall, throughout the performance of the Services, maintain an adequate and effective Change Order control system. Contractor shall maintain a current set of Drawings and Specifications at each worksite.

2.2    Should any conflict, error, omission or discrepancy appear in the Drawings, Specifications, instructions, or in work done by others, Contractor shall notify Company. If Contractor proceeds with any of the Services in question prior to receiving instructions, then required corrections shall be at Contractor's expense. Contractor shall not deviate from the Drawings and Specifications without prior written approval from Company. Materials shall not be substituted for those specified, nor shall "or equal" items be furnished without Company's prior written approval.

3.0    PROSECUTION OF THE WORK

3.1    Contractor shall perform the Services in a professional workmanlike manner using only qualified, careful and efficient workers and in strict conformity with this Agreement and related documents. Contractor shall provide, at Contractor's expense, all supervision, labor, materials not furnished by Company, construction equipment, tools, consumables, temporary services and facilities, transportation, storage, and all other facilities and services necessary or appropriate for the satisfactory performance of the Services.

3.2    Unified operations are essential to efficiency and control of the Services, limitations of hazards and general public relations. Contractor understands that its activities must take into consideration the fact that other facilities may be under construction simultaneously at other work sites. Contractor shall fully coordinate its activities

with the activities being performed by others such that all facilities may be constructed with a minimum of delay or interference.

3.3     Whenever the Services are in progress, Contractor shall have a duly authorized representative at the work site who shall control performance of the Services, ("Contractor Representative"). A comparable representative from the Company ("Company Representative") may advise said representative when the Company Representative observes that the Services do not comply with the provisions of this Agreement. Such instructions given to the Contractor Representative by the Company Representative shall be considered as having been given to the Contractor. Services shall be performed only during daylight hours unless otherwise authorized by the Company Representative.

3.4     Contractor shall not offer Company personnel and representatives any gift or entertainment at any time.

## 4.0     CONTRACTOR'S SCHEDULE AND PROGRESS

4.1     Contractor shall be bound to perform the Services and all separable parts thereof in accordance with the schedule set forth in the Project Service Agreements. The Contractor shall submit a planning schedule with his technical proposal (Gantt Chart or network). The Contractor will develop a construction schedule detailing the sequence of the Services, number of work locations, and the means and methods of performing the Services, within the limitations stated in this Agreement. The Contractor shall submit the initial Contractor's Schedule for approval not later than seven (7) days following award of the Agreement.

4.2     Throughout the Term of this Agreement, Contractor shall be responsible for maintaining an updated schedule for any Services, monitoring the progress of various activities, and periodic reporting of the progress status of any and all activities, issues, and concerns relating to the performance of the Services. The Contractor will submit each month an updated Contractor's Schedule in both printed and electronic copy to the Company Representative. The monthly schedule update, when compared with the physical Services completed, will be used by Company to verify the progress of construction. If Contractor fails to submit the required schedules and progress reporting documentation, the Company may withhold approval of Contractor's invoices until such time as Contractor furnishes the required information.

4.3     If, in the opinion of Company, Contractor falls behind the schedule for reasons other than an Excusable Delay, the Company Representative shall so notify Contractor in writing and Contractor shall take such steps as may be necessary to improve its progress. Company may, at its discretion, require Contractor to increase the number of shifts, or overtime operations, days of work, or the amount of construction plant, or all of them, and to submit for approval such supplementary schedules as necessary to demonstrate the manner in which the schedule will be regained, all without additional cost to Company.

4.4    Contractor shall immediately notify Company of any Excusable Delay which may affect the times and sequences in the schedule, and shall make all requests for extensions of time, in writing, to Company within five (5) days of occurrence.

4.5    Failure of Contractor to comply with the requirements of this Section 4.0, CONTRACTOR'S SCHEDULE AND PROGRESS, shall be grounds for determination by Company that Contractor is not prosecuting the Services with such diligence as will ensure its completion within the time specified. Upon such determination, Company may terminate Contractor's right to proceed with the work, or any separable part thereof, in accordance with Section 12.0, TERMINATION FOR DEFAULT, hereof.

## 5.0    GUARANTEES

5.1    Consistent with the Warranty of Construction set forth in more detail in Section 29 below, Contractor guarantees to Company that the Services shall strictly comply with the Drawings and the Specifications, and that the Services shall be professional in every particular and free from defects, errors, and omissions in construction and workmanship. Contractor further guarantees that all materials, equipment, and supplies furnished for the Services by Contractor, and its subcontractors or suppliers, shall be new, merchantable, of the most suitable grade, and fit for their intended purposes and shall comply in all respects with the Specifications provided by Company.

5.2    Contractors' guarantees set forth in Section 5.1 above shall extend for twenty four (24) months after the date of written Final Acceptance of the Services by Company. Design and engineering, labor, equipment, and/or materials furnished by Contractor pursuant to Section 5.1 above to correct defects shall be guaranteed by Contractor in accordance with the guarantees set forth in Section 5.1 above for a period of twenty four (24) months from the date of completion of the correction.

5.3    In the event Contractor shall have been notified of any defects in the Services in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, Company shall have the right to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay Company for costs incurred in correcting such defects plus any damages suffered by Company, or alternatively Company may, at its discretion, deduct such costs and damages from any payments due Contractor.

5.4    With respect to any items of manufactured equipment specified by Company and purchased by Contractor from others, Contractor warrants that the equipment is as specified, and agrees to pass on and assign to Company the manufacturer's warranty.

## 6.0    INSPECTION, TESTING, AND QUALITY CONTROL

6.1    Company will notify Contractor of the Company Representative who shall make inspections and make decisions on behalf of Company as provided herein. This

person may act either directly or through authorized assistants. Contractor shall notify Company of the name of Contractor's Representative on the job site who shall have general supervision and direction over Contractor's personnel and equipment either directly or through authorized assistants.

6.2   Contractor shall inspect all materials, supplies, and equipment, which are to be incorporated in the Services. In addition, Contractor shall conduct a continuous program of quality control throughout the execution of the Services.

6.3   Contractor shall, during the course of performance of the Services hereunder, make or cause to be made all tests required by this Agreement. If this Agreement involves the installation of fiber optic cable, fiber optic cable may be delivered by Company to Contractor's staging areas or purchased directly by Contractor as detailed in a Project Service Agreement. Contractor shall be responsible for testing of this cable upon receipt from Company. Company may require additional inspections and tests. Contractor shall furnish Company with documentation satisfactory to Company of the results of all inspections and tests. Company shall be given not less than five (5) working days' notice of any tests to be made by Contractor or Contractors' subcontractors and suppliers in order that Company may witness any such tests.

6.4   Company and its representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Services and all material, supplies, and equipment used in the performance of the Services at the job site and at Contractor's and its suppliers' or subcontractors' shops. Contractor shall provide or cause to be provided access and sufficient, safe, and proper facilities for such inspections. Contractor shall provide the Company Representative every reasonable means for the purpose of inspection, even to the extent of dismantling or exposing portions of unfinished Services. If in the judgment and discretion of the Company Representative any Services performed or materials furnished by Contractor hereunder are defective or fail to comply with the requirements of this Agreement, Contractor shall, at Contractor's expense, immediately repair or replace the work or materials found to be defective to the satisfaction of the Company Representative. Where the Company Representative requests dismantling or exposing finished work, Contractor shall receive compensation for extra work involved only if the dismantled or exposed finished work meets the requirements of this Agreement.  Such compensation must be authorized as provided for in Section 16.0, CHANGES.

6.5   Failure on the part of the Company Representative to discover or reject work or materials furnished by Contractor or any of its subcontractors or suppliers, which are not in accordance with the requirements of this Agreement, shall not be construed to imply acceptance of such work or materials. Likewise payment or partial or entire occupancy of the Services by Company shall not be construed to be acceptance of the Services or materials which are not in accordance with Drawings and Specifications of this project.

6.6     If the material furnished by Company is defective, but the defect was not apparent at the time Contractor installed it, the Contractor shall provide the labor and equipment necessary to replace said material and shall be paid for such Services when authorized as provided for in Section 16.0, CHANGES. If the Contractor installs obviously defective Company furnished material, Contractor shall provide, at Contractor's expense, the labor and equipment necessary to replace said material. Company will replace defective material furnished by Company. Material damaged by Contractor will be charged to Contractor.

6.7     Rejection by Company of any or all parts of defective Services shall be final and binding provided that Company shall have notified Contractor of any such defect and reviewed its objections with Contractor. Such rejected Services shall be promptly corrected or replaced by Contractor at Contractor's expense. If Contractor fails to commence and diligently continue correction or replacement of such rejected Services within seven (7) calendar days after receipt of written notice from Company to correct or replace the rejected Services, Company may at its option remove and replace the rejected Services, and Contractor shall promptly reimburse Company for the costs of such removal and replacement of defective and rejected Services, or alternatively, Company may at its option deduct any such costs so incurred from any moneys due Contractor.

6.8     All Services performed by Contractor shall be subject to coordination and inspection by Company Representatives, the representatives of permitting agencies, Right of Way Owner, and all city, county, state or provincial inspectors. Services rejected by any such inspections and representatives shall be corrected by Contractor and its subcontractors at their sole cost, as expeditiously as possible, until it passes the inspection.

6.9     Not later than thirty (30) days after each acceptance date, Contractor shall provide Company data and documentation which shall specify at a minimum, a graphical representation of the fiber route in an industry accepted or mutually agreed upon format (as-builts), relevant splice locations pertaining to the installed fiber optic cable; relevant termination points of the fiber; and any other information relevant to the location and specifications of the fiber optic cable.

## 7.0     CONDITIONS AND RISKS OF WORK

Contractor represents that it has carefully examined the Drawings and Specifications for the Services and has fully investigated and acquainted itself with all conditions on the Right of Way relevant to the Services, and its surroundings. Contractor assumes the risk of such conditions and, regardless of such conditions, the expense, and difficulty of performing the Services, will fully complete the Services for the stated contract unit prices without further recourse to Company. Information on the site of the Services and local conditions at such site, which may have been furnished by Company, is not guaranteed with respect to accuracy by Company and is furnished only for the convenience of Contractor.

8.0    SAFETY AND CODE OF CONDUCT

8.1    Company is committed to high standards of social responsibility and ethical conduct. Company requires its contractors to meet the same high standards it has set for itself and to review the clauses below which are referred to herein as the Code of Conduct and agree to adhere to its principles as a condition of doing business and supplying goods or services to the Company.

(a)    Compliance with Laws.  Contractor will comply with all applicable laws and regulations regarding, among other things, environmental matters, occupational health and safety, labor and employment practices, human rights, immigration, anti-corruption, privacy protection, product safety, shipping and product labelling.

(b)    Labor and Human Rights.  Contractor shall not use workers under the applicable legal age of employment or forced or involuntary labor or engage any third party that uses such workers. Contractor shall have in place and enforce appropriate policies to ensure the workplace is free of harassment, abuse, and discrimination, and Contractor will not engage in any discrimination in hiring and employment practices.

(c)    Wages and Compensation.  Contractor must comply with all applicable employment standards laws, including those relating to minimum wages, overtime hours and legally mandated benefits.

(d)    Health and Safety.  Contractor shall have in place and enforce appropriate policies to ensure that workers will not be subjected to unsafe working conditions and shall provide its workers with a safe and healthy workplace in compliance with all applicable health and safety laws and regulations. Contractor shall inspect the working environments where its employees, agents, or subcontractors are or may be present on the Right of Way Owner's premises and shall promptly take action to correct conditions that cause or may reasonably be expected to cause these working environments to become an unsafe place of employment. Contractor shall indemnify and hold harmless Company and the Right of Way Owner, their respective directors, officers, employees, servants, heirs, assigns, and agents from and against any and all claims, loss, or liability in any manner arising directly or indirectly out of Contractors' failure to comply with this Section 8.0. This indemnification specifically extends to all fines and penalties, costs and attorney's fees incurred as the result of the conduct caused by or contributed to by the Contractor.

(e)    Environment. Contractor must comply with all applicable environmental laws and requirements, and are encouraged to have programs and policies in place to minimize their organization's overall environmental impact.

(f)    Contractor Assessment and Monitoring.  Company reserves the right to assess and monitor on an ongoing basis the Contractor's practices regarding this Code of Conduct. The Contractor may be asked to provide a report outlining their

DocuSign Envelope ID: D22E601F-6C98-4368-8E99-2F5066274883

compliance with this Code of Conduct. In the case of non-compliance, the Contractor will take all reasonable measures to meet the standards outlined in this Code in a diligent manner, or face the termination of their right to supply goods and services to Company.

8.2 When working on railroad right of way, the safety and continuity of operations of trains are of paramount importance. Contractor shall arrange its Services so that the personnel, trains and the tracks and appurtenances will be protected and safeguarded at all time.

8.3 Contractor shall utilize a suitably qualified safety inspector who will head its safety management program. This safety inspector will be responsible for developing the required safety management plan, ensuring attendance by all Contractor's and its subcontractors' personnel at railroad safety training classes, and enforce compliance therewith in accordance with the applicable railroad safety rules, requirements, laws, regulations, codes, and the Contract Documents.

8.4 Accidents, injuries, and illnesses requiring medical attention other than first aid, damage to property of Company, Right of Way Owner, and Contractor, and fires shall be orally reported to Company at the time of the incident. Written reports, satisfactory in form and content to Company and meeting applicable codes/regulations, shall be submitted, promptly after each incident, by Contractor to all involved parties as required by the applicable regulations, codes, and other requirements.

8.5 Contractor shall maintain job site accident, injury and illness records and statistics as required by all applicable laws, statutes, ordinances, regulations, and codes; and such records and statistics shall be available for inspection and copying by Company, and shall be submitted by Contractor to governmental agencies as required by law.

8.6 When the possibility of injury to persons or damage to property is anticipated, Contractor shall take immediate remedial action, including the stoppage of Services where necessary, to prevent such injury or damage. Should Contractor encounter any unexpected hazardous, toxic, or other condition in furtherance of the Services, Contractor shall immediately cease such activity and shall notify Company, and shall thereafter coordinate with Company and the pertinent Right of Way Owner in efforts to remedy such condition.

8.7 Contractor shall take particular care to prevent the fouling of the railroad tracks, and to avoid coming into contact with, or causing damage to the railroad tracks, any water, sewer, steam, gas, fuel, or other pipe lines, mains or service pipes, electrical, communications, other energy transmission conduits, cables, wires, or service connections, other private, utility, or governmental facilities, and any hazardous, toxic, or dangerous condition or thing, whether they are located upon, below, or above the ground surface. Contractor shall be responsible for protection of the integrity of all railroad tracks. Repair of any and all damage, if sustained,

DocuSign Envelope ID: D22E601F-6C98-4368-8E99-2F5066274883

will be the responsibility of and costs shall be borne solely by Contractor or its subcontractors. Contractor shall take all necessary and/or customary precautions to prevent injury to persons or property from open manholes, excavations, ditches, and from materials or equipment left on the job site, by placing signs and lights, erecting barricades, or doing other things as prudence may require or as mandated by law, local regulations, or the Right of Way Owner.

8.8     If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Contractor, a subcontractor or anyone directly or indirectly employed by them, the Contractor shall, prior to harmful exposure of any employees on the site to such substance, give both immediate oral notice and follow up written notice of the chemical composition thereof to Company in sufficient detail and time to permit compliance with such laws by Company, other contractors and employers on the site, to the extent Material Safety Data Sheets (MSDS) exist, they shall also be provided.

8.9     Contractor shall be responsible for, at Contractor's expense, the provision of all necessary warning devices, barricades, flaggers, and uniformed patrolmen as are necessary to safely perform and protect the work. Contractor shall be responsible for, at Contractor's expense, determination of necessity, and provision of, security to protect materials, work in progress, or finished work. The foregoing notwithstanding, on railroad right of way Company will arrange for and pay for railroad flaggers.

8.10    In the event the Contractor encounters on the site material reasonably believed to be asbestos, lead, or polychlorinated biphenyl (PCB), or other potentially dangerous substance, which has not been rendered harmless, the Contractor shall immediately stop work in the area affected and report the condition to Company in writing. The Services in the affected area shall resume in the absence of such substances, or when it has been rendered harmless. In case of dispute, Company shall have the right to determine whether work should resume and shall so state in writing.

8.11    Contractor shall comply with applicable legislation regarding the in transportation of materials including, but not limited to regulations which apply to securing of equipment for transport, marking and placarding of transport vehicles and regulations governing driver qualifications. If applicable, Contractor shall comply with the requirements of the drug testing, education and training program imposed upon operators of commercial vehicles by the applicable state or provincial department of transportation.

8.12    Contractor agrees that if any of the work to be performed under this Agreement is subcontracted, the requirements of the preceding paragraphs in this section shall be incorporated into a written Agreement executed between Contractor and the subcontractor.

9.0   CLEAN-UP

9.1   Contractor shall at all times keep its work area in a neat, clean, and/or safe condition and remove from the Right of Way and the vicinity thereof and properly dispose of all debris and rubbish caused by Contractor. Upon completion of the Services, Contractor shall promptly return unused materials furnished by Company and remove from the Right of Way all of Contractor's equipment, material, and like items, leaving such premises and the vicinity clean, safe, and ready for use. All work areas shall be restored by Contractor and its subcontractors to their original conditions. Contractor and its subcontractors shall replace in kind and/or bear the sole expense all disturbed material.

9.2   In the event Contractor or any of its subcontractors shall fail to maintain the work area as described above in a manner satisfactory to Company, the Right of Way Owner, or other authorities with jurisdiction, or fails to effect such clean up or removal in compliance with the applicable regulations, codes, Company's or Right of Way Owner's requirements within seven (7) calendar days after having received Company's written order to do so, Company shall have the right, without further notice to Contractor, to perform such cleanup and remove such items on behalf of, at the risk of and at the expense of Contractor. Any and all costs and expenses so incurred by Company will be deducted from any moneys due Contractor.

9.3   Waste materials including, but not restricted to, refuse, garbage, sanitary wastes, industrial wastes, oil and other petroleum products, shall be disposed of by the Contractor. Waste materials removed from the construction area shall be disposed of at an approved disposal site. It shall be the responsibility of the Contractor to make any necessary arrangements with private parties and state/provincial/local officials pertinent to locations and regulations of such disposal. Any fees or charges required to be paid for dumping of materials shall be paid by the Contractor. Material to be disposed of by removal shall be removed from the construction area prior to completion of the Services.

9.4   Contractor shall restore, at Contractor's expense, all property damaged by Contractor or its subcontractors in connection with all Services performed under the Agreement.

10.0   SOLE AND EXCLUSIVE BENEFIT

10.1   All Services performed by Contractor under this Agreement shall be for the sole and exclusive benefit of Company. In the performance of Services, Contractor shall not build, construct, install, splice, create or otherwise obtain any conduit, cable, fiber, structure, infrastructure or any other value for the benefit of Contractor or any other third party. For clarity by way of example, the restriction set forth in this Section shall include, but not be limited to, a prohibition on Contractor from installing any additional conduit, cable or fiber on behalf of or for the benefit of Contractor or any third party, while installing conduit, cable or fiber, underground or on aerial facilities, on behalf of Company under this Agreement.

10.2     During the performance of Services for Company, Contractor shall not enter into any other agreements whatsoever with any other party in which Contractor agrees to perform work on a route substantially similar to the route along which Contractor is performing Services for Company, without the prior written consent of Company, which will not be unreasonably withheld.

10.3     Contractor shall not secure its own public and/or private rights of way, easements, or other property rights in or around the locations defined in the Project Service Agreement for any purpose whatsoever, including but not limited to, placement of its own additional conduit, fiber optic cable, or other equipment at any time while performing Services hereunder, without the prior written consent of Company, which may be withheld in Company's sole discretion.

10.4     This Section shall not be subject to any notice and cure provision outlined in Section 12 and a violation hereof shall constitute a material breach and default of this Agreement. Notwithstanding and in addition to any other remedy available under this Agreement for such breach, Contractor understands and agrees that if it constructs or installs any facilities in violation of this prohibition, such facilities shall immediately and without further action become Company's property and Contractor shall deliver title of such facilities to Company.

## 11.0   SUBCONTRACTS

11.1     Contractor shall not subcontract performance of any portion of the Services under this Agreement without first notifying Company of the intended subcontracting (and proposed subcontractors) and obtaining Company's written consent, which consent may be withheld in Company's sole discretion.

11.2     Contractor guarantees that the performance of any portions of the Services by its subcontractors shall comply with the terms of this Agreement.

11.3     Where a portion of the Services is subcontracted, Contractor remains fully responsible for proper and safe performance of the Services, and shall be responsible to Company for any and all acts and omissions of the subcontractor and its employees. Nothing contained in this Agreement shall create any contractual obligation or other liability on Company's part to the Contractor's subcontractors and suppliers.

11.4     Company reserves the right to let other contractors in connection with work on the Right of Way covered by this Agreement. Contractor shall afford such other contractors reasonable opportunities for the execution of their work, and shall cooperate and coordinate its work with such contractors; however, should any such work performed by any contractors delay the work of Contractor hereunder, such delay will be excused under Section 13.0, EXCUSABLE DELAYS AND TIME EXTENSIONS.

12.0   DEFAULT

12.1   If Contractor fails to prosecute the Services or separable parts thereof with due diligence so as to endanger the ultimate scheduled completion thereof, or if Contractor shall default in the performance of any of its obligations under this Agreement and shall fail to correct such default within seven (7) calendar days following notice thereof from Company, Company may, at its option and without prejudice to any other rights or remedies Company may have, hold in abeyance further payments to Contractor and/or terminate any Service or this Agreement and/or step-in to complete the Services, including taking possession of the Services at the job site and any or all materials and plant equipment (whether delivered to the job site or on order therefor by Contractor at job site) and finish the Services by whatever method Company deems expedient (the "Step-In Rights"). The foregoing notwithstanding, if Contractor vacates the job site, Company may terminate for default without opportunity to correct such default.  Further, notwithstanding the foregoing, a failure to meet any milestone or timelines is a default hereunder and no notice shall be required of such default.

12.2   In the event of termination by Company under Section 12.1 above, Contractor shall, within seven (7) calendar days from the effective date of termination, advise Company of all outstanding subcontracts, rental agreements, purchase orders, and any other agreements which Contractor may have with others pertaining to performance of the Services and furnish Company with complete copies thereof. Upon request by Company, Contractor shall assign to Company in form and content satisfactory to Company, Contractor's title to materials and plant equipment for the Services and such of the subcontracts, rental agreements, purchase orders, and other agreements as may be designated by Company.

12.3   In the event of termination or Company's exercise of the Step-In Rights by Company under Section 12.1 above, Contractor shall not be entitled to receive any further payment until the Services are completed. If the amounts due Contractor, including retainage, for Services completed by Contractor at the time of termination or Company's exercise of the Step-In Rights, shall exceed the sum of the total cost to Company for completing the Services, such excess amount, including retainage, shall be paid to Contractor. If the sum of the total cost to Company of completing the Services plus amounts previously paid to Contractor, shall exceed the Agreement Price for the completed Services, Contractor shall promptly pay the difference to Company, or at Company's discretion, Company may deduct this excess cost from moneys due Contractor. Company shall have the right and is authorized to offset against and deduct from any moneys due Contractor any other damages suffered by Company due to said default or event giving rise to the termination or due to any other defaults of Contractor. Contractor shall continue to be fully liable for all such other damages suffered by Company. A waiver by Company of one default by Contractor shall not be considered to be a waiver of any subsequent default by Contractor, nor be deemed to amend or modify the terms of this Agreement.  Except as may be prohibited or to the extent permitted by law, Contractor expressly waives any formal notice by Company of Contractor's failure

to perform, or passive breach of Contractor's express obligations under this Agreement.

12.4    Contractor (and its sureties) agree that a termination by Company under Section 12.1 above will NOT be cause for the discharge of the payment and performance bonds defined in Section 28.0, BONDS, hereof.

12.5    Upon the voluntary or involuntary filing of a petition in bankruptcy by or against Contractor, or any general assignment by Contractor for the benefit of its creditors, or the appointment of a receiver to take charge of Contractor's assets, Company may treat Contractor as in default under Section 12.1 above and may exercise any of the remedies of this notice; provided, that if any such filing, assignment or appointment was initiated by someone other than Contractor, Contractor shall not be in default if it succeeds in having the petition, assignment, or appointment dismissed or otherwise terminated within twenty (20) days after the same is filed or effective.

## 13.0    EXCUSABLE DELAYS AND TIME EXTENSIONS

In the event Contractor or Company is delayed in performing any of its respective obligations in this Agreement and such delay is caused by acts of God, war, riots, civil insurrection, acts of the public enemy, strikes, lockouts, accidents, acts of civil or military authority, fires, floods, or earthquakes or any other condition beyond the reasonable control of the party delayed, such delay shall be excused and the period of such delay shall be added by a contract Change Order to the time for performance of the obligation delayed. In the event of any such delay, the party delayed shall, at no cost to the other party, exercise due diligence to shorten the delay and shall keep the other party advised as to the continuance of the delay and steps taken to shorten or resolve the delay. Contractor shall not be entitled to additional or extra compensation by reason of any delay covered by this Section 13.0, EXCUSABLE DELAYS AND TIME EXTENSIONS. In addition to the above, Contractor shall be entitled to treat as an Excusable Delay hereunder any delay caused by the acts of railroad (not otherwise permitted hereunder), the failure of Company to discharge any of its obligations hereunder, or any other delay which Company and Contractor agree in writing should be treated as an Excusable Delay hereunder.    If the circumstances giving rise to the excusable delay persist for a period of forty five (45) calendar days or longer, Company may, at its sole discretion, terminate this Agreement without penalty or further notice.

## 14.0    POSSESSION PRIOR TO COMPLETION

Company shall have the right to move into Contractor's working and storage areas and the right to take possession of or use any completed or partially completed parts of the Services as Company deems necessary for its operations. In the event Company desires to exercise the foregoing right, Company will so notify Contractor.    Upon receiving such notification from Company, Contractor shall, within seven (7) calendar days, advise Company of any reasons why Contractor believes the takeover would be undesirable and of any problems which may result from such takeover, and Company may at its option thereafter withdraw

its notification or elect to proceed as originally proposed. In the event Company takes possession of or uses such part of the Services, Company will exercise all reasonable efforts to avoid interference with Contractor's continuance of the Services. Such possession or use shall not constitute acceptance of the Services. In the event Contractor believes that any interference from Company as a result of such move-in or taking possession or use justifies modification of the Contract Price or the schedule for completion of the Services, Contractor shall comply with the provisions of Section 16.0, CHANGES, hereof. Following Company possession or use described herein, Contractor shall remain responsible under its Guarantees as provided in these General Terms and Conditions.

15.0    NOTICE OF COMPLETION AND FINAL ACCEPTANCE

15.1    Substantial Completion. When the Contractor considers that the Services, or a designated portion thereof are acceptable to the Company, are Substantially Complete, and when Contractor has satisfactorily completed inspections, tests and documentation that are required by this Agreement, the Contractor shall promptly give notice to Company, specifying the Services completed and the date it was completed. Contractor and Company shall then promptly participate in a walk-through inspection of the Services, and shall jointly prepare a punch-list of items remaining to be completed or corrected. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Services in accordance with the Contract Documents. When the Company determines, on the basis of this review, that the Services or designated portion thereof are Substantially Complete, the Company and the Contractor shall execute a certificate of Substantial Completion that shall establish the date of Substantial Completion. The certificate of Substantial Completion shall also establish the responsibilities of the Company and the Contractor for security, maintenance, heat, utilities, damage to the Services and insurance, and shall fix the time within which the Contractor shall complete or correct the items listed therein. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Services, or designated portion thereof, unless otherwise provided in the certificate of Substantial Completion. Upon Substantial Completion of the Services, or designated portion thereof, and upon application by the Contractor, the Company shall make payment, reflecting adjustment in retention, if any, for such Services or portion thereof as provided in the Contract Documents.

15.2    Final Completion. Upon receipt of written notice that the Services are ready for final review and acceptance, and upon receipt of a final application for payment, the Company will promptly review the completed Services and, if it finds the work acceptable under the Contract Documents and the Agreement fully performed, the Company shall make final payment to Contractor.

The foregoing notwithstanding, neither the final payment nor the remaining retained percentage shall become due until the Contractor submits to the Company (a) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Services for which the Company or his property might in any way be responsible, have been paid or are otherwise satisfied, (b)

consent of surety, if any, to final payment, and (c) if required by the Company, other data establishing payment or satisfaction of all such obligations, such as receipts, released and waivers of liens arising out of the Agreement, to the extent and in such form as may be designated by the Company. If any subcontractor refuses to furnish a release or waiver required by the Company, the Contractor may furnish a bond satisfactory to the Company to indemnify him against any such lien. If any such lien remains unsatisfied after all payments to Contractor are made, the Contractor shall refund to the Company all monies that the Company may be compelled to pay in discharging such lien, including all costs and reasonable attorneys fees.

If, after Substantial Completion of the Services, final completion thereof is materially delayed through no fault of the Contractor or by the issuance of Change Orders affecting final completion, the Company shall, upon application by the Contractor, and without terminating the Agreement, make payment of the balance due for that portion of the Services fully completed and accepted. If the balance for Services not fully completed or corrected is less than the retainage stipulated in the Contract Documents, and if bonds have been furnished, written Consent of Surety to the payment of the balance due for that portion of Services fully completed and accepted shall be submitted by the Contractor to the Company prior to certification of such payment.  Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

The making of final payment shall constitute a waiver of all claims by the Company except those arising from:

(1)     Unsettled liens;
(2)     Faulty or defective Services;
(3)     Failure of the Services to comply with the requirements of the Contract Documents, including the terms of any special warranties required by the Contract Documents; or
(4)     Incomplete Services appearing or discovered after Substantial Completion.

The acceptance of final payment shall constitute a waiver of all claims by the Contractor except those previously made in writing and identified by the Contractor as unsettled at the time of the final application for payment.

15.3     If Company rejects the Notice of Completion and specifies defective or unfinished portions of the Services, Contractor shall, within seven (7) calendar days, commence to remedy such defective and unfinished portions of the Services. Thereafter, Contractor shall again give Company a written Notice of Completion of the Services specifying a new date for the completion of the Services based on the date such defective or unfinished portions of the Services were corrected. The foregoing procedure shall apply again and successively thereafter until Company has given Contractor written notice of acceptance.

15.4    Any failure by Company to inspect or to reject the Services or to reject Contractor's notice of completion as set forth above, shall not be deemed to be acceptance of the Services for any purpose by Company nor imply Final Acceptance of, or agreement with the said notice of completion.

15.5    Neither final payment nor any provision in this Agreement shall relieve Contractor of responsibility for faulty workmanship or faulty Contractor furnished material that may be discovered within a period of one (1) year from the date of final payment. Contractors shall, at Contractor's expense remedy any such defects and pay for all damages resulting therefrom. Company shall give notice of observed defects with reasonable promptness.

16.0    CHANGES

16.1    This Agreement shall be subject to changes by additions, deletions, or revisions to the Services by Company. Contractor will be notified of such changes by the Company Contract Administrator by receipt of additional and/or revised Drawings, Specifications, exhibits, or written orders.

16.2    Contractor shall submit to Company Contract Administrator within ten (10) working days after receipt of notice of a change, a proposal comprised of a detailed estimate with supporting calculations and pricing for the change together with any adjustments in the Contract Schedule required for the performance of Services as changed. Requests for time extensions shall be accompanied with a fragmentary network for the Contractor's Schedule, or, if required, a complete schedule update to demonstrate the impact to the Contractor's Schedule. Pricing of changes shall be in accordance with the unit prices or pricing structure of this Agreement and shall clearly define any increase, decrease, or no change in compensation and performance period under this Agreement.

16.3    Contractor shall not perform changes in the Services in accordance with Sections 16.1 and 16.2 above until the Company Contract Administrator has approved in writing, through the issuance of a Change Order, the pricing for the change and any adjustment in the schedule for performance of the Services. Upon receiving such written approval from Company, Contractor shall diligently perform the change in strict accordance with this Agreement.

16.4    Contractor shall not suspend performance of this Agreement pending the review and negotiation of any change, except as may be directed by the Company Contract Administrator pursuant to Section 17.0, SUSPENSION OF WORK, hereof. The unit prices or pricing structure contained in this Agreement shall constitute the basis for the pricing of any and all changes under this Agreement. In the event Company and Contractor are unable to reach agreement for pricing of a change, or time for performance of changed Services, Contractor shall comply with Section 19.0, CLAIMS, hereof.

16.5    Contractor shall not comply with oral changes in the Services received from
Company unless Contractor deems that such changes will not affect the cost,
schedule, or integrity of the Services. If Contractor believes that any oral change in
the Services may involve a change in the cost, time to perform, or integrity of the
Services, Contractor shall require that the change be given in writing and shall
comply with the provisions set forth in Sections 16.2, 16.3, and 16.4 above. Any
and all costs incurred by Contractor to perform oral changes shall be for
Contractor's account and Contractor shall not be entitled to claim any additional
time to perform the Services. Contractor hereby waives any and all rights to claim
from Company such costs or additional time to perform the Services as a result of
compliance by Contractor with such oral changes.

16.6    No one other than Company's OSP Manager or, when authorized in writing,
Company's job site representative, shall be entitled to issue Change Orders. In no
event shall Contractor be entitled to compensation for its costs in executing Change
Orders given to Contractor by anyone not authorized in writing by the Company
OSP Manager.

16.7    The Contractor shall be responsible for having taken steps reasonably necessary to
ascertain the nature and location of the work, and the general and local conditions
which can affect the work or the cost thereof.  Failure by the Contractor to do so
will not relieve the Contractor from responsibility for successfully performing the
work without additional expense to Company. Company does not assume
responsibility for any understanding or representations concerning conditions made
by any of its officers, employees or agents prior to or during the performance of
this Agreement, unless such understanding or representations are expressly stated
in this Agreement. The Contractor shall promptly, and before such conditions are
disturbed, notify Company in writing of:

> (a) Subsurface or latent physical conditions at the work sites differing
> materially from those indicated in this Agreement;

> (b) Unknown physical conditions at the work sites of an unusual nature,
> differing materially from those ordinarily encountered and generally
> recognized as inherent in work of the character provided for in this
> Agreement; or

> (c) Company shall promptly investigate the conditions. If Company finds
> that such conditions do materially differ and cause an increase or decrease
> in the Contractor's cost of, or the time required for, performance of the
> Project Service Agreement, an equitable adjustment may be made and the
> Project Service Agreement modified in writing accordingly. Any claim of
> the Contractor for adjustment hereunder shall not be allowed unless
> Contractor has given notice as required above.

17.0   SUSPENSION OF WORK

17.1   Company may at any time, and from time to time, by written notice to Contractor suspend further performance of all or any portion of the Services by Contractor. Said notice of suspensions shall specify the day of suspension and the estimated duration of the suspension. Upon receiving any such notice of suspension, Contractor shall promptly suspend further performance of the Services to the extent specified, and during the period of such suspension shall properly care for and protect all Services in progress and materials, supplies, and equipment Contractor has on hand for performance of the Services. Upon the request of Company, Contractor shall promptly deliver to Company copies of outstanding purchase orders, rental agreements and subcontracts of Contractor for materials, equipment and services for the Services, and shall take such action relative to such purchase orders and subcontracts as may be directed by Company. Company may at any time withdraw the suspension of performance of the Services as to all or part of the suspended Services by written notice to Contractor specifying the effective date and scope of withdrawal, and Contractor shall resume diligent performance of the Services for which the suspension is withdrawn on the specified effective date of withdrawal.

17.2   If Contractor believes that any such suspension or withdrawal of suspension justifies modification of the Contract Price or time of completion, Contractor shall comply with the provisions of the procedure set forth in Section 16.0, CHANGES, hereof. In no event shall Contractor be entitled to any prospective profits or any damages because of such suspensions or withdrawals of suspension.

18.0   TERMINATION AT COMPANY'S OPTION

18.1   Company shall have the right at any time, with or without cause, to terminate further performance of the Services by written notice to Contractor specifying the date of termination. On the date of such termination stated in said notice, Contractor shall discontinue performance of the Services and shall preserve and protect tools, construction equipment, and facilities on job site, materials and plant equipment purchased for or committed to the Services (whether at job site or elsewhere) in progress and completed Services (whether at job site or other locations) pending Company's instructions and if requested by Company, shall turn over the same to Company, including title to said materials and plant equipment, or dispose of same in accordance with Company's instructions.

18.2   In the event of such termination, Contractor shall, upon request of Company, promptly advise Company of outstanding subcontracts, rental agreements, purchase orders, and any other agreements, which Contractor has with others pertaining to performance of the Services, and shall furnish Company with complete copies thereof. Contractor shall assign to Company in form satisfactory to Company, such of its subcontracts, rental agreements, purchase orders, and other agreements as are designated by Company, or shall take such other action relative to such

subcontracts, rental agreements, purchase orders, and other agreements as may be directed by Company.

18.3   If Contractor has fully and completely performed all of its obligations under this Agreement up to the date of such termination, Contractor shall recover from Company as complete and full settlement for such termination: (a) all amounts due to Contractor for Services activities fully complete; plus (b) partially completed Services based on the unit prices or pricing structure in this Agreement after making appropriate adjustments to reflect the percentage of completion; plus (c) actual costs (if any) incurred by Contractor to remove tools, construction equipment and facilities to its premises or to otherwise dispose of them as directed by Company instructions; plus (d) actual costs necessarily incurred in terminating, in accordance with Company directions, pending subcontracts, rental agreements, purchase orders, and other agreements.

18.4   All requests for compensation under any of the foregoing provisions of Section 18.3 shall be submitted to Company in accordance with the provisions of Section 16.0, CHANGES, hereof. In no event shall Contractor be entitled to any prospective profits or any damages because of such termination.

## 19.0   CLAIMS

19.1   Subject to the provisions of Section 16.0, CHANGES, hereof, Contractor shall give the Company OSP Manager written notice within five (5) working days after the happening of any event which Contractor believes may give rise to claim by Contractor for an increase in the Contract Price or the period of performance.

19.2   Within fourteen (14) working days after the happening of such event, Contractor shall supply the Company OSP Manager with a statement supporting Contractor's claim, which statement shall include Contractor's detailed estimate of any change in Contract Price and period of performance occasioned thereby. If requested by Company in writing, Contractor shall substantiate its claim with payroll documents, paid invoices, receipts, records of performance, and other documents satisfactory to the Company Contract Administrator and subject to Company verification. Company shall not be liable for, and Contractor hereby waives, any claim or potential claim of Contractor of which Contractor knew or should have known and which was not reported by Contractor in accordance with the provisions of this Section 19.0, CLAIMS. Contractor agrees to continue performance of the Services during the time any claim of Contractor hereunder is pending. Company shall not be bound to any adjustments in the Contract Price or scheduled time for Contractor's claim unless expressly agreed to by Company in writing. No claim hereunder by Contractor shall be allowed if asserted after final payment under this Agreement.

## 20.0   PROTECTION OF MATERIALS, EQUIPMENT, AND WORK

20.1   Contractor shall at all times, in accordance with the best practices, preserve and protect all materials and equipment (whether furnished by Contractor or Company)

used by Contractor in the execution of the Services from damage or loss due to weather, fire, theft, unexplained disappearance, or other similar casualty.

20.2    Contractor shall at all times, in accordance with the best practices, protect from damage due to Contractor's and its subcontractors' operations, equipment and materials (whether stored or installed), paving, structures and any and all other items on job site belonging to Right of Way Owner, Company, or others.

## 21.0    CONTRACTOR'S CONSTRUCTION EQUIPMENT

21.1    Contractor shall furnish all appropriate and acceptable equipment required for Contractor's own use in the performance of the work in the time specified; such equipment shall be serviceable and shall be kept in good operating condition. Although Company does not hereunder lease, hire or rent such equipment and shall exercise no rights, power, dominion or control over such equipment, if in the opinion of the Company Representative, the condition of any piece of equipment is such that it would adversely affect the workmanship of the completed job or unduly retard progress, it shall be repaired or replaced with equipment satisfactory to the Company Representative.

21.2    Contractor agrees that performance or inspection of equipment shall not be probative in any dispute over the quality of work performed with that piece of equipment.

21.3    Contractor shall identify itself on all equipment owned. The identification shall include Contractor name, and may, at Company discretion, include a local phone number where Contractor can be reached during business hours.

## 22.0    MATERIAL

22.1    Contractor shall furnish, at Contractor's expense, all material necessary to complete the Services under this Agreement unless specifically set forth in the Contract Documents to be provided by Company.

22.2    The material specified to be furnished by Company will be located at Company's project yard or other locations designated by Company. Contractor shall unload all Company furnished materials at no cost to Company. When materials are job site delivered, Contractor shall be present and take responsibility for the unloading.

22.3    Company will consider Contractor recommendations, which shall be in writing, as to shipping. If Contractor requests, in writing, a diversion of the material after it has been shipped or is en route to the designated material sites, any additional cost involved in the diversion will be charged to Contractor and deducted from the total amount paid to Contractor.

22.4    Materials and equipment furnished by Company (all of which are specified in the Scope of Work) shall be received and unloaded by Contractor and the quantity and quality thereof shall be checked and tested by Contractor for compliance with the

Agreement requirements. The delivery and Contractor's receipt and acceptance of all such materials and equipment shall be recorded in writing. If Contractor elects not to perform such tests upon receipt of Company-furnished materials and equipment, the receipt thereof as evidenced by Contractor's prepared documentation will be construed as conclusive evidence of Contractor's acceptance thereof and the full conformance therewith with the Agreement requirements. Upon receipt by the Contractor, Company-furnished material and equipment will be the sole responsibility of Contractor who shall bear all risks for damage or loss thereto.

22.5    Contractor shall carefully note any visible damage to Company-furnished materials and equipment prior to Contractor's acceptance of delivery. Contractor shall notify Company of any materials and equipment supplied to Contractor by Company which are surplus and without additional compensation shall cooperate with Company in the disposition of such surplus as directed by Company.

22.6    Contractor shall notify Company of any lack of or requirement for materials and equipment supplied by Company in sufficient time for Company to furnish said materials or equipment in advance of Contractor's need. In the event of misfit of Company-furnished materials or equipment, Contractor shall promptly notify Company of such misfit. Contractor shall take all reasonable steps to avoid standby time due to such misfit or lack of Company-furnished materials or equipment and to continue the progress of other portions of the Services pending correction of such misfit and/or the furnishing of materials or equipment.

22.7    Contractor shall return to Company unused quantities of materials and supplies provided by Company. Waste materials generated by Contractor in completion of the Services, including empty containers of paint, glue, solvent, and similar products and paper and cloth material used for clean up or application of paints, glue, solvents or other materials shall be accumulated and disposed of by Contractor.

22.8    All material furnished by Contractor must be satisfactory to the Company Representative, and any material that is not satisfactory shall, at Contractor's expense, be removed and satisfactory material substituted.

22.9    Contractor shall load, haul, and unload all materials, including those furnished by Company, upon the right-of-way provided by Company or at places designated by the Company Representative. Contractor shall perform all Services in a manner that will avoid damage to materials. Contractor shall place material in a manner that will cause the least interference with the normal use of the land crossed by the right-of-way.

22.10    Contractor warrants that all materials and equipment furnished and incorporated by it in the project shall be new unless otherwise requested by Company or agreed to in writing by both parties.

23.0    CARE, CUSTODY, CONTROL, AND TITLE TO MATERIALS AND EQUIPMENT

23.1 Good and clear title to all material and equipment furnished by Contractor under this Agreement for the Services shall pass to Company upon its incorporation into the Services. In addition, title to material and equipment not yet incorporated into the Services, shall pass to Company when Contractor has been paid for such material and equipment. Contractor shall ensure that vendors and suppliers from whom Contractor obtains materials and equipment do not retain, encumber, or reserve title to such items. Contractor shall execute such other and additional documentation as Company may require as evidence of such transfer of title to Company.

23.2 Notwithstanding the provisions of Section 23.1 above, the care, custody, and control (but not title) of Contractor's material and equipment incorporated into the Services shall remain with Contractor until the Services has been accepted in writing by Company pursuant to Section 15.0, NOTICE OF COMPLETION AND FINAL ACCEPTANCE, hereof, and shall thereupon pass to Company unless Company notifies Contractor in writing that such care, custody, and control is assumed by Company at an earlier date. The taking of possession of the Services pursuant to Section 14.0, POSSESSION PRIOR TO COMPLETION, hereof, shall not constitute the assumption of care, custody, and control of the Services until such time as the Services have either been accepted in writing by Company or Contractor has been notified as set forth herein.

## 24.0    CONTRACTOR'S PERSONNEL

24.1 Contractor shall provide an adequate number of qualified and competent project management and supervisory staff, craft persons, and other personnel to perform the Services. At all times during the course of the Services, Contractor shall provide at the job site a qualified, competent, and responsible project manager, (the "Project Manager"). The Project Manager shall have full authority to represent Contractor with respect to any and all matters pertaining to this Agreement and direction given to him by Company shall be binding on Contractor. Contractor shall furnish the Company Contract Administrator a written appointment of its Project Manager, within one (1) week from the effective date of this Agreement. Contractor shall not transfer or remove any of its supervisory or key personnel from performance of the Services without the prior written approval of Company.

24.2 Any employees (including a subcontractor or its employees) of Contractor deemed by Company, in its sole judgment, to be objectionable shall be promptly replaced by Contractor at no additional expense to Company.

24.3 If requested by Company, Contractor shall furnish Company with the names and titles of Contractor's employees, subcontractor's employees, and others who have performed or are performing the Services hereunder.

25.0    LABOR HARMONY

      Contractor shall maintain workable and harmonious relations with its employees and between Contractor's employees and the employees of other subcontractors and the employees of Company and Right of Way Owner. Whenever Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of the Services, Contractor shall immediately give notice thereof including all relevant information to Company.

26.0    INTENTIONALLY DELETED

27.0    INTENTIONALLY DELETED

28.0    BONDS

    28.1    Contractor shall provide the Company Contract Administrator, within fifteen (15) calendar days from the receipt of a written request from the Company Contract Administrator, payment and performance bonds payable to Company in form satisfactory to Company each in the full amount of the applicable Project Service Agreement and all subsequent modifications, with surety thereon satisfactory to Company, for the faithful performance of this Agreement, including changes, alterations, or extras thereto without consent of surety, and for the payment of all labor, services, materials and supplies used in, or furnished for, performance or prosecution of Services. In the event Contractor fails to provide such bonds, Company shall be entitled to terminate this Agreement for default pursuant to Section 12.0, TERMINATION FOR DEFAULT, hereof. To secure performance by Contractor and any extended funds hereunder by Company, Company shall have a lien upon all materials, tools, appliances, and equipment of Contractor on the premises or used in connection with the Services.

    28.2    The period of validity of the payment and performance bonds shall extend one hundred eighty (180) calendar days after the expiration of the one (1) year period of Guarantees defined in Section 5.0, GUARANTEES, hereof.

29.0    WARRANTY OF CONSTRUCTION

    29.1    In addition to any other warranties or guarantees included in this Agreement, the Contractor warrants that the work performed under this Agreement conforms to the Agreement requirements and is free from defects in design or workmanship performed by the Contractor or any of its subcontractors.

    29.2    The warranty shall remain in effect for twenty-four (24) months from the date the Company delivers its Notice of Acceptance for all Services.

    29.3    The Contractor shall remedy at its expense any such defect or failure to conform and is responsible for any damages to persons and property resulting from such defects or failure to conform. The Contractor shall also restore any Services

damaged in fulfilling the terms of this warranty.

29.4    In addition to other rights and remedies provided by this clause, all subcontractors', manufacturers', and suppliers' warranties expressed or implied, respecting any work and materials shall, at the direction of Company be enforced by the Contractor for the benefit of Company. The Contractor shall obtain any warranties which the Contractor's subcontractors, manufacturers, or suppliers would give in normal commercial practice.

29.5    If, within the warranty periods, any defect appears, then Company shall have the right to take the following actions:

(a)    Retain such defective items or work and an equitable reduction will be made in the Contract Price for such defective items or work; or

(b)    Return such defective items to the Contractor and require Contractor to repair or replace such defective items. Such repair or replacement shall be at the Contractor's sole expense at no cost to Company, including all related shipping costs and import duties, if applicable. Responsibility for the items while in transit shall be borne by the Contractor; or

(c)    Correct or replace such defective items or work with similar items and recover the total cost incurred by Company, including shipping costs and import duties, if applicable, from the Contractor; or

(d)    Require the Contractor to correct or replace the defective items or work.

29.6    Upon discovery or disclosure of any defect within the warranty periods provided hereby, the following conditions shall apply:

(a)    Company shall furnish written notice to the Contractor of the item or work involved and, if known to the Company, set forth the nature of the defect.

(b)    Within fifteen (15) days after receipt by the Contractor of the notification provided pursuant to Section 29.6(a), the Contractor shall provide to Company, in writing, the following information:

(i)    Acknowledgment of the notification given to the Contractor by Company of the defect;

(ii)    The corrective action to be taken by the Contractor to remedy the defect;

(iii)    Disposition instructions regarding the defective item or work

(iv)   The date that the defective items or work shall be repaired, or replaced as required, or

(v)   With the advance approval of Company, submit a proposed price reduction to this Agreement for Company's consideration.

29.7   Approvals by Company shall not release the Contractor from any obligations under the warranties set forth in this clause.

29.8   The terms "work" and "items" as used herein include related services and data to be delivered under this Agreement except for normal maintenance items.

29.9   Items or work repaired or replaced pursuant to this clause shall be subject to all provisions of this clause to the same extent as items or work initially delivered, except that time elapsed after Notice of Acceptance and prior to written notification by Company of the failure or defect shall be deducted from the warranty periods provided hereby for the purpose of computing time remaining under this warranty for repaired or replacement items or work. Any time subsequent to notification by Company of a defect and prior to repair or replacement and redelivery shall be added to the period of this warranty for the purpose of computing time remaining under this warranty.

29.10   The aforesaid warranties shall survive acceptance and payment and shall not be deemed to be the exclusive rights of Company but shall be in addition to the other rights of Company under law and the terms of this Agreement.

30.0   INDEMNITY

30.1   Contractor agrees to defend, indemnify, and hold harmless Company, Right of Way Owner, the affiliated entities of each, and all of their directors, officers, employees, agents, servants, customers, successors, heirs, representatives, and assigns (collectively the "indemnitees"), from and against, any and all claims, proceedings, losses, demands, actions (and all expenses associated therewith asserted against, suffered, or incurred by indemnitees) with respect to:

(a)   Death or injury to any persons or damage to property arising out of the acts or omissions of Contractor, its subcontractors and its or their employees or agents during performance of the Services.

(b)   Any violation of applicable law, ordinance, regulation, or rule by Contractor, its subcontractors, and its or their employees or agents during the performance of the Services.

(c)   Infringement of patents, trademarks, copyrights, or other intellectual property rights covering products manufactured or supplied by Contractor for the Services or their use in the Services or in combination with products manufactured or supplied by others for use in the Services.

(d)    Actual contamination or pollution (within the meaning of applicable laws or regulations) caused by Contractor, its subcontractors and its or their employees or agents during performance of the Services.

(e)    Any failure by Contractor, its subcontractors and its or their employees or agents to comply with any obligation imposed on any of them under this Agreement.

(f)    Any failure by Contractor to pay its subcontractors, employees, or agents for any services, materials, equipment, labor, or other charges, resulting in the filing, recording, assertion, or claim of any and all mechanic's, materialmen's, or other similar liens, claims, or actions.

(g)    Any claim by Contractor's subcontractors, employees, or agents for any wages, damages, or other right to payment for any services, materials, equipment, labor, or other charges incurred during performance of the Services.

(h)    Any claim by a third party for right to payment from Company for amounts otherwise owed to Contractor.

30.2    Contractor's indemnification obligation as set forth in this Section 30.0, INDEMNITY, shall include indemnification of the indemnitees from and against any and all consequential, special, exemplary, punitive, or other damages; fines, penalties, assessments asserted by any governmental agency; and/or claims therefor which the indemnitees, or any of them, may suffer and/or incur as a result of any claim or action included within Contractor's said indemnification obligation.

30.3    Company shall promptly notify Contractor of any claim(s) within Contractor's indemnification obligation of which Company has knowledge and shall give Contractor any assistance and information reasonably available to Company for the defense of any such claim(s). Any such assistance or information given to Contractor by Company shall be at Contractor's sole cost and expense. Contractor shall not settle or compromise any such claims(s) without Company's prior written approval in each such instance.

30.4    Any and all costs, expenses, and attorney's fees which Company may incur in the furtherance of the disposal or defense of any claim or action set forth above, or in the enforcement of Contractor's indemnification obligations under this Section 30.0, INDEMNITY, shall be solely the responsibility of and be reimbursed by Contractor. At Contractor's sole cost and expense, Company shall cooperate with and assist Contractor in the defense of any claim or action included within Contractor's said indemnification obligation.

31.0   INSURANCE

31.1    Prior to commencement of the Services, and at all times during the performance of the Services, Contractor shall secure and maintain insurance coverage in the form and amounts set forth in the following paragraphs and provide Company with an

insurance certificate confirming compliance with this requirement for each policy providing such required coverage. The insurance certificate shall indicate that Company shall be notified not less than thirty (30) days prior to any cancellation or material change in coverage. All coverage secured by Contractor shall be on a per occurrence basis. All insurance policies shall be obtained and maintained with companies rated A-VII or better by Best's Key Rating Guide. Contractor's insurance shall cover its subcontractors who perform any of the Services, or Contractor shall require each such subcontractor to maintain insurance of the type and amounts required of the Contractor.

31.2    Contractor hereby waives any and all rights to recover against Company, or against the officers, directors, shareholders, partners, joint ventures, employees, agents, customers, invitees or business visitors of Company, for any loss or damage to Contractor arising from any cause covered by any property, general liability, and workers compensation insurance required to be carried pursuant to this section or any other property insurance actually carried by Contractor. Contractor, from time to time, will cause its insurers to issue appropriate waiver of subrogation rights endorsements to all property, general liability and workers' compensation insurance policies carried in connection with this Agreement.

31.3    Insurance coverage provided for under this Agreement shall be written for not less than the limits of liability described in the following paragraphs or such limits as may be required by law, whichever is greater.

(i)    Workers' Compensation and Employer's Liability insurance covering all employees of Contractor and any subcontractors wherever they may be in Canada or the United States as the case may be, so long as they are engaged in the work covered by this Agreement. Workers' Compensation insurance in amounts required by applicable law and Employer's Liability insurance with a limit of at least one million dollars ($1,000,000.00) per occurrence is required.

(ii)    Commercial General Liability insurance (Bodily Injury and Property Damage) which shall provide not less than five million dollars ($5,000,000.00) combined single limit liability insurance, per job aggregate, on an occurrence basis, with the railroad exclusion deleted, protecting Contractor and any subcontractors from liability arising out of the Services for: (a) bodily injury, sickness, or disease, including death at any time resulting therefrom, sustained by any person; and (b) damage to or destruction of property, including loss of use thereof. Company shall be named as an additional insured for any action or omission of the additional insured. Such insurance as is afforded by the general liability policy shall be primary insurance and no other insurance of the additional insured shall be called upon to contribute to a loss.

(iii)    Contractor shall maintain at all times during the term of this Agreement "All Risk" property insurance in an amount equal to the replacement cost of any

and all equipment owned, leased, or borrowed while in Contractor's or subcontractor's care, custody, or control including while in transport at the direction of Contractor or subcontractor. Such "All Risk" insurance shall also cover all materials and equipment stored on the project site for incorporation into the Services as well as all partially constructed structures.

(iv)   Contractor shall procure and maintain automobile liability insurance covering death or injury to any person or persons, or damage to property arising from the operation of vehicles or equipment, with limitations of not less than two million dollars ($2,000,000).

31.4   In the event the Contractor fails to obtain the required insurance or to obtain the required certificates from any subcontractor and a claim is made or suffered, such party shall indemnify and hold harmless Company from any and all claims for which the required insurance would have provided coverage. Further, in the event of any such failure which continues after seven (7) days' written notice thereof by Company, Company may, but shall not be obligated to, obtain such insurance and will have the right to deduct the cost of such insurance from the moneys due the Contractor.

31.5   In the event coverage is denied or reimbursement of a properly presented claim is disputed by the carrier for insurance provided above, the Contractor carrying such coverage shall make good faith efforts to pursue such claim with its carrier.

32.0   INDEPENDENT CONTRACTOR

Nothing in this Agreement shall be deemed to make Contractor, nor any of Contractor's subcontractors, nor the employees or agents thereof, an agent, representative, or employee of Company. Contractor shall at all times be an independent Contractor and shall have sole responsibility for and control over the details and means for performing the Services provided that Contractor is in compliance with the terms of this Agreement. However, Company may require the Contractor to remove from the Services any of Contractor's employee, Company deems incompetent, careless, or otherwise objectionable.

33.0   CONFIDENTIAL INFORMATION AND OWNERSHIP OF DOCUMENTS

Design criteria, performance specifications, and other information obtained by Contractor from Company and working Drawings and Specifications prepared by Contractor shall be held in confidence by Contractor and shall not be used by Contractor for any purposes other than for the performance of the Services or as authorized in writing by Company. Contractor agrees that it shall not make disclosure of any such Confidential Information to anyone except employees, subcontractors and consultants of Contractor to whom disclosure is necessary for the purposes of this Agreement, and who have agreed to be bound by the obligations of confidentiality and restrictions on use hereunder. Contractor shall cause its employees, subcontractors and consultants to whom it makes disclosure to observe the obligations of confidentiality and restrictions on use in accordance with this Agreement.  All such documents furnished by Company to Contractor and documents

prepared by Contractor shall become the property of Company; and upon completion of the Services, or earlier upon termination of this Agreement or when requested by Company, Contractor shall return to Company all such documents including any copies thereof.

34.0    PUBLICITY

The Contractor nor any of its subcontractors shall not make news releases, publicize, or issue advertising pertaining to the Services or this Agreement without first obtaining the written approval of Company.

35.0    APPLICATIONS FOR PAYMENT

35.1    Form of Application. The Contractor shall submit to Company within two (2) weeks following the end of each monthly billing period, on a form approved by Company, an application for each payment requested. Each application for payment shall also include a statement of the Services performed by the Contractor during such monthly billing period, including production reports and itemization of payment according to unit costs set forth in a Project Service Agreement, as well as the project number, route name, Purchase Order number and an itemization of any charges which may be due, all certified as correct by the Contractor. Each application for payment shall be verified by the Company field representative before being submitted for payment. Zayo shall not be obligated to make payments with respect to any Application for Payment that fails to satisfy the requirements of this Section 35.

35.2    Payment. The amount so stated, subject to any retainage described in subsection 35.3, shall be paid by Company within ninety (90) days of approval of the application for payment by Company.

35.3    Retainage. Company, at its option and discretion, may retain and withhold from each payment twenty percent (20%) of any payment plus any other withholdings or retainage which may be authorized by the Contract Documents, up to forty-five (45) days after Final Acceptance of the Services in accordance with the provisions of the Contract Documents and the acceptance of such work by Company. Company, at its option and discretion, may retain and withhold the final payment of the entire unpaid balance of any specific Services up to thirty (30) days after Final Acceptance of the Services in accordance with the provisions of the Contract Documents and the acceptance of the Services by Company.

35.4    Lien Waivers. Company reserves the right, before making any payments, or at any time during the progress of the work, to require the Contractor to furnish evidence in a form satisfactory to Company, that all claims, liens and causes of action, if any, for the payment of wages or salaries or the payment of charges for labor, materials, tools, machinery, or supplies have been satisfied, released or settled, and in case such evidence is not furnished, the amount of such claims, liens, and causes of action may be retained from any moneys otherwise due the Contractor hereunder until they shall have been furnished.

35.5   Right to Audit. Contractor shall maintain for a period of three (3) years after final payment under this Agreement, all records and accounts pertaining to Services performed for a unit price Contract Price, a reimbursable Contract Price, or otherwise authorized in writing by Company for performance on a reimbursable basis. Company shall have the right to audit, copy and inspect said records and accounts at all reasonable times during the course of such Services, and for three (3) years following the completion of the Services, for the purpose of verifying units furnished and reimbursable costs incurred, as applicable.

36.0   REGULATIONS, ORDERS, CODES

36.1   Contractor shall comply strictly with local, municipal, state, provincial, federal and governmental laws, orders, ordinances, codes, and regulations applicable to Contractor's operations in the performance of the Services hereunder.

36.2   Contractor shall not, under any circumstance, apply to or enter into negotiations with any governmental authority or agency for acceptance of variations from or revisions to safety or health, or air, water or noise pollution laws or regulations relating to this Agreement or to the performance thereof, without Company's prior written approval, given in Company's sole discretion.

37.0   COMMUNICATIONS

All notices or other communications required or permitted by this Agreement shall be in writing and shall be personally delivered (including by means of professional messenger service) or sent by registered or certified mail, postage prepaid, return receipt requested, and addressed to the party at the address stated on the first page of the Agreement, and shall be deemed given when actually received or refused. Either party may by similar notice given change the address to which future notices or other communications shall be sent.

38.0   TAXES, DUTIES, AND FEES

38.1   Contractor shall pay all taxes, including sales, use, gross receipts, federal/state/provincial/local income, and all similar taxes, duties, fees, and other assessments of whatever nature imposed by governmental authorities and applicable to the performance of the Services and this Agreement.

38.2   Contractor shall pay or cause to be paid when due, all payroll taxes and contributions which are measured by remuneration paid to persons employed by Contractor or its subcontractors in connection with the Services or which arise by virtue of their employment and which now or hereafter are imposed by any governmental authority.

39.0   LIENS

39.1   To the full extent permitted by applicable laws, Contractor hereby waives and releases any and all rights of mechanics', materialmen's, or other similar liens and similar rights for payment for services, labor, equipment, or materials furnished by

Contractor in performance of the Services and granted by law to persons supplying materials, equipment, services and other things of value to improve or modify land or structures thereon, which Contractor may have against Company or the Right of Way Owner's premises, property belonging to Company, or to any of them, or funds payable by Company to the Right of Way Owner, if any.

39.2    Contractor shall at all times promptly pay for all services, materials, equipment, and labor used or furnished by Contractor in the performance of the Services under this Agreement and shall at its expense keep the Right of Way Owner's premises and all property belonging to Company and/or the Right of Way Owner free and clear of any and all of the above mentioned liens and rights of lien arising out of services, labor, equipment, or materials furnished by Contractor or its employees, materialmen, or subcontractors in the performance of the Services. If Contractor fails to release and discharge any such claim of lien or resolve any threatened claim of lien against the Right of Way Owner's premises or the property of Company and/or the Right of Way Owner arising out of performance of the Services within five (5) days after notice from Company to remove such claim of lien or resolve such threatened lien, Company may, at its option, discharge or release the claim of lien or otherwise deal with the lien claimant or threatened lien claimant, and Contractor shall pay Company any and all costs and expenses of Company in so doing, including reasonable attorney's fees incurred by Company, or alternatively Company may, at its choosing, deduct such costs and fees from Contractor's invoices.

## 40.0    RIGHT TO OFFSET

Company, without waiver of any rights or remedies which it may at any time have against the Contractor, shall be entitled from time to time to deduct from any amounts due or owing by Company to Contractor in connection with this Agreement (or any other contract with Company), any and all amounts owed by Contractor to Company in connection with this Agreement and any and all amounts owed by Contractor to any subcontractor.

## 41.0    INTENTIONALLY DELETED

## 42.0 ASSIGNMENTS

42.1    Contractor shall not assign, or transfer its rights or obligations under this Agreement or any interest herein without the express written consent of Company. Company may assign this Agreement in whole or part without the consent of Contractor or its sureties and without invalidating this Agreement; such consent shall not relieve Contractor from full responsibility and liability for the work hereunder and the proper performance of all the terms and conditions of this Agreement.

42.2    Contractor shall not assign, sell, or otherwise transfer any right to payment from Company under this Agreement to any third party without the express written consent of Company. For the avoidance of doubt, Contractor shall not enter into

any factoring agreement with respect to any right to payment from Company without Company's express written consent.

## 43.0 GOVERNING LAWS & ATTORNEYS FEES

The validity, performance and all matters relating to the interpretation and effect of this Agreement and any amendment thereto shall be governed by the laws of the State of Colorado, excluding its rules with respect to conflict of laws and all litigation arising under this Agreement shall be in the state courts located in Boulder County, Colorado. Contractor hereby irrevocably consents to the exclusive personal jurisdiction of the state courts located in Boulder County, Colorado and Contractor shall not institutes any legal proceeding in any other court. Registered or certified mail of any legal process shall constitute lawful and valid service of process in any such proceeding, suit or controversy. In the event either party institutes suit, action or proceeding in court against the other party, in connection with any dispute or matter arising under this Agreement, the prevailing party shall be entitled to recover reasonable costs, including attorney fees in addition to any other relief granted by the court.

## 44.0 NON-SOLICITATION

During the Term of the Agreement and for a period of two (2) years thereafter, Contractor shall not solicit the employment of (or advise, suggest or recommend that any other person or entity employ, offer employment to or solicit the employment of) any of Company's personnel (including but not limited to employees, agents or consultants of Company with whom Contractor comes in contact in performing its obligations under this Agreement.

## 45.0 ORDER OF PRECEDENCE

Except as otherwise set forth herein, in the event of inconsistency between provisions of the Contract Documents, the inconsistency shall be resolved by giving precedence in the following order:

  (a) Project Service Agreement(s)
  (b) The Agreement
  (c) Exhibits A, Outside Plant Manual, and B, Inside Plant/Cabinet Installation
  (d) Exhibit C, General Terms and Conditions

## 46.0 SEVERABILITY

In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and shall remain in effect and be binding upon Contractor and Company. The failure of Company to enforce or insist upon compliance with any of the terms or conditions of this Agreement, the waiver of any term or condition of this Agreement, or the granting of an extension of time for performance, shall not constitute the permanent waiver of any term or condition of this Agreement, and this Agreement and each of its provisions shall remain at all times in full force and effect until modified by the parties in writing.

DocuSign Envelope ID: D22E601F-6C98-4368-8E99-2F5066274883

47.0   LIMITATION OF LIABILITY

In no event shall Company be liable to Contractor, and Contractor hereby releases Company from any indirect, special, exemplary, punitive or consequential damages, lost profits or lost revenues related to this Agreement and/or the performance of the Services hereunder regardless of the form of action, even if Company has been advised of the possibility of such damages.

48.0   SECURITY REQUIREMENTS

Contractor agrees to comply with Zayo's Vendor Security Requirements, available at http://www.zayo.com/privacy (the "Security Requirements"). Contractor understands that such Security Requirements are subject to change without notice or consent of Contractor. Contractor further agrees to comply with any additional reasonable audit procedures requested by Zayo in order for Zayo to confirm Contractor's compliance with the Security Requirements.

49.0 ENTIRE AGREEMENT

This Agreement sets forth the entire understanding of Contractor and Company and supersedes any and all prior agreements, arrangements or understandings related to the matter described herein. No subsequent agreement between Contractor and Company shall be effective or binding unless it is made in writing and signed by both parties.

## FIRST AMENDMENT TO THE MASTER CONSTRUCTION SERVICES
## AGREEMENT

This First Amendment (the "Amendment") is made March 31, 2023 by and between Zayo Group, LLC ("Company") and BDC Group, Inc., ("Contractor") amending the Master Construction Services Agreement (the "Agreement") dated October 13, 2020 by and between Zayo Group, LLC and BDC Group, Inc. Any amendments herein are annexed to and made a part of the Agreement. In each instance in which the provisions of this Amendment contradict or are inconsistent with the provisions of the Agreement, the provisions of this Amendment shall prevail and govern, and the contradicted, superseded or inconsistent provisions shall be deemed amended accordingly. Company and Contractor wish to make the following addendum to the Agreement:

1. *Subsection 35.2 Payment* under **SECTION 35. APPLICATIONS FOR PAYMENT** in *Exhibit C: GENERAL TERMS AND CONDITIONS* is hereby deleted in its entirety and replaced with the following:

    "35.2 Payment. The amount so stated, subject to any retainage described in subsection 35.3, shall be paid by Company within sixty (60) days of approval of the application for payment by Company."

Except as set forth herein, all other terms and conditions of the MCSA shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first above written.

**ZAYO GROUP, LLC**

By: _DFF5BD0FC6CA47E..._

Name: Mike Mooney

Title: Chief Legal Officer

Date: April 3, 2023

**BDC GROUP, INC.**

By: _Todd Shores_
_578BAD610E54442..._

Name: Todd Shores

Title: CFO

Date: April 3, 2023

1

# ZAYO®

| Purchase Order No. | ZAYO-869228 |
|---|---|
| Date | 06-JUN-2022 |

ᴅˢ
TS   June 7, 2022

| Vendor: | Billing Address: | Ship To: |
|---|---|---|
| BDC GROUP INC<br>1525 KETELSEN DRIVE<br>Hiawatha, IA  52233<br>United States | Zayo Group LLC<br>1805 29th St<br>Ste 2050<br>Boulder, CO  80301<br>United States<br><br>ATTENTION:  ACCOUNTS PAYABLE | See PO notes for One Time Ship to<br>address<br>Erick Mast |

| Shipping Method | Payment Terms | Vendor Quote Number | Page |
|---|---|---|---|
| BESTWAY | 90 Days | | 1 |

| Item / Description | Req. Date | U/M | Ordered | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| Construction<br>Chicago to Omaha LH Overpull - BDC Group**$350(cost per dig up)<br>X 567(estimated dig ups) = $198,450 Total**$1.30(CPF) X<br>3,064,008 (estimated footage including slack) = $3,983,210.40<br>**Total Contract Price = $4,181,660.40 | 26-MAY-2022 | Each | 4181660 | 1.00 | ███ |

| | |
|---|---|
| Subtotal | ███ |
| Trade Discount | 0.00 |
| Freight | 0.00 |
| Tax | 0.00 |
| Order Total (USD) | ███ |

This Purchase Order and the services described herein are governed by the terms and conditions of the Master Construction Services Agreement effective October 13, 2020.

# PROJECT SERVICE AGREEMENT

Project Service Agreement No. 11

Purchase Order No. ZAYO-869228

This Project Service Agreement ("PSA") is effective as of May 15, 2022 ("Effective Date"), by and between Zayo Group, LLC ("Company"), together with its affiliates, and BDC Group, Inc., (the "Contractor"). This Project Service Agreement is entered into pursuant to the Master Services Agreement between the Company and the Contractor effective October 13, 2020, (the "Agreement"), and is subject to the terms and conditions of such Agreement.

## I.   Definitions:

1.  "Construction" shall be defined as, and includes but is not limited to, any underground Construction methodologies (boring, trenching, plowing), cable placement (including conduit, duct, and fiber), potholing, aerial make-ready (except power make-ready), and aerial strand and cable placement.

2.  "Linear Feet/Footage" shall be defined as the route distance over which the Construction activity is taking place.  Linear Footage excludes excess cable footage that is part of aerial cable slack, aerial and/or underground slack coils, pole risers or any other situation where excess cable length is placed but the linear route distance is not increased.

## II.   Scope of Work:

The Contractor is hereby authorized to perform the placement of one (1) 288 micro FOC in an existing 12/10mm microduct and one (1) 432 Ribbon FOC in an existing vacant 1.5" conduit (blue) from Chicago, IL to Omaha, NE as shown in Attachment 1 - Maps. The route is approximately 2,785,464 linear feet. This placement is adjacent to the Canadian National, Iowa Interstate and CSX railroads.

**Scope Details:**

### Segment 1 – Omaha to Des Moines

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Omaha, NE to Des Moines, IA.

- Placement of approximately 819,456 ft of 432 Ribbon FOC in existing 1.5" conduit.

### Segment 2 – Des Moines to Mississippi River

- Proofing and repair as needed) of one (1) existing 1.5" conduit (blue) from Des Moines, IA to Mississippi River, IA.

- Placement of approximately 752,453 ft of 432 Ribbon FOC in existing 1.5" conduit.

## Segment 3 – Mississippi River to Morris

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Davenport to Sheffield.

- Proofing and repair (as needed) of one (1) existing 12/10mm microduct from Mississippi River to Davenport as well as Sheffield to Morris.

- Placement of approximately 264,000 ft of 432 Ribbon FOC in existing 1.5" conduit(blue) from Davenport to Sheffield

- Placement of approximately 267,643 ft of 288 microfiber in existing 12/10mm microduct from Mississippi River to Davenport and approximately 400,224 ft of 288 microfiber in existing 12/10mm microduct from Sheffield to Morris for a total of 667,867 ft of 288 microfiber.

## Segment 4 – Morris to Western Ave

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Morris to Western Ave.

- Placement of approximately 281,688 ft of 432 Ribbon FOC in existing 1.5" conduit.

- All necessary duties and responsibilities called out in Section 2 "Construction – Contractor Responsibility" of this Document.

This work was awarded based on the Request for Proposal (RFP) LH Fiber Overbuild from Chicago, IL to Omaha, NE, *VBP-006228*. The RFP is incorporated into this Project Services Agreement. In the event of an express conflict between the terms of the RFP, the Agreement, or this Project Services Agreement, the following order of precedence shall apply: the Agreement, this Project Services Agreement, the RFP.

Contractor is responsible for all costs and expenses associated with the Project and for the performance of the deliverables required to complete the Contractor Responsibilities as set forth in further detail below. The only items that will not be the responsibility of the Contractor are those expressly listed as Company Responsibility. Contractor affirms that it shall at all times make prompt and full payment to any vendors or subcontractors that it engages in the performance of this PSA. Any changes to this PSA (including, but not limited to, any change in price or scope) shall only be valid if set forth in a written amendment that has been signed by both parties.

### A. Responsibility of Parties

1. Material

   i. Company Responsibility

      ☒ Fiber Optic Cable
      ☒ Cable Tags
      ☒ Microduct

☒ Microduct Couplers

ii.    Contractor Responsibility

☒ All materials for fiber placement: Pulling Lubricant, Mule Tape, etc.
☒ Duct Couplings
☒ Other material as required to meet Company and/or applicable ROW ("Right of Way") municipal and/or permit agency requirements.

2.  Duct Verification – Contractor Responsibility

☒ Perform all rod, rope and proofing of vacant conduit, for approximately 2,785,464  Linear Feet.

3.  Construction – Contractor Responsibility

☒ All 288 count micro fiber cable installation from Company backbone to site termination location. Approximately 667,867 Linear Feet of placement in existing Company duct. Contractor shall be responsible for any damage caused to the fiber cable during fiber cable placement.  Contractor may at its discretion and its cost, test the fiber cable prior to the installation in order to establish the initial condition of the fiber cable.

☒ All 432 count fiber cable installation from Company backbone to site termination location. Approximately 2,117,597 Linear Feet of placement in existing Company duct. Contractor shall be responsible for any damage caused to the fiber cable during fiber cable placement.  Contractor may at its discretion and its cost, test the fiber cable prior to the installation in order to establish the initial condition of the fiber cable.

☒ Construction shall meet all applicable Company, municipal, and any other permitting/right-of-way authority specifications including depth requirements for waterways, culverts and/or railroad crossings.

☒ All ring/lateral fiber installation per Company and/or applicable cable manufacturer specifications from Company splice location to Company meet me manhole/handhole location.

☒ All mobilizations and demobilizations of crews are included in the Contract Price.

☒ Perform field review services of Construction drawings and redline drawings to reflect the as constructed state of the project to be used in producing final "as-built" quality drawings. Redlines should capture actual running line placement, trench

depth, bore placement, conduit, splice, fiber access, building, pole, fiber, sheath, ownership, rights, easement, right of way, and permit information.

☒ Contractor is responsible for completing and delivering the Company Cable Routing Form (CRF) for all fiber cables installed throughout this project.

☒ Contractor is responsible for ensuring that Company Construction standards are followed allowing for all new Company assets to be accurately located for protection and Contractor is responsible for protecting the newly installed plant until the final as-built and fiber test result documents are delivered and accepted.

☒ All restoration per Company and/or applicable ROW/permit authority specifications, including but not limited to asphalt, slurry, micro-seal, and grind and overlay if necessary. Contractor must complete restoration within Thirty (30) days of construction complete (CNC). If Contractor fails to complete such restoration to as was or better condition and/or to city specified code, Company will withhold the 20% retainage plus any additional costs necessary for Company to hire a restoration company of its choice to complete the work.

☒ In addition to Contractor's indemnification obligations outlined in the Agreement, should Contractor cause service disruption to existing Company customers, damages in the amount of $2,000.00 for each individual customer outage ("Disruption Damages") shall be deducted from any of Contractor's invoices per Company's right to set-off.

4.    Other Contractor Responsibilities

☒ All permit fees shall be passed through to Company with supporting documentation.

☒ MH/HHs may be buried, HH search and exposure are included in the placement rate.

☒ Pictures of cable coiled safely & secured in manholes with Lat/Longs, cable sequentials, and manhole name/number

☒ Contractor is responsible for all traffic control costs.

☒ Contractor is responsible for all police or third party support fees excluding railroad flagging.

Contractor is responsible for providing key management personnel for progress reporting purposes on a daily basis back to Company. Daily conference calls/meetings will take place and Contractor is responsible for being present at every meeting to report progress.

If Company receives a fine or penalty due to work that is not completed to the municipality's, pole owner's, conduit owner's or other permitting agency's

specifications Company reserves the right to back charge or withhold an amount equal to the fine and the cost to bring work into compliance.

Contractor is liable for any loss, theft, damage to materials or equipment while in Contractor's possession and Contractor attests to maintaining adequate insurance coverage to accommodate replacement value should loss, theft, or damage occur.

☒ Contractor is responsible for continually updating the project KMZ file to reflect accurate OSP design throughout the design and Construction phase and provide to Company Project Manager on a real time basis.

☒ Contractor is responsible for providing final redlines within five (5) days of completion of Construction (includes duct placement, cable placement, and FTP placement).

☒ Contractor shall ensure all applications for permit allow for 30-60 days of processing time by the permitting agency.

☒ Contractor shall provide regular updates, preferably daily but no less than weekly, to the Company Project Tracker and be prepared to report on progress during management sessions. Failure to comply with this requirement may trigger Step-In per Company's rights in Section 12, Default, of the Agreement.

Contractor is responsible for increasing the design/Construction personnel if required to keep up with the Schedule, including all costs/wages associated with such action. This may also include work conducted during night and weekend hours. Contractor shall adopt/adhere to Company's holiday work schedule in order to maintain the agreed upon Schedule (i.e. Contractor will have full staff available to perform all necessary outside plant Construction, splicing and operational activities.) In extraordinary cases, both Company and Contractor may need to work on a scheduled holiday to maintain project completion expectations.

**Contractor Representative:**    **TERRY SELBY**

**Company Project Manager:**    **ERICK MAST**

### III.    Schedule:

The Project shall begin on May 15, 2022, shall be completed no later than June 30, 2023, and shall meet the following site completion milestones ("Site Completion Milestones"):

| Site | Site Completion Milestone |
|---|---|
| **Segment 1 – Omaha to Des Moines** | |
| Span 1 – Omaha, NE to Logan, IA | 6/30/2023 |
| Span 2 – Logan, IA to Harlan, IA | 6/30/2023 |
| Span 3 – Harlan, IA to Gutherie Center, IA | 6/30/2023 |
| Span 4 - Gutherie Center, IA to Des Moines, IA | 6/30/2023 |
| **Segment 2 – Des Moines to Mississippi River** | |
| Span 5 – Des Moines to Newton, IA | 12/1/2022 |

| Span 6 – Newton, IA to Victor, IA | 6/30/2023 | |
|---|---|---|
| Span 7 – Victor, IA to Cedar Rapids, IA | 6/30/2023 | |
| Span 8 – Cedar Rapids, IA to River, IA | 6/30/2023 | |
| **Segment 3 – Mississippi River to Morris** | | |
| Span 9 – River, IA to Iowa City, IA | 10/1/2022 | |
| Span 10 – Iowa City, IA to Davenport, IA | 10/1/2022 | |
| Span 11 – Davenport, IA to Sheffield, IA | 12/1/2022 | |
| Span 12 – Sheffield, IA to Peru, IL | 10/1/2022 | |
| Span 13 – Peru, IL to Morris, IL | 10/1/2022 | |
| **Segment 4 – Morris to Western Ave** | | |
| Span 14 – Morris, IL to Western Ave | 12/1/2022 | |

*Weather Dependent*

Contractor agrees to begin constructing no later than seven (7) calendar days from the date all site and/or backbone segment permits are received. Failure to start promptly will also be cause for Late Delivery damages further described below.

A. **Late Deliveries:** Should Contractor fail to deliver the scope by the Due Date, Contractor shall be liable to Company for a discount of one thousand dollars ($1,000) for each calendar day of delay beyond the Due Date, which Company may set off against any amounts payable to Contractor.

B. **Equipment Reliability:** Contractor shall maintain ninety-nine and a half percent (99.5%) up time on like equipment during working hours across the term of the project. The cost for renewal of any permits that expire as a result of downtime on Contractor's equipment shall be borne by the Contractor. Contractor shall be liable to Company for a discount of one thousand dollars ($1,000) for each calendar day of like equipment downtime beyond the requirement set above, Company may set off against any amounts payable to Contractor.

C. **Excusable Delays:** Contractor shall not be liable for delays defined as Excusable Delays per Section 13 of the Agreement or delays caused by permitting agencies or municipal authorities who fail to act upon the requests of Contractor in a timely manner provided Contractor has delivered all appropriate documentation required of the agency expeditiously.

D. **Step-In Rights:** Should Contractor fail to deliver by the Due Date, Company may, at its option and without prejudice to any other rights or remedies Company may have, hold in abeyance further payments to Contractor and/or terminate this PSA and/or step-in to complete the Services, including taking possession of the Project and any or all completed designs or other work product and finish the Services by whatever method Company deems expedient ("Step-In Rights").

IV. **Contract Price:** $██████████

This is a unit rate contract for the Contractor to complete the full scope of work at the rates shown in the table below for a not-to-exceed total value of $██████████ (the "Contract Price"). The unit rates listed below are all-in and include material and restoration costs. Contractor shall not proceed

with any work above the value of the Contract Price until and unless a change order or new Project Service Agreement is executed by both parties. Contractor understands that any additional costs above the Contract Price are the responsibility of the Contractor. Unforeseen conditions shall not be cause for changes unless explicitly agreed to herein.

| Segment | Description | Est Qty | CPF | Total$ |
|---|---|---|---|---|
| OMAHA TO DES MOINES | Dig Ups | 158 | | |
| | Proof & Place Fiber | 901,401 | | |
| DES MOINES TO MISSISSIPPI RIVER | Dig Ups | 176 | | |
| | Proof & Place Fiber | 827,698 | | |
| MISSISSIPPI RIVER TO MORRIS | Dig Ups | 179 | | |
| | Proof & Place Fiber | 1,025,053 | | |
| MORRIS TO WESTERN AVE | Dig Ups | 54 | | |
| | Proof & Place Fiber | 309,855 | | |

**V.    Payment Schedule/Invoice Acceptance:**

On a monthly basis, Contractor shall submit a single invoice to Company for the work completed that has been accepted by Company during the previous month pursuant to the Delivery Milestones and associated milestone requirements set forth below. Contractor shall bill only for actual scope completed. Acceptance will only be granted upon completion of all tasks as outlined below.

Upon acceptance from Company that Construction is complete, Contractor may invoice for the value or completed portion thereof, **minus twenty percent (20%) retainage.** For example, as Contractor documents to Company the completion of underground or aerial Construction, Contractor may invoice for the value of the completed portion, minus twenty percent (20%) retainage. The final twenty percent (20%) retainage may be billed upon completion and acceptance from Company for the following items: site walk through, Contractor completion of punch list items, provision of all subcontractor and vendor lien releases, etc.

**A.   Delivery Milestones**

   a.  ☒ <u>Permit Costs</u> – Pass-through permitting fees may be invoiced to Company upon receipt of applicable permit with documentation of applicable costs. Contractor

shall invoice separately from the Services performed in this Project Service Agreement, referencing the unique purchase order number.

b. ☒ <u>Duct Verification</u> – Complete all rod and rope and provide Company Project Manager with final butterfly drawings.

c. ☒ <u>Construction Complete</u>

  i. ☒ <u>Backbone Sites</u> – completion of network from lateral location to the next lateral location to include:

    ☒ Fiber placement
    ☒ Pictures of cable coiled safely & secured in manholes with Lat/Longs, cable sequentials, and manhole name/number
    ☒ Restoration – Per ROW provider requirements.
    ☒ Construction redline drawings (uploaded to Box.Net)
    ☒ Signed checklist by Company Project Manager or inspector

d. ☒ <u>Closeout Complete</u>

    ☒ Complete package of KMZ files for each segment
    ☒ Construction Drawings
    ☒ Final Redlines
    ☒ Lien Waivers, and other applicable closeout information to properly document project completion and turn over to Company.

**B. Invoice Requirements**

All invoices must clearly identify the specific location where the work was completed as well as reference appropriate purchase order line items.

The following backup information is to be provided with each invoice prior to acceptance by Company:

a. Milestone invoice:

  i. Sign off/acceptance for completion of milestone by Company Project Manager or inspector.

  ii. Documentation per above definitions of milestones.

  iii. Subcontractor and Contractor lien waivers in the same form and content as Attachment 2 unless otherwise required by local law.

b. Final invoice (at Closeout Complete):

  i. Final redline / as-built drawing.

  ii. Notice of completion approval from applicable permit/ROW agency.

    iii.    Final check list signed/approved by both Contractor and Company representative and/or inspector.

    iv.    Subcontractor and Contractor lien waivers in the same form and content as Attachment 3 unless otherwise required by local law.

c.  All invoices shall:

    i.    Include work applicable to this PSA only.

    ii.    Include an invoice date equal to the date the invoice is submitted to Company (the "Invoice Date").

    iii.    Pass-Through Permit Fees: Actual pass-through costs for permits shall be submitted for payment by Contractor separately from invoices for work performed and shall reference the unique purchase order.

Should an invoice not meet any of these requirements, including work invoiced without accepted contractual deliverables, Company reserves the right to reject an invoice and not acknowledge it as received by Company until Contractor rectifies the omission(s).

Upon Company's confirmation that all missing items have been received, Contractor shall modify the Invoice Date to reflect the date Company acknowledges that all errors have been corrected.

Should any invoice be received in excess of the Contract Price, the invoice will be rejected and not acknowledged as received by Company.

## C. Invoice Submission

Each invoice shall include only work applicable to this Project. Invoices should also reference Company purchase order number to ensure timely payment. Invoices are to be sent to the attention of Accounts Payables at 1805 29th Street, Suite 2050, Boulder, CO 80301 (ZayoAP@zayo.com and Erick.Mast@zayo.com if sending electronically).

The parties agree that all terms and conditions of the original Agreement remain unchanged except as hereby modified.

Zayo Group, LLC

By: _Kevin Mammel_
    0E74B21B40AC498...

Name: __Kevin Mammel__

Title: __SVP Finance__

Date: __June 7, 2022__

BDC Group Inc.

By: _Terry Selby_
    6CDD97F6F223457...

Name: __Terry Selby__

Title: __Vice President__

Date: __June 7, 2022__

**Attachment 1 – Maps**

*Route Overview*



Zayo Group, LLC Proprietary and Confidential

## Attachment 2 – LIEN WAIVER AND RELEASE UPON PROGRESS PAYMENT

Invoice Number(s): _____

Purchase Order Number (s): _____

Upon receipt by the undersigned of a check from Zayo Group, LLC in the sum of $_____ payable to _____("Contractor") and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's lien, stop notice, or bond right the undersigned has on the job for Zayo Group, LLC located at [**JOB LOCATION AND DESCRIPTION**] _____.

This release covers payment to the undersigned for all labor, services, equipment, or material furnished to the jobsite or furnished to Zayo Group, LLC except for disputed claims for additional work in the amount of $0.

Upon payment, Contractor agrees to defend, indemnify, and hold harmless Company, Right of Way Owner, the affiliated entities of each, and all of their directors, officers, employees, agents, servants, customers, successors, heirs, representatives, and assigns from and against, any and all claims, proceedings, losses, demands, actions (and all expenses associated therewith asserted against, suffered, or incurred) made by Contractor's vendors, suppliers, subcontractors, agents, employees, or laborers with respect to the work invoiced and paid pursuant to the above.

The undersigned warrants that he either has already paid or will use the monies he receives from this progress payment to promptly pay in full all of his laborers, subcontractors, materialmen and suppliers for all work, materials, equipment or services provided for or to the above referenced project up to the date of this waiver.

Contractor: _____

Signature: _____

Title: _____

Date: _____

### Attachment 3 – LIEN WAIVER AND RELEASE UPON FINAL PAYMENT

Invoice Number(s): _____

Purchase Order Number (s): _____

Upon receipt by the undersigned of a check from Zayo Group, LLC in the sum of $_____ payable to _____("Contractor") and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's lien, stop notice, or bond right the undersigned has on the job for Zayo Group, LLC located at [JOB LOCATION AND DESCRIPTION] _____.

This release covers the final payment to the undersigned for all labor, services, equipment, or material furnished to the jobsite or furnished to Zayo Group, LLC except for disputed claims for additional work in the amount of $_____.

Upon payment, Contractor agrees to defend, indemnify, and hold harmless Company, Right of Way Owner, the affiliated entities of each, and all of their directors, officers, employees, agents, servants, customers, successors, heirs, representatives, and assigns from and against, any and all claims, proceedings, losses, demands, actions (and all expenses associated therewith asserted against, suffered, or incurred) made by Contractor's vendors, suppliers, subcontractors, agents, employees, or laborers with respect to the work invoiced and paid pursuant to the above.

The undersigned warrants that he either has already paid or will use the monies he receives from this progress payment to promptly pay in full all of his laborers, subcontractors, materialmen and suppliers for all work, materials, equipment or services provided for or to the above referenced project.

Contractor: _____

Signature: _____

Title: _____

Date: _____



| Purchase Order No. | ZAYO-869228 |
|---|---|
| Date | 06-JUN-2022 |

January 30, 2023

| Vendor: | Billing Address: | Ship To: |
|---|---|---|
| BDC GROUP INC<br>1525 KETELSEN DRIVE<br>Hiawatha, IA 52233<br>United States | Zayo Group LLC<br>1805 29th St<br>Ste 2050<br>Boulder, CO 80301<br>United States<br><br>**ATTENTION:** ACCOUNTS PAYABLE | See PO notes for One Time Ship to<br>address<br>Erick Mast |

| Shipping Method | Payment Terms | Vendor Quote Number | | | Page | | |
|---|---|---|---|---|---|---|---|
| BESTWAY | 90 Days | | | | 1 | | |
| Item / Description | | Req. Date | U/M | Ordered | Unit Price | | Ext. Price |
| Construction<br>Chicago to Omaha LH Overpull - BDC Group**$350(cost per dig up)<br>X 567(estimated dig ups) = $198,450 Total**$1.30(CPF) X<br>3,064,008 (estimated footage including slack) = $3,983,210.40<br>**Total Contract Price = $4,181,660.40 | | 26-MAY-2022 | Each | 4181660 | 1.00 | | ▮ |
| Construction<br>CHI-OMA LH Project****PSA Amendment for additional<br>$9,249.10****BDC Group | | 19-JAN-2023 | Each | 9249 | 1.00 | | ▮ |

| | | |
|---|---|---|
| Subtotal | | ▮ |
| Trade Discount | | 0.00 |
| Freight | | 0.00 |
| Tax | | 0.00 |
| Order Total (USD) | | ▮ |

This Purchase Order and the services described herein are governed by the terms and conditions of the Master Construction Services Agreement effective October 13, 2020.

## FIRST AMENDMENT TO PROJECT SERVICE AGREEMENT #11 (ZAYO-869228)

This First Amendment ("Amendment") is made January 9, 2023 by and between Zayo Group, LLC ("Company") and BDC Group Inc. ("Contractor") amending the Project Service Agreement #11, ZAYO-869228 ("PSA #11") dated May 15, 2022, by and between Company and Contractor.  Any amendments herein are annexed to and made a part of PSA #11.  In each instance in which the provisions of this Amendment contradict or are inconsistent with the provisions of PSA #11, the provisions of this Amendment shall prevail and govern, and the contradicted, superseded or inconsistent provisions shall be deemed amended accordingly.  Company and Contractor wish to make following amendments to PSA #11:

1.  The first paragraph under **Section II. Scope of Work**  is hereby deleted and replaced with the following:

The Contractor is hereby authorized to perform the placement of one (1) 288 micro FOC in an existing 12/10mm microduct and one (1) 432 Ribbon FOC in an existing vacant 1.5" conduit (blue) from Chicago, IL to Omaha, NE as shown in Attachment 1 - Maps. The route is approximately 2,673,377 linear feet. This placement is adjacent to the Canadian National, Iowa Interstate and CSX railroads.

2.  The *Scope Details* under **Section II. Scope of Work**  are hereby deleted and replaced with the following:

### Segment 1a – Omaha to Grimes

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Omaha, NE to Des Moines, IA.

- Placement of approximately 769,801 ft of 432 Ribbon FOC for 730, 807 linear feet in existing 1.5" conduit.

### Segment 1b – Grimes to SE 14th St, Des Moines

- Placement of approximately 100,000 ft of 288 micro cable for 96,640 linear feet in newly placed micro duct.

- Placing (2) micro ducts (12.7/10mm) approximately 96,640 linear feet in occupied 1.5" conduit (144 FOC currently in 1.5" conduit).

### Segment 2 – SE 14th St, Des Moines to Mississippi River

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Des Moines, IA to Mississippi River, IA.

- Placement of approximately 777,763 ft of 432 Ribbon FOC for 745,183 linear feet in existing 1.5" conduit.

### Segment 3 – Mississippi River to Morris

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Mississippi River to Morris, IL.
- Placement of approximately 277,200 ft of 432 Ribbon FOC for 264,000 linear feet in existing 1.5' conduit
- Placement of approximately 696,601 ft of micro fiber for 667,867 linear feet in existing 12.7/10 mm micro duct.

### Segment 4 – Morris to Cook County Line

- Proofing and repair (as needed) of one (1) existing 1.5" conduit (blue) from Morris, IL to Cook County Line.

- Placement of approximately 183,023 ft of 432 Ribbon FOC for 166,713 linear feet in existing 1.5" conduit.

3. The first bullet under subsection *A.2. Duct Verification* and the first two bullets under subsection *A.3. Construction – Contractor Responsibility* in **Section II. Scope of Work** are hereby deleted and replaced with the following:

    2.  Duct Verification – Contractor Responsibility

        ☒ Perform all rod, rope and proofing of vacant conduit, for approximately 2,673,377 Linear Feet.

    3.  Construction – Contractor Responsibility

        ☒ All 288 count micro fiber cable installation from Company backbone to site termination location. Approximately 766,674 Linear Feet of placement in existing Company duct. Contractor shall be responsible for any damage caused to the fiber cable during fiber cable placement. Contractor may at its discretion and its cost, test the fiber cable prior to the installation in order to establish the initial condition of the fiber cable.

        ☒ All 432 count fiber cable installation from Company backbone to site termination location. Approximately 1,906,703 Linear Feet of placement in existing Company duct. Contractor shall be responsible for any damage caused to the fiber cable during fiber cable placement. Contractor may at its discretion and its cost, test the fiber cable prior to the installation in order to establish the initial condition of the fiber cable.

4. The Due Date/Site Completion Milestones in **Section III. Schedule** is/are hereby deleted and replaced with the following Site Completion Milestone table.

| Site | Site Completion Date | Days from NTP |
|---|---|---|
| **Segment 1 – Omaha to Des Moines** | | |
| Span 1 – Omaha, NE to Logan, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 2 – Logan, IA to Harlan, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 3 – Harlan, IA to Gutherie Center, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 4 - Gutherie Center, IA to Grimes, IA | TBD (fiber delivery) | 90 days from NTP |
| **Scope Change – Grimes, IA to Des Moines, IA** | | |
| Scope Change – Grimes, IA to Des Moines, IA | 2/28/2023 | |
| **Segment 2 – Des Moines to Mississippi River** | | |
| Span 5 – Des Moines to Newton, IA | 2/28/2023 | |
| Span 6 – Newton, IA to Victor, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 7 – Victor, IA to Cedar Rapids, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 8 – Cedar Rapids, IA to River, IA | TBD (fiber delivery) | 90 days from NTP |
| **Segment 3 – Mississippi River to Morris** | | |
| Span 9 – River, IA to Iowa City, IA | 3/30/2023 | |
| Span 10 – Iowa City, IA to Davenport, IA | 4/30/2023 | |
| Span 11 – Davenport, IA to Sheffield, IA | TBD (fiber delivery) | 90 days from NTP |
| Span 12 – Sheffield, IA to Peru, IL | 12/31/2022 | |
| Span 13 – Peru, IL to Morris, IL | 4/30/2023 | |
| **Segment 4 – Morris to Cook County** | | |
| Span 14 – Morris, IL to Cook County | 2/28/2023 | |

Contractor agrees to begin constructing no later than seven (7) calendar days from the date all segment permits and materials are received ("NTP"). Failure to start promptly will also be cause for Late Delivery damages further described below

5. **Section IV. Contract Price** is hereby deleted and replaced with the following:

This is a unit rate contract for the Contractor to complete the full scope of work at the rates shown in the table below for a not-to-exceed total value of $▆▆▆▆▆ (the "Contract Price"). The unit rates listed below are all-in and include material and restoration costs. Contractor shall not proceed with any work above the value of the Contract Price until and unless a change order or new Project Service Agreement is executed by both parties. Contractor understands that any additional costs above the Contract Price are the responsibility of the Contractor. Unforeseen conditions shall not be cause for changes unless explicitly agreed to herein.

| Segment | Description | Est Qty | CPF | Totals |
|---|---|---|---|---|
| Segment 1a – Omaha to Grimes | Dig Ups | 130 | ▆ | ▆ |
| | Proof & Place Fiber | 769,881 | ▆ | ▆ |
| Segment 1b – Grimes to SE 14th St, Des Moines | Dig ups | 30 | ▆ | ▆ |
| | Proof & place micro duct | 96,640 | ▆ | ▆ |
| | Proof & Place fiber | 100,000 | ▆ | ▆ |
| Segment 2 – SE 14th St, Des Moines to Mississippi River | Dig Ups | 174 | ▆ | ▆ |
| | Proof & Place Fiber | 777,763 | ▆ | ▆ |
| Segment 3 – Mississippi River to Morris | Dig Ups | 179 | ▆ | ▆ |
| | Proof & Place Fiber | 973,801 | ▆ | ▆ |
| Segment 4 – Morris to Cook County Line | Dig Ups | 54 | ▆ | ▆ |
| | Proof & Place Fiber | 183,023 | ▆ | ▆ |
| | | | TOTAL | ▆ |

Except as set forth herein, all other terms and conditions of PSA #11 shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first above written.

| **Zayo Group, LLC** | **BDC Group Inc.** |
|---|---|
| By: _Kevin Mammel_ | By: _Todd Shores_ |
| —0E74B21B40AC496... | —2593D60D4D9D448... |
| Name: Kevin Mammel | Name: Todd Shores |
| Title: SVP Finance | Title: CFO |
| Date: February 4, 2023 | Date: January 30, 2023 |

DocuSign Envelope ID: 8296118E-6EE8-4AD8-8050-42C685D2B235

**Attachment 1 – Maps** is hereby amended to include the following maps:

Des Moines Scope Change
Approximately 96,640'



Cook County Scope Change
Approximately 164,488 from Morris to Cook County

