**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In Re: | ) Case No.: 23-00484 |
| | ) |
| **BDC GROUP, INC.,** | ) Chapter 7 (Converted from Chapter 11) |
| | ) |
| Debtor. | ) Hon. Thad J. Collins |
| | ) |
| EIN: 47-2908533 | ) **MOTION FOR CLARIFICATION OF** |
| | ) **STIPULATED ORDER FOR STAY RELIEF** |
| | ) **AND OTHER MATTERS, OR** |
| | ) **ALTERNATIVELY FOR RELIEF FROM** |
| | ) **ORDER** |
| | ) |
| | ) No Hearing Set |

**COMES NOW**, Zayo Group, LLC, ("Zayo"), by and through its counsel of record in this case, Jeffrey D. Goetz, Esq., of the law firm of Dickinson, Bradshaw, Fowler & Hagen, P.C., Jordan A. Kroop, Esq., and Jason Rosell, Esq., of the law firm of Pachulski, Stang, Ziehl & Jones, LLP, and hereby moves (this Motion) this Honorable Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure, made applicable in this Bankruptcy Case under Federal Rules of Bankruptcy Procedure 9024, to clarify or modify the *Stipulated Order for Stay Relief and Other Matters* ("Consent Order") (Docket Item 361), including by recognizing Zayo's right to recoupment, or determine adequate assurance of payment to Guidance Well Services, LLC, dba GuideWell ("GuideWell").

Zayo advises that it is also filing contemporaneously with this Motion its Objection (Docket Item 449) to Keystone Savings Bank's ("Keystone") *Motion for Order to Show Cause* ("Contempt Motion") (Docket Item 431).

Zayo should be relieved paragraphs 2 and 3 of the Consent Order that compel Zayo to pay to BDC $481,141.65 upon entry of the Consent Order, because Zayo was fraudulently

induced to agree to the immediate payment terms in paragraphs 2 and 3 of the Consent Order, as more thoroughly discussed, detailed, and argued in Zayo's Objection to the Contempt Motion, which is incorporated here by reference.

## PROCEDURAL HISTORY

On December 7, 2023, Zayo filed its motion for relief from the automatic stay (Docket Item 307) ("RS Motion") to terminate its executory Master Construction Services Agreement, as amended, with the Debtor.  The premise for the Motion was that BDC had materially breached the terms of that contract and, because of the type and nature of those defaults, BDC could not, even if it wanted to, cure those defaults.  The subject defaults were itemized and explained in detail in the RS Motion.

Among some of the primary reasons for filing the RS Motion was that BDC had submitted progress payment invoices to Zayo for work done by BDC and its sub-contractor GuideWell, with BDC duly executing multiple "Lien Waivers and Release Upon Progress Payment" ("Lien Waivers") forms to Zayo upon payment.  Zayo timely paid BDC for those progress payment invoices pursuant to the terms of the agreement.  Notwithstanding receipt of timely payment and the express representations by BDC in the Lien Waivers, Zayo asserted BDC fraudulent submitted the Lien Waivers while simultaneously failing to pay GuideWell, who, in turn, filed mechanics liens in Illinois and Iowa upon property owned by several railroad companies where fiber optic cable was being installed.  Those railroad companies subsequently banned Zayo, BDC, and GuideWell from entering their property until the mechanics liens were withdrawn, severely frustrating Zayo's ability to deliver timely services to its many clients, some of the largest technology companies in the world.  Zayo's damages were potentially astronomical.

A Notice setting bar date for objections to the RS Motion was filed the same day at Docket Item 310, setting December 28, 2023, as the last day to timely file objections to the RS Motion. On December 8, 2023, the Court filed its Telephonic Hearing Notice on the RS Motion for January 5, 2024, at 10:30 a.m., Central Time.

Immediately after the Court's docketing of its Notice of Telephonic Hearing, and based on the urgency of the RS Motion, on December 11, 2023, Zayo filed its motion to Expedite Hearing (Docket Item 315) and Declaration of Dwight Davis, (Docket Item 316) as Onsite Project Manager for Zayo in support thereof. This Court granted Zayo's Motion to Expedite Hearing and entered its Hearing Notice at Docket Item 319 and set a telephonic hearing for December 15, 2023, at 11:30 a.m.

On December 12, 2023, the Debtor filed its Resistance (Docket Item 322) to the RS Motion, generally asserting without specificity that the Debtor "disputes Zayo's Motion's factual allegations," yet did not dispute that it had defaulted under or otherwise breached its agreement with Zayo.

Although not a party to the subject contract between BDC and Zayo, Keystone inserted itself into the proceedings on the RS Motion and filed its own separate Resistance (Docket Item 323) to the RS Motion on December 14, 2023. Zayo asserted and continues to assert that Keystone's resistance was based on irrelevant, immaterial, and otherwise non-sensical "red herring" arguments not related to BDC's conduct, defaults, or breaches of BDC's agreement with Zayo.

After the expedited hearing on December 15, 2023, the Court docketed its Proceeding Memo (Docket Item 325) continuing the hearing and scheduling an evidentiary hearing for January 4, 2024.

Although not served with formal discovery requests, Zayo—in a good-faith effort to amicably reach a consensual resolution of objections to the RS Motion—agreed to exchange documentary evidence with Keystone, the Debtor, and the Official Committee of Unsecured Creditors.  Zayo provided a copious amount of documents in at least 21 categories responsive to Keystone's informal discovery requests, including, but not limited to, the Master Construction Services Agreement, amendments thereto, the Project Service Agreement and amendments thereto, copies of the several mechanics liens and supporting documentation, invoices from BDC to Zayo, schedule of processed, approved and pending invoices, contract progress and schedule charts, pre-bid questionnaire from BDC, and extensive email correspondence between BDC and Zayo over a period of many months.

Notwithstanding Zayo's robust production of relevant and material responses to Keystone's informal discovery requests, on December 31, 2023, Keystone filed a Motion to Continue Evidentiary Hearing, on an expedited basis (Docket Item 339), cynically arguing that it wanted more and additional documentation and information from Zayo, notwithstanding all the relevant and probative discovery related to BDC's contract defaults and breaches had been consensually provided to Keystone and without once articulating what Keystone needed to see that it had not already been provided.  Keystone's motion to continue evidentiary hearing was followed by BDC filing a Joinder (Docket Item 341) on January 2, 2024, seeking a continuance of the January 4th evidentiary hearing and Zayo objecting to a continuance (Docket Item 340). On January 2nd, the Court entered its Notice of Hearing on Keystone's Motion to Continue, to be heard that day at 4:00 p.m.  The Court subsequently entered its Proceeding Memo and Order (Docket Item 343) continuing the hearing to January 18, 2024.

On January 15, 2024, Keystone filed its Second Motion to Continue the January 18, 2024, Hearing (Docket Item 351), with this Court entering its Hearing Notice (Docket Item 352) on January 16, 2024, with an objection filed by Zayo (Docket Item 354), and hearing set for January 16, 2024.  This Court subsequently filed its Proceeding Memo and Order (Docket Item 355) continuing the evidentiary hearing until January 24, 2024.

After expending multiple hours over several weeks of settlement discussions by video and telephone conferences and exchanges of email and documents between Zayo, BDC, Keystone, and the Committee, Zayo and Keystone executed and filed their Consent Order granting Zayo relief from the automatic stay, which the Court then entered (Docket Item 361) on January 24, 2024.  BDC did not execute or sign off on the Consent Order but BDC was at all times an integral part of the settlement discussions that led up to the Consent Order, which never would have been submitted to the Court without BDC's approval.

Hours later, on January 25, 2024, Keystone declared a default under the DIP financing order, cut BDC's access to working capital, and filed its first Motion for Relief from Stay re: Set Off and Account Freeze (Docket Item 363), an action any objective observer would have immediately deemed a malicious and bad faith act designed to frustrating and contravene the party's settlement reached the day before.  The next day, January 26th, Keystone filed a second motion for relief from stay, further upending the Chapter 11 case.

Unable to fend off Keystone's series of fatal blows, the Debtor filed its motion to convert its case from Chapter 11 to a case under Chapter 7 on January 29, 2024, (Docket Item 369) and on January 30th, the Court entered its Order converting the BDC case to a case under Chapter 7 (Docket Item 384).  Rene Hanrahan was appointed Chapter 7 Trustee that same day (Docket Item 385).

5

**FACTUAL BASIS FOR RELIEF FROM ORDER**

As detailed in Zayo's Objection to Keystone's Contempt Motion, there is clear and convincing evidence substantiating Zayo's assertion that Keystone, during the ostensibly "confidential" settlement process that resulted in the filing of the Consent Order, fraudulently induced Zayo to agree to deposit $481,141.65 into BDC's Debtor in Possession Bank Account upon entry of the Consent Order. Keystone intentionally and materially misrepresented to Zayo that nearly a half million dollars of Zayo's funds would be held by BDC as Debtor in Possession pending mediation with GuideWell intended to clear GuideWell's numerous mechanics liens on third-party property and simultaneously satisfy Zayo's alleged debt to the BDC estate. After weeks of negotiations with BDC and its counsel—a process beset at every minute with Keystone's attempts to strongarm BDC into bending to Keystone's transparent desire to grab every copper penny coming into the estate— Zayo finally agreed to a process that would ensure that Zayo's funds would be used to satisfy BDC's administrative obligations to GuideWell and to release the mechanics liens that continued to cloud several third parties' properties and frustrate the process of a large fiber optic cable project for some of the largest technology companies in the world.

What Zayo could not have known—what was hidden from Zayo, hidden from BDC, hidden from the Committee, and hidden from this Court—when all the parties agreed to the Consent Order, was Keystone's ulterior motive, which was revealed within mere hours of this Court's entry of the Consent Order. With the nascent Consent Order entered, Keystone immediately declared a default under the DIP financing order, immediately cut off BDC from access to any working capital, immediately forced BDC to cease operations, and convert its case to Chapter 7. In doing so, Keystone killed BDC, killed the Chapter 11 case, and greatly

6

enhanced its chances of seizing nearly a half million dollars of Zayo's funds so that it couldn't be used as part of achieving the parties' settlement goals, couldn't be used to release the GuideWell liens, and couldn't be used to satisfy GuideWell's administrative expense claims against the BDC estate. Keystone cravenly secured Zayo's commitment to pay a huge sum of money into the estate and then attempted to grab all that money for itself, to the exclusion of Zayo, BDC, and the Bankruptcy Estate. Zayo was intentionally misled and so was this Court.

Zayo highlights several facts and factors for the Court:[1]

1) The subject Motion was filed solely by Keystone, and not supported or joined by BDC or the Chapter 7 Trustee;
2) Although the underlying Motion for Relief from Stay was filed by Zayo against BDC alone, Keystone clumsily insinuated itself into the matter for its own benefit alone;
3) In doing so—by, among other things, making frivolous and non-probative "discovery" demands, motivated by its secret goal of defeating Zayo's recoupment rights—Keystone deceived Zayo, BDC, and the Committee (and, ultimately, the Court), imposed needless delay, costs, the parties and their counsel unnecessary time and expense, and consumed Court resources;
4) Keystone would have no basis to seek relief from the stay to seize estate funds unless it could bamboozle Zayo into agreeing to pay over to the BDC's DIP Account funds BDC was not contractually entitled to receive;
5) Keystone's Contempt Motion, by taking selective facts out of context to characterize Zayo as ignoring the Consent Order, is additional evidence of Keystone's bad faith and ill intent, and demonstrates its zeal to harm Zayo and further mislead this Court; and,
6) Once the case was converted to Chapter 7, the Debtor was no longer a Debtor in Possession maintaining a Debtor in Possession Bank Account; so, delivering a half million dollars of Zayo's funds to the Debtor's bank account, Keystone would not only have put those funds outside the control of the Chapter 7 Trustee and the Bankruptcy Estate but would have fatuously delivered those funds to Keystone in furtherance of their nefarious scheme.

---

[1] Considerable, additional documentary and testimonial evidence regarding Keystone's conduct (and the conduct of Keystone's counsel) can be adduced at an evidentiary hearing on the Contempt Motion. Zayo eagerly awaits the opportunity to present that evidence, but is constrained by decorum and a sincere desire to prevent embarrassment from including even a summary of that evidence in this publicly-filed pleading. Zayo respectfully requests that the Court exercise its discretion to receive that evidence either under seal or in camera.

7

Surely, this Court knows, only too well, the importance, propriety, and sanctity of encouraging parties to settle and to maintain the confidentiality of settlement discussions so that parties are incentivized to even engage in them. Zayo fully appreciates that critical dynamic, especially in Chapter 11 cases. But Keystone has used that promise of confidentiality as a weapon to make mischief. Keystone has exploited a settlement to advance its own interests at the severe expense of all other parties to that settlement. Zayo is compelled to "fight fire with fire" by filing its Objection to Contempt Order that squarely challenges the good faith and fairness of Keystone and, regrettably, its counsel.

This Court can't know most of what occurred in the leadup to the Consent Order but; surely, this Court can only surmise, correctly, that Zayo would never have agreed to turnover of nearly a half million dollars under the Consent Order severely jeopardizing its recoupment rights, unless that turnover was part of a process that would have ineluctably resulted in the GuideWell liens being satisfied and released. Conversely, if Zayo had, had any inkling of Keystone's bad faith and true, sinister intent during the settlement process, Zayo would never have entered into the Consent Order in the form drafted by Keystone's counsel and would simply have proceeded with an evidentiary hearing on its original stay relief motion.

## LEGAL ARGUMENTS

Federal Rule of Civil Procedure 60(b), as incorporated by Federal Rule of Bankruptcy Procedure 9024, permits the Court "on motion and just terms [to] relieve a party or its legal representative from a final judgement, order, or proceeding." "Rule 60(b) provides for extraordinary relief, which may be granted only upon a showing of exceptional circumstances." *Mitchell v. Shalala*, 48 F.3d 1039, 1041 (8th Cir. 1995) (citing *Atkinson v. Prudential Ins. Co.*, 43 F.3d 367, 371 (8th Cir. 1994)).

8

Grounds upon which relief may be sought include, among other things, "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)," and "any other reason that justifies relief." The party seeking relief from a judgment or order pursuant to Rule 60(b) bears the burden of demonstrating by clear and convincing evidence that the prerequisites for such relief are satisfied. *See Info-Hold, Inc. v. Sound Merck, Inc.*, 538 F.3d 448, 454 (6th Cir. 2008).

Here, Zayo does not file this motion to ask this Court to reconsider its Order, but rather to respectfully request that this Court affirm Zayo's right to carry out Zayo's obligations, under this Court's Order, in the way that best serves the interest of justice for the Bankruptcy Estate and furthers the original intention of all parties involved (other than, of course, Keystone's hidden intention to manipulate the settlement for its own gain), by recouping the amount BDC owes to GuideWell and then paying GuideWell that amount directly. In the alternative, and for the same reasons, Zayo respectfully requests this Court grant relief under the Order by directing all funds owed to Guidewell be paid immediately to Guidewell upon the Chapter 7 trustee's receipt of the funds on the Estate's behalf.

**The Doctrine of Recoupment Justifies Relief under Rule 60(b)**

There is a catch-all provision under Rule 60(b)(6) which allows the Court to grant relief for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). As will be discussed below, there are strong equitable considerations in favor of ensuring funds paid by Zayo are promptly received by GuideWell. Moreover, there is no prejudice against the other parties in allowing Zayo to recoup these funds. As such, the reasoning underlying the doctrine of recoupment is in, and of itself, a "reason that justifies relief" under Rule 60(b)(6).

9

**The Doctrine of Recoupment, Generally**

In bankruptcy cases, recoupment is an equitable doctrine allowing:

> a defendant to deduct its claim from the amount the plaintiff could otherwise recover if the claim arises out of the same transaction or subject matter on which the plaintiff sued. . . . Recoupment . . .allows a creditor in bankruptcy "to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the [debtor's] claim." . . . To justify recoupment in bankruptcy, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."

*In re Terry*, 687 F.3d 961, 965 (8th Cir. 2012) (internal citations omitted). "In other words, recoupment is the determination of the rights of parties to a single transaction so as to determine the net liability one to the other out of that single transaction." *In re Clemens*, 261 B.R. 602, 606 (Bankr. M.D. Pa. 2001) (citing 9D Am.Jur.2d *Bankruptcy* § 2558 (1999)).

Additionally, funds subject to recoupment are not considered part of the debtor's estate and, as such, are not subject to the automatic stay.[2] Recoupment is not limited only to prepetition claims; recoupment may be employed to recover across the petition date. 11 U.S.C. § 553(a); *In re Gardens Regional Hospital and Medical Center, Inc.*, 975 F.3d 926 (9th Cir. 2020).

The doctrine of recoupment is limited to situations in which "both debts arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Malinowski,* 156 F.3d at 133, quoting *University Med. Ctr. v. Sullivan (In re University Med. Ctr.),* 973 F.2d 1065, 1081 (3d Cir.1992). To meet the "same transaction" test, the parties' claims against each other must "result from a set of

---

[2] *Malinowski v. N.Y. State DOL (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998); *see Kosadnar*, 157 F.3d at 1016; *Holford v. Powers (In re Holford)*, 896 F.2d 176, 179 (5th Cir. 1990); *In re Norsal Indus., Inc.*, 147 B.R. 85, 87 (Bankr. E.D.N.Y. 1992) (stating that "for purposes of bankruptcy two points distinguish them. First, set-off of a prepetition debt against a prepetition claim is explicitly stayed by virtue of Section 362(a)(7). There is no such explicit prohibition on recoupment. Second, the right to set-off is limited by Section 553 of the Bankruptcy Code. There are no similar limitations on the right of recoupment.").

10

reciprocal contractual obligations or from the same set of facts." *Malinowski*, 156 F.3d at 134. "The Supreme Court has opined: '"Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" *In re Madigan*, 270 B.R. 749, 755 (B.A.P. 9th Cir. 2001) (citing *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)). "Fairness and equity may influence whether two competing claims arise from the same transaction." *In re Terry*, 687 F.3d at 965.

**The Doctrine of Recoupment as Applied to Construction Contracts**

Although there is no controlling case law in the 8th Circuit applying the doctrine of recoupment to pay sub-contractors as Zayo intends to do, it has been considered in other circuits, and the overwhelming consensus of those cases, described below, is that general contractors are entitled to recoup funds in an effort to pay a sub-sub-contractor with a mechanic's lien on the property, just as Zayo proposes to use recoupment to compensate GuideWell (a sub-sub-contractor of Zayo's and BDC's sub-contractor).

In the case *Matter of U.S. Abatement Corp.*, the 5th Circuit Court of Appeals held that the district court clearly erred in finding that the same transaction was not at issue; when, one claim was by the property owner for indemnification by the general contractor for lien payments made to a subcontractor did not arise from the same transaction, and the other claim was by the general contractor for payment from the property owner for work completed. 79 F.3d 393, 399 (5th Cir. 1996). In doing so, the 5th Circuit found that, under the agreement, there was an expectation to keep the property clear of liens and; therefore, the claims arose out of the same transaction. *Id.* Additionally, the 5th Circuit considered applicable state case law holding that persons in the property owner's position were entitled to withhold the amount of the liens from the contractor as

11

further evidence that it was in the interest of justice to allow the property owner to recoup the funds. *See id.* at 399-400.

> The Court of Appeals reasoned:
>
> The terms of the contract between [the general contractor] and [the property owner] not only govern [the property owner's] payments to [the general contractor], but also impose clear obligations on [the general contractor] to keep [the property owner's] property lien free. The Indemnity Clause of the contract provides that [the general contractor] will "indemnify and hold [the property owner] harmless against the payment of any and all ... liens ... against its property ... growing out of or incident to [the general contractor's] operation hereunder." Moreover, the Retainage Clause authorizes [the property owner] to withhold thirty percent of the money due to [the general contractor] as leverage to ensure that [the general contractor] would compensate in full all subcontractors or vendors who might assert lien rights against [the property owner's] property. **These contractual clauses proclaim a "normal expectation" that contractors will "keep jobs lien free." Thus, [the property owner's] claims against [the general contractor] for reimbursement of lien payments arise from the same transaction under which [the general contractor] seeks payment from [the property owner].** At least three prior cases have directly addressed the question whether an owner in [the property owner's] position is entitled to withhold payments from a contractor when unpaid subcontractors assert lien rights against the owner's property pursuant to Louisiana law. *In each case,* the court concluded that the owner has the right to retain the amount of the liens from the sums it owes the contractor.
>
> We agree. Recoupment is "an equitable doctrine designed to determine a just liability on [a] claim"; and under the circumstances presented by this appeal, equity dictates that [the property owner] pay [the general contractor] only the contract price *less* the amounts it has paid or will have to pay to remove the liens placed on its property by [the general contractor's] unpaid subcontractors and vendors. **The only reason that [the property owner] is burdened by the lien payments is [the general contractor's] failure to meet its obligation to keep [the property owner's] property free of liens. It is only just and equitable that [the property owner] be allowed to recoup the amount of the lien payments from the amount it owes [the general contractor]**.

*Id.* at 399-400 (footnotes omitted) (bold emphasis added; italic emphasis in original). Similarly, *In re Davidson Lumber Sales, Inc.*, the 10th Circuit Court of Appeals considered whether a general contractor would be allowed to recoup funds owed to the debtor-contractor who had failed to pay a sub-contractor when the general contractor was contractually obligated to the

12

owner of the project to deliver the project free of mechanics liens. 66 F.3d 1560 (10th Cir. 1995). The 10th Circuit did not decide whether recoupment or set-off was more applicable in the case but nonetheless held that, even under the more burdensome requirements of setoff, the general contractor was entitled to withhold the funds to pay the sub-contractor. *Id.* at 1564, fn. 1.

The 10th Circuit in *Davidson Lumber Sales* cited case law that discussed special considerations present in the construction industry where payments are made down the line:

> Like the law merchant of an earlier day, the building trades have gradually created a set of commercial expectations as the result of the customs and practices of the industry. The nature of the industry is such that the commercial expectations of the parties are defeated when a building contractor or subcontractor does not use accounts paid to him on a job to pay subcontractors or materialmen. Unless the parties see that construction funds are properly applied down the line, the liabilities of the parties up the line are affected. The unpaid workers must undertake the lengthy and wasteful process of filing, perfecting and foreclosing on their mechanics liens. The owner's property and the construction lender's security are encumbered.
>
> . . . [T]o preserve the economic viability of the multi-tier payment system used in the construction industry, courts and legislatures have increasingly found that **the parties have an *independent legal duty* arising from reasonable commercial expectations to see to the proper application of construction funds. In the absence of statute, courts have declared that construction funds in the hands of a contractor are held subject to a constructive trust or an equitable assignment or an equitable lien.** Even in the absence of a state builders trust statute, federal bankruptcy courts in a variety of situations have refused to apply the property, preference and statutory liens sections of the Bankruptcy Act to favor unsecured creditors over the equitable claims of subcontractors and materialmen to the proceeds of a construction project in the hands of a bankrupt contractor.

*Id.* at 1566-67 (emphasis added). The Court of Appeals then cited cases "holding that when a general contractor pays a supplier on the basis of an independent legal obligation, those payments do not become part of the bankruptcy estate," as the basis for its own ruling. *Id.* at 1567-68 (citing *Crocker v. Braid Elec. Co. (In re Arnold)*, 908 F.2d 52, 56 (6th Cir.1990); *Shaw Indus., Inc. v. Gill (In re Flooring Concepts, Inc.)*, 37 B.R. 957, 961 (9th Cir. BAP 1984); *Rieser v. Bruck Plastics*

13

*Co. (In re Trinity Plastics, Inc.)*, 138 B.R. 203, 207 (Bankr.S.D.Ohio 1992).

Lastly, the 10th Circuit found that the automatic stay didn't prevent set-off for post-petition obligations because "allowing set-off would not 'violate the reasons behind the rules expressed or implied' by that section." *See id.* at 1570 (citation omitted). The Court reasoned:

> The primary function of section 362(a)(7), which as we have observed applies by its terms to the setoff of a prepetition debt, "is to permit rehabilitation of Chapter 11 debtors." . . . "[I]f the right to set-off will not substantially interfere with the debtor's reorganization effort and has been obtained in good faith, equitable considerations favor lifting the automatic stay to allow set-off." . . . The automatic stay is thus intended to promote the purposes of the Bankruptcy Code in rehabilitating Chapter 11 debtors. Presumably the same considerations would apply to the application of section 362(a)(3) to post-petition setoff. "Property acquired by the debtor post-bankruptcy must be used for the benefit of all unsecured creditors or for the debtor's benefit in reorganizing or for the debtor's fresh start." . . . .
> Here . . . denying the right to setoff would not increase the funds available to pay unsecured claims or give the debtor the use of the money for reorganization or for a fresh start. The setoff would at most only affect an asset, the accounts receivable assigned to the bank, which would otherwise not be available for any of the purposes underlying the automatic stay. Here, too, denying setoff on the basis of the automatic stay "will give [the creditor with a security interest in the debtors account receivables] an advantage based on bankruptcy law for no reason related to the bankruptcy case. [That creditor] should not get a windfall because [the debtor] happened to file bankruptcy. The result should be controlled by the law that would control outside of bankruptcy."
>
> Although the *Davidson Lumber Sales* case dealt with setoff instead of recoupment, the same equitable considerations apply in both doctrines. Moreover, the Court in *Davidson Lumber Sales* specifically did not consider recoupment under the assumption that if setoff were available then recoupment would also be available.

*Id.* at 1564, fn. 1.

**Based on the Analysis From Other Jurisdictions, Zayo Should Be Entitled to Recoup the Funds Owed to BDC under Applicable Bankruptcy Law**

Based on the consistent holdings in similar cases from other jurisdictions, Zayo should be entitled to recoup funds owed to BDC to pay GuideWell, simultaneously satisfying GuideWell's mechanics liens and satisfying GuideWell's administrative expense claim against the BDC estate.

14

First, there is an indemnification clause in the contract between Zayo and BDC covering payments Zayo makes to remove mechanics liens from BDC's sub-contractors and, like the *U.S. Abatement Corp.* case, the claims arise out of the same transaction.

Moreover, even if there were no indemnification clause, the claims would still arise out of the same transaction because of the strong equity considerations and the nature of the construction industry's "down the line payments concept" that result in a logical relationship between the obligations.

Additionally, Section 572.33A of the Iowa Code provides:

> An owner of a [commercial] building, land, or improvement upon which a mechanic's lien of a subcontractor may be posted is not required to pay the general contractor compensation for work done unless the general contractor furnishes to the owner one of the following:
> a. Receipts and waivers of claims for mechanics' liens, signed by all persons who furnished material or performed labor for the building, land, or improvement.
> b. A good and sufficient bond to be approved by the owner, conditioned that the owner shall be held harmless from any loss which the owner may sustain by reason of the posting of mechanics' liens by subcontractors.

Like the state in *U.S. Abatement Corp.*, Section 572.33A shows the Iowa legislature's intent to facilitate down the line payments in the construction industry by avoiding windfalls to contractors who do not pay their subcontractors and is further evidence that the interests of justice are well served to allow Zayo to recoup funds from BDC to pay BDC's subcontractor, GuideWell.

Like the general contractor in the *Davidson Lumber Sales* case, Zayo has an independent obligation to the property owners—here several railroad companies and other third-party landowners not before this Court—to keep the property free and clear of liens. As such, payments to GuideWell should not be considered part of the bankruptcy estate. *See In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560 (citing *Crocker v. Braid Elec. Co. (In re Arnold)*, 908 F.2d 52, 56 (6th Cir.1990); *Shaw Indus., Inc. v. Gill (In re Flooring Concepts, Inc.)*, 37 B.R. 957, 961 (9th Cir.

15

BAP 1984); *Rieser v. Bruck Plastics Co. (In re Trinity Plastics, Inc.)*, 138 B.R. 203, 207 (Bankr.S.D.Ohio 1992).

Lastly, like in *Davidson Lumber Sales*, any payment made to the debtor's estate does not increase the size of the estate, but instead "will give [the creditor with a security interest in the bank account] an advantage based on bankruptcy law for no reason related to the bankruptcy case," resulting in an inappropriate windfall to that creditor.  Were Zayo to pay a half million dollars under the Consent Order into the estate only for Keystone to snatch all of it, Keystone would obtain exactly that type of unwarranted windfall.  It can hardly be gainsaid that Keystone's rapacious conduct makes Keystone the least deserving recipient of a windfall one could reasonably imagine.

WHEREFORE, Zayo requests entry of an order clarifying Zayo's authority under the Consent Order to recoup from BDC all funds owed to GuideWell so that Zayo may pay GuideWell directly, thereby satisfying the true intent of the Consent Order; or, in the alternative, grant relief under the Order by directing all funds owed to Guidewell be paid immediately to Guidewell.

RESPECTFULLY SUBMITTED,

Dated:  March 15, 2024

/s/ *Jeffrey Goetz*
Jeffrey D. Goetz, Esq., AT#000
Dickinson Bradshaw Fowler & Hagen, P.C.
801 Grand Avenue, Ste. 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
jgoetz@dickinsonbradshaw.com

/s/ *Jordan Kroop*
Jordan A. Kroop, Esq., *Pro Hac Vice*
Jason Rosell, Esq., *Pro Hac Vice*
Pachulski Stang Ziehl & Jones, LLP
780 Third Ave., 34th Floor
New York, NY  10017
212/561-7734
jkroop@pszjlaw.com
jrosell@pszjlaw.com

**All future notices will be sent to the above address.**

CERTIFICATE OF SERVICE: This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

*/s/ Brenda Mozena*