# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | ) Case No.: 23-00484 |
| | ) |
| **BDC GROUP, INC.,** | ) Chapter 7 (Converted from Chapter 11) |
| | ) |
| Debtor. | ) Hon. Thad J. Collins |
| | ) |
| EIN: 47-2908533 | ) **ZAYO GROUP'S AMENDED OBJECTION TO** |
| | ) **KEYSTONE SAVINGS BANK'S MOTION** |
| | ) **FOR ORDER TO SHOW CAUSE** |
| | ) |
| | ) No Hearing Set |

**COMES NOW**, Zayo Group, LLC ("Zayo"), by and through its counsel of record in this case, Jeffrey D. Goetz, Esq., of the law firm of Dickinson, Bradshaw, Fowler & Hagen, P.C., and Jordan A. Kroop, Esq., and Jason Rosell, Esq., of the law firm of Pachulski, Stang, Ziehl & Jones, LLP, and hereby files with this Honorable Court its amended objection to Keystone Savings Bank's *Motion for Order to Show Cause* (Docket Item 431, "**Contempt Motion**").

Zayo is not in contempt of, and has not violated, this Court's *Stipulated Order for Stay Relief and Other Matters*, dated January 24, 2024 (Docket Item 361, "**Stipulated Order**"). The Stipulated Order: (1) required Zayo to pay the BDC estate $237,824.14 under Paragraph 3 ("**First Amount**"); (2) required Zayo to pay $243, 317.51 and retain $50,000 on account of "retainage" pending future testing of fiber optic cable installation under Paragraph 4 ("**Second Amount**"); and (3) provided under Paragraph 5 that $241,642.90 ("**Third Amount**") would be the subject of future resolution.[1]

---

[1] Although the Stipulated Order does not make this explicit, the parties informed the Court that they all intended that a mediation would occur among the Debtor, Keystone, Zayo, and GuideWell to resolve the Third Amount.

- ✓ **Zayo has paid the First Amount.[2]**

- ✓ **Zayo has satisfied the Second Amount via recoupment by paying $300,000 to GuideWell.[3]**

- ✓ **Zayo remains ready and willing to proceed with a mediation to resolve the Third Amount and any remaining disputes.**

## PROCEDURAL HISTORY

On December 7, 2023, Zayo filed its motion for relief from the automatic stay (Docket Item 307) ("**RS Motion**") to terminate its executory Master Construction Services Agreement with the Debtor because BDC had materially breached that contract in ways impossible for BDC to cure. The RS Motion detailed those breaches.

Zayo alleged in the RS Motion that BDC had submitted progress payment invoices to Zayo for work done by BDC and its sub-contractor GuideWell, executing multiple "Lien Waivers and Release Upon Progress Payment" ("**Lien Waivers**") to Zayo requesting Zayo's payment as a result. Zayo timely paid BDC for those progress payment invoices. Zayo later learned that BDC had submitted fraudulent Lien Waivers because BDC had never paid GuideWell, who, in turn, filed mechanics liens in Illinois and Iowa on property owned by several railroad companies where fiber optic cable was being installed. Those railroad companies subsequently banned Zayo, BDC, and GuideWell from entering their property until the mechanics liens were withdrawn, preventing Zayo from delivering timely services to its many clients, some of the largest technology companies in the world. Zayo's damages were potentially astronomical.

---

[2] On April 4, 2024, Zayo wired to the Chapter 7 Trustee payment in the amount of $237,824.14. The Chapter 7 Trustee has confirmed receipt.

[3] On April 1, 2024, Zayo wired to GuideWell payment in the amount of $300,000. Guidewell confirmed receipt of this payment and has since recorded the release of all its liens (in Cedar, Muscatine and Scott counties in Iowa, and Henry and LaSalle counties in Illinois). In return, GuideWell agreed to waive and release all claims against the BDC bankruptcy estate, including its approximately $350,000 administrative expense claim.

On December 12, 2023, the Debtor filed its Resistance (Docket Item 322) to the RS Motion, generally asserting without specificity that the Debtor "disputes Zayo's Motion's factual allegations," yet did not dispute that it had breached its agreement with Zayo. Although not a party to the subject contract between BDC and Zayo, Keystone filed its own separate Resistance (Docket Item 323) to the RS Motion on December 14, 2023.

Although not served with formal discovery requests, Zayo—in a good-faith effort to amicably reach a consensual resolution of objections to the RS Motion—agreed to exchange documentary evidence with Keystone, the Debtor, and the Official Committee of Unsecured Creditors. Zayo provided a copious amount of documents in at least 21 categories responsive to Keystone's informal discovery requests.

Notwithstanding Zayo's robust production of relevant and material responses to Keystone's informal discovery requests, Keystone sought and obtained two additional continuances of the hearing on the RS Motion.

After spending multiple hours over several weeks of settlement discussions by video and telephone conferences and exchanges of email and documents between Zayo, BDC, Keystone, and the Committee, Zayo and Keystone executed and filed the Stipulated Order granting Zayo relief from the automatic stay, which the Court then entered on January 24, 2024.  BDC did not execute or sign off on the Stipulated Order but BDC was at all times an integral part of the settlement discussions that led up to the Stipulated Order.

The next day, Keystone declared a default under the DIP financing order, cut BDC's access to working capital, and filed its first *Motion for Relief from Stay re: Set Off and Account Freeze* (Docket Item 363).  The next day after that, Keystone filed a second motion for relief from stay, ultimately forcing the Debtor to move to convert its case from Chapter 11 to Chapter

3

7, which the Court granted on January 30, 2024 (Docket Item 384). Among other things, the case's conversion removed BDC from possession and made the planned mediation—to which BDC was integral because of its sole knowledge of disputes pertaining to GuideWell's invoices—essentially impossible. Faced with a radically changed landscape in which Keystone expressed its intention to sweep all funds Zayo would pay under the Stipulated Order—which would have deprived the estate of any recovery, would have left the estate with a nearly $300,000 administrative expense claim in GuideWell's favor, and would have made it impossible for the GuideWell liens to be released—Zayo began discussions with the Chapter 7 trustee and her counsel to attempt to deal with how the case's conversion affected the Stipulated Order.

**Specifically, had Zayo paid $300,000 toward the Second Amount to the estate under circumstances in which those funds would *not* be used to satisfy GuideWell's liens, Zayo would be forced to *pay $300,000 twice*—once, as required by the Stipulated Order, and a second time to clear the GuideWell liens** that had been placed on third parties' property through absolutely no fault or involvement on Zayo's part. It remained paramount for Zayo to clear the GuideWell liens because the landowners continued to prevent Zayo from accessing Zayo's own worksites unless and until the GuideWell liens were released. Given these radically changed circumstances and the parties' original intentions for the Stipulated Order and the mediation (which would have resulted in a process to release the GuideWell liens in all events), neither Zayo nor the Chapter 7 trustee believed that Zayo should be forced to pay $300,000 twice and provide an unwarranted windfall to Keystone.

On February 23, 2024, Keystone filed the instant Contempt Motion. Zayo initially objected to it and simultaneously filed a motion under Bankruptcy Rule 7024 for relief from the

4

Stipulated Order, citing the changed circumstances described above. Following a telephonic hearing on March 26, 2024, at which Zayo's and Keystone's respective counsel agreed that the open disputes should be narrowed to the propriety of Zayo's recoupment, Zayo withdrew its Rule 9024 motion and its initial objection to the Contempt Motion without prejudice.

This amended objection is intended to focus the Court's attention on a sole legal issue: was it proper for Zayo to avoid paying $300,000 twice for the same debt (*i.e.,* the Second Amount) by paying $300,000 directly to GuideWell and recouping that amount from the BDC estate in satisfaction of the Second Amount in the Stipulated Order.

It was.

## RECOUPMENT

Because Zayo has paid the First Amount to the Chapter 7 estate, Zayo has satisfied Paragraph 3 of the Stipulated Order. Because Zayo remains ready and willing to engage in a mediation or other process to resolve disputes pertaining to the Third Amount and nothing in the Stipulated Order required Zayo to pay any portion of the Third Amount, Zayo has not violated Paragraph 5 of the Stipulated Order. The sole dispute among the parties now is whether, by taking a recoupment against the estate for the Second Amount via payment of $300,000 to GuideWell, Zayo has satisfied its obligations regarding the Second Amount in the Stipulated Order.

Zayo respectfully asserts that it has. Accordingly, there is no factual or legal basis to hold Zayo in contempt of the Stipulated Order.

### The Doctrine of Recoupment, Generally

In bankruptcy cases, recoupment is an equitable doctrine allowing:

> a defendant to deduct its claim from the amount the plaintiff could otherwise recover if the claim arises out of the same transaction or subject matter on which the plaintiff sued. . . . Recoupment . . .allows a creditor in bankruptcy "to show that because of matters arising out of the transaction sued on, he or she is not

5

liable in full for the [debtor's] claim." . . . To justify recoupment in bankruptcy, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."[4]

"In other words, recoupment is the determination of the rights of parties to a single transaction so as to determine the net liability one to the other out of that single transaction."[5]

Additionally, funds subject to recoupment are not considered part of the debtor's estate and, as such, are not subject to the automatic stay.[6] Recoupment is not limited only to prepetition claims; recoupment may be employed to recover across the petition date.[7]

The doctrine of recoupment is limited to situations in which "both debts arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."[8] To meet the "same transaction" test, the parties' claims against each other must "result from a set of reciprocal contractual obligations or from the same set of facts."[9] "The Supreme Court has opined: '"Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'"[10] "Fairness and equity may influence whether two competing claims arise from the same transaction."[11]

---

[4] *In re Terry*, 687 F.3d 961, 965 (8th Cir. 2012) (internal citations omitted).
[5] *In re Clemens*, 261 B.R. 602, 606 (Bankr. M.D. Pa. 2001) (citing 9D Am.Jur.2d *Bankruptcy* § 2558 (1999)).
[6] *Malinowski v. N.Y. State DOL (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998); *see Kosadnar*, 157 F.3d at 1016; *Holford v. Powers (In re Holford)*, 896 F.2d 176, 179 (5th Cir. 1990); *In re Norsal Indus., Inc.*, 147 B.R. 85, 87 (Bankr. E.D.N.Y. 1992) (stating that "for purposes of bankruptcy two points distinguish them. First, set-off of a prepetition debt against a prepetition claim is explicitly stayed by virtue of Section 362(a)(7). There is no such explicit prohibition on recoupment. Second, the right to set-off is limited by Section 553 of the Bankruptcy Code. There are no similar limitations on the right of recoupment.").
[7] 11 U.S.C. § 553(a); *In re Gardens Regional Hospital and Medical Center, Inc.*, 975 F.3d 926 (9th Cir. 2020).
[8] *Malinowski,* 156 F.3d at 133, quoting *University Med. Ctr. v. Sullivan (In re University Med. Ctr.),* 973 F.2d 1065, 1081 (3d Cir.1992).
[9] *Malinowski*, 156 F.3d at 134.
[10] *In re Madigan*, 270 B.R. 749, 755 (B.A.P. 9th Cir. 2001) (citing *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)).
[11] *In re Terry*, 687 F.3d at 965.

**The Doctrine of Recoupment as Applied to Construction Contracts**

Although there is no controlling case law in the Eighth Circuit applying the doctrine of recoupment to pay sub-contractors as Zayo did, it has been considered in other circuits, and the overwhelming consensus of those cases, described below, is that general contractors are entitled to recoup funds in an effort to pay a sub-sub-contractor with a mechanic's lien on property, exactly as Zayo used recoupment to satisfy the invoices of, and clear the liens filed by, GuideWell (a sub-sub-contractor of Zayo's and BDC's sub-contractor).

In *Matter of U.S. Abatement Corp.*, the Fifth Circuit Court of Appeals held that the district court clearly erred in finding that the same transaction was not at issue when (a) one claim was by the property owner for indemnification by the general contractor for lien payments made to a subcontractor and (b) the other claim was by the general contractor for payment from the property owner for work completed.[12] The Fifth Circuit ruled that, under the agreement, there was an expectation to keep the property clear of liens and, therefore, the claims arose out of the same transaction.[13] Additionally, the court there considered applicable state case law holding that persons in the property owner's position were entitled to withhold the amount of the liens from the contractor as further evidence that it was in the interest of justice to allow the property owner to recoup the funds.[14]

> The Court of Appeals reasoned:
>
> The terms of the contract between [the general contractor] and [the property owner] not only govern [the property owner's] payments to [the general contractor], but also impose clear obligations on [the general contractor] to keep [the property owner's] property lien free. The Indemnity Clause of the contract provides that [the general contractor] will "indemnify and hold [the property owner] harmless against the payment of any and all ... liens ... against its property ... growing out of or incident to [the general contractor's] operation

---

[12] 79 F.3d 393, 399 (5th Cir. 1996).
[13] *Id.*
[14] *See id.* at 399-400.

7

> hereunder." Moreover, the Retainage Clause authorizes [the property owner] to withhold thirty percent of the money due to [the general contractor] as leverage to ensure that [the general contractor] would compensate in full all subcontractors or vendors who might assert lien rights against [the property owner's] property. **These contractual clauses proclaim a "normal expectation" that contractors will "keep jobs lien free." Thus, [the property owner's] claims against [the general contractor] for reimbursement of lien payments arise from the same transaction under which [the general contractor] seeks payment from [the property owner].** At least three prior cases have directly addressed the question whether an owner in [the property owner's] position is entitled to withhold payments from a contractor when unpaid subcontractors assert lien rights against the owner's property pursuant to Louisiana law. *In each case,* the court concluded that the owner has the right to retain the amount of the liens from the sums it owes the contractor.
>
> We agree. Recoupment is "an equitable doctrine designed to determine a just liability on [a] claim"; and under the circumstances presented by this appeal, equity dictates that [the property owner] pay [the general contractor] only the contract price *less* the amounts it has paid or will have to pay to remove the liens placed on its property by [the general contractor's] unpaid subcontractors and vendors. **The only reason that [the property owner] is burdened by the lien payments is [the general contractor's] failure to meet its obligation to keep [the property owner's] property free of liens. It is only just and equitable that [the property owner] be allowed to recoup the amount of the lien payments from the amount it owes [the general contractor].**[15]

Similarly, *In re Davidson Lumber Sales, Inc.*, the Tenth Circuit Court of Appeals considered whether a general contractor could recoup funds owed to the debtor-contractor who had failed to pay a sub-contractor when the general contractor was contractually obligated to the owner of the project to deliver the project free of mechanics liens.[16] The Tenth Circuit did not decide whether recoupment or set-off was more applicable in the case but nonetheless held that, even under the more burdensome requirements of setoff, the general contractor was entitled to withhold the funds to pay the sub-contractor.[17]

---

[15] *Id.* at 399-400 (footnotes omitted) (bold emphasis added; italic emphasis in original).
[16] 66 F.3d 1560 (10th Cir. 1995).
[17] *Id.* at 1564, fn. 1.

The *Davidson Lumber Sales* court cited case law discussing the special considerations present in the construction industry where payments are made down the line:

> Like the law merchant of an earlier day, the building trades have gradually created a set of commercial expectations as the result of the customs and practices of the industry. The nature of the industry is such that the commercial expectations of the parties are defeated when a building contractor or subcontractor does not use accounts paid to him on a job to pay subcontractors or materialmen. Unless the parties see that construction funds are properly applied down the line, the liabilities of the parties up the line are affected. The unpaid workers must undertake the lengthy and wasteful process of filing, perfecting and foreclosing on their mechanics liens. The owner's property and the construction lender's security are encumbered.
>
> . . . to preserve the economic viability of the multi-tier payment system used in the construction industry, courts and legislatures have increasingly found that **the parties have an *independent legal duty* arising from reasonable commercial expectations to see to the proper application of construction funds. In the absence of statute, courts have declared that construction funds in the hands of a contractor are held subject to a constructive trust or an equitable assignment or an equitable lien.** Even in the absence of a state builders trust statute, federal bankruptcy courts in a variety of situations have refused to apply the property, preference and statutory liens sections of the Bankruptcy Act to favor unsecured creditors over the equitable claims of subcontractors and materialmen to the proceeds of a construction project in the hands of a bankrupt contractor.[18]

The court then cited cases "holding that when a general contractor pays a supplier on the basis of an independent legal obligation, those payments do not become part of the bankruptcy estate," as the basis for its own ruling.[19]

Lastly, the Tenth Circuit found that the automatic stay did not prevent set-off for post-petition obligations because "allowing set-off would not 'violate the reasons behind the rules expressed or implied' by that section.":[20]

---

[18] *Id.* at 1566-67 (emphasis added).
[19] *Id.* at 1567-68 (citing *Crocker v. Braid Elec. Co. (In re Arnold)*, 908 F.2d 52, 56 (6th Cir.1990); *Shaw Indus., Inc. v. Gill (In re Flooring Concepts, Inc.)*, 37 B.R. 957, 961 (9th Cir. BAP 1984); *Rieser v. Bruck Plastics Co. (In re Trinity Plastics, Inc.)*, 138 B.R. 203, 207 (Bankr.S.D.Ohio 1992).
[20] *See id.* at 1570 (citation omitted).

9

The primary function of section 362(a)(7), which as we have observed applies by its terms to the setoff of a prepetition debt, "is to permit rehabilitation of Chapter 11 debtors." … "[I]f the right to set-off will not substantially interfere with the debtor's reorganization effort and has been obtained in good faith, equitable considerations favor lifting the automatic stay to allow set-off." … The automatic stay is thus intended to promote the purposes of the Bankruptcy Code in rehabilitating Chapter 11 debtors. Presumably the same considerations would apply to the application of section 362(a)(3) to post-petition setoff. "Property acquired by the debtor post-bankruptcy must be used for the benefit of all unsecured creditors or for the debtor's benefit in reorganizing or for the debtor's fresh start." ….

Here … denying the right to setoff would not increase the funds available to pay unsecured claims or give the debtor the use of the money for reorganization or for a fresh start. The setoff would at most only affect an asset, the accounts receivable assigned to the bank, which would otherwise not be available for any of the purposes underlying the automatic stay. Here, too, denying setoff on the basis of the automatic stay "will give [the creditor with a security interest in the debtors account receivables] an advantage based on bankruptcy law for no reason related to the bankruptcy case. [That creditor] should not get a windfall because [the debtor] happened to file bankruptcy. The result should be controlled by the law that would control outside of bankruptcy."

Although the *Davidson Lumber Sales* case dealt with setoff instead of recoupment, the same equitable considerations apply in both doctrines. Moreover, the Court in *Davidson Lumber Sales* specifically did not consider recoupment under the assumption that if setoff were available then recoupment would also be available.[21]

### Zayo Properly Recouped the Funds Owed to BDC

Based on the consistent appellate holdings in strikingly similar cases from other jurisdictions, Zayo's payment to GuideWell properly operated as recoupment of funds owed to BDC (*i.e.,* the Second Amount), which simultaneously satisfied GuideWell's mechanics liens and satisfied GuideWell's administrative expense claim against the BDC estate, conferring a $350,000 benefit to the Chapter 7 estate and its creditors. Zayo could take a recoupment for several reasons.

First, there is an indemnification clause in the contract between Zayo and BDC making BDC liable for payments Zayo makes to remove mechanics liens from BDC's sub-contractors and,

---

[21] *Id.* at 1564, fn. 1.

10

like the *U.S. Abatement Corp.* case, the claims arise out of the same transaction.[22] Had Zayo not recouped the $300,000 it paid to GuideWell to remove its liens, Zayo would have had a commensurate administrative expense claim against the estate—one that may never have been paid, considering the case's conversion to Chapter 7. Instead of two administrative expense claims for approximately $650,000 in total, Zayo's recoupment ensured there would be none.

Second, even without this indemnification clause, the claims would still arise out of the same transaction because of the strong equity considerations and the nature of the construction industry's "down the line payments concept" that result in a logical relationship between Zayo's obligations to BDC and BDC's obligations to GuideWell. Consider Iowa Code § 572.33A:

> An owner of a [commercial] building, land, or improvement upon which a mechanic's lien of a subcontractor may be posted is not required to pay the general contractor compensation for work done unless the general contractor furnishes to the owner one of the following:
>
> a. Receipts and waivers of claims for mechanics' liens, signed by all persons who furnished material or performed labor for the building, land, or improvement.
>
> b. A good and sufficient bond to be approved by the owner, conditioned that the owner shall be held harmless from any loss which the owner may sustain by reason of the posting of mechanics' liens by subcontractors.

Like the state in *U.S. Abatement Corp.*, § 572.33A shows the Iowa legislature's clear intent to facilitate down-the-line payments in the construction industry by avoiding windfalls to contractors who fail to pay their subcontractors. Zayo's contract with BDC, Iowa law, and the paramount interests of justice are well served by allowing Zayo to recoup funds from BDC to pay BDC's subcontractor, GuideWell.

---

[22] Section 30.1 of the Master Construction Services Agreement between Zayo and BDC provides: Contractor [BDC] agrees to … indemnify … Company [Zayo] … from and against, any and all claims … losses … (and all expenses associated therewith …) with respect to: … (f) Any failure by Contractor to pay its subcontractors [GuideWell] … for any services, materials, equipment, labor, or other charges, resulting in the filing, recording, assertion, or claim of any and all mechanic's, materialmen's, or other similar liens, claims, or actions.

11

Third, like the general contractor in *Davidson Lumber Sales*, Zayo has an independent obligation to the property owners—here several railroad companies and other third-party landowners not before this Court—to keep the property free and clear of liens. As such, payments to GuideWell in satisfaction of its liens do not constitute part of BDC's bankruptcy estate.[23] Nor do those funds constitute either Keystone's collateral or proceeds of Keystone's collateral.

Last, like in *Davidson Lumber Sales*, any payment made to the debtor's estate does not increase the size of the estate, but instead "will give [the creditor with a security interest in the bank account] an advantage based on bankruptcy law for no reason related to the bankruptcy case," resulting in an inappropriate windfall to that creditor. Thus, instead of paying hundreds of thousands of dollars to the estate only to have Keystone claim it all—resulting both in a windfall to Keystone and a failure to satisfy either GuideWell's mechanic's liens or its administrative expense claim against the estate—Zayo has upheld the parties' overall intent in the Stipulated Order, has cleared the GuideWell liens, has satisfied GuideWell's approximately $350,000 administrative expense claim in this case, and has satisfied its obligations regarding the Second Amount in the Stipulated Order via a recoupment amply supported by contract, statute, and appellate caselaw throughout the country.

The Court could reasonably wonder why Zayo would agree in the Stipulated Order to pay the estate this amount rather than exercise its right to recoupment at that time. The answer to that question is two-fold: (1) at the time the parties negotiated the Stipulated Order, the Debtor was disputing a significant portion of GuideWell's invoices and had intended to use the multi-party mediation to resolve those disputes; and (2) Zayo was acceding to the Debtor's and Keystone's

---

[23] *See In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560 (citing *Crocker v. Braid Elec. Co. (In re Arnold)*, 908 F.2d 52, 56 (6th Cir.1990); *Shaw Indus., Inc. v. Gill (In re Flooring Concepts, Inc.)*, 37 B.R. 957, 961 (9th Cir. BAP 1984); *Rieser v. Bruck Plastics Co. (In re Trinity Plastics, Inc.)*, 138 B.R. 203, 207 (Bankr.S.D.Ohio 1992).

request that every effort be used in mediation to *both* clear the GuideWell liens *and* to maximize the recovery to the estate. When the case was converted and mediation including the Debtor became impossible, Zayo was left with no choice but to exercise its right to recoupment that accomplished both those goals—the GuideWell liens were cleared and the estate received a direct $350,000 benefit with the elimination of GuideWell's administrative expense claim in that amount.[24]

Keystone will likely argue that the recoupment deprived it of the ability to collect the $300,000 Zayo paid to GuideWell as part of its collateral, but (leaving aside the point made above that the payment was neither Keystone's collateral nor proceeds of Keystone's collateral) the parties—including Keystone—never intended for Zayo's money to go directly into Keystone's coffers without satisfying GuideWell's valid claims or releasing GuideWell's destructive mechanic's liens. Not that the law on recoupment makes this relevant, but Keystone has not been harmed in any way by the recoupment.

## CONCLUSION

Zayo has paid the First Amount. Zayo has satisfied the Second Amount via a proper recoupment (and has, in the process, conferred a $350,000 benefit on the estate). Zayo remains ready and willing to engage in an appropriate process to resolve all disputes pertaining to the Third Amount. Zayo has not violated any requirement of the Stipulated Order and certainly should not be held in contempt. Zayo respectfully requests this Honorable Court to deny the Contempt Motion.

---

[24] Zayo used its own expertise with fiber optic cable installation to carefully review GuideWell's liens and ultimately agreed with GuideWell to satisfy approximately $350,000 of invoices for a settled amount of $300,000.

RESPECTFULLY SUBMITTED,

Dated: April 17, 2024

/s/ *Jeffrey Goetz*
Jeffrey D. Goetz, Esq., AT#000
Dickinson Bradshaw Fowler & Hagen, P.C.
801 Grand Avenue, Ste. 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
jgoetz@dickinsonbradshaw.com

/s/ *Jordan Kroop*
Jordan A. Kroop, Esq., *Pro Hac Vice*
Jason Rosell, Esq., *Pro Hac Vice*
Pachulski Stang Ziehl & Jones, LLP
780 Third Ave., 34th Floor
New York, NY 10017
212/561-7734
jkroop@pszjlaw.com
jrosell@pszjlaw.com

**All future notices will be sent to the above address.**

CERTIFICATE OF SERVICE: This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/ *Brenda Mozena*

14