# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br>BDC GROUP, INC.,<br>    Debtor. | Bankruptcy Case No. 23-00484<br>Adversary No. _____ |
| KEYSTONE SAVINGS BANK,<br>    Plaintiff,<br>v.<br>LIBERTY MUTUAL INSURANCE COMPANY, and RENEE HANRAHAN, Trustee of the Bankruptcy Estate of BDC Group, Inc.,<br>    Defendants. | **COMPLAINT AND JURY DEMAND** |

COMES NOW Plaintiff Keystone Savings Bank, for its Complaint against Defendants Liberty Mutual Insurance Company and Renee Hanrahan, as Trustee of the Bankruptcy Estate of BDC Group, Inc., states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. BDC Group, Inc. ("Debtor") is an Iowa corporation with its principal place of business located in Hiawatha, Iowa. BDC is the Debtor in the above action.

2. Plaintiff Keystone Savings Bank ("Bank") is a bank organized under the laws of the State of Iowa, which maintains its primary office at 81 Main Street, Keystone, Iowa.

3. Defendant Liberty Mutual Fire Insurance Company "(Liberty Mutual") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, and is authorized to and does conduct business in the State of Iowa.

4. Defendant Renee Hanrahan is the acting and duly authorized representative of the Debtor's Bankruptcy Estate.

5. The Court has jurisdiction over the bankruptcy case and this adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This action is a core proceeding under 28 U.S.C. § 157.

6. Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

## PROCEDURAL BACKGROUND

7. On June 13, 2023, Debtors commenced a bankruptcy case under Chapter 11 of the U.S. Bankruptcy Code.

8. The bankruptcy case was converted to a proceeding under Chapter 7 in January 2024.

9. The bankruptcy case remains pending in the United States Bankruptcy Court for the Northern District of Iowa as case no. 23-00484.

## GENERAL ALLEGATIONS

10. Debtor operated a utility installation services and construction company with its principal office in eastern Iowa. The Debtor continued portions of its business after seeking bankruptcy protection, which operations halted by the time the case was converted to Chapter 7 in January 2024.

11. Debtor maintained three physical locations in Iowa and used a storage yard to store various equipment it owned, located at 11900 Livingston Road S-15, Manassas, VA 20109.

12. The Manassas, VA storage lot is an outdoor storage yard, surrounded by a tall chain link fence with a gate that is secured with a chained and locked dial padlock.

13. Debor used the storage location in Manassas, VA, among other things, to organize, secure, and deploy various pieces of equipment that it used in the area to perform contracts, including a large contract with Summit IG.

14. Approximately at the time the Debtor's sought bankruptcy protection or soon thereafter, it decided to wind up the business unit responsible for the performance of the Virginia operations. Debtor hired a professional to visit the storage lot, and identify and appraise the equipment secured there.

15. Early in the bankruptcy case Debtor's former employee, Hector, maintained the padlock code and provided access to certain creditors or individuals who would visit to appraise items or take possession where allowed, including the Debtor's hired professional.

16. The equipment secured at the Manassas VA lot included pieces of equipment that were assets owned by Debtor and pledged to the Bank, John Deere, and other creditors as collateral.

17. The Bank's duly perfected security interests extended to the Debtor's equipment, all proceeds of that equipment, and the Debtor's contract rights, general intangibles, and after-acquired property.

18. On or before October 27, 2023, several pieces of equipment, tools, and vehicles were stolen from the storage lot in Manassas VA. A list of certain equipment stolen from the Manassas VA lot is attached as Exhibit 1.

19. Debtor filed a police report with William County Police Department on October 27, 2023.

20. Liberty Mutual previously issued an insurance policy to Debtor for the coverage period of November 1, 2022 through November 1, 2023 under Policy Number YM2-Z91-472579-052 ("the Insurance Policy").

21. The Insurance Policy covers certain equipment under the Contractors' Equipment Coverage Blanket Equipment Form. That provision is believed to state, in part:

**PROPERTY COVERED**

"We" cover the following property unless the property is excluded or subject to limitations.

**Equipment Coverage** -- "We" cover direct physical loss caused by a covered peril to:

1. "your" "contractors' equipment"; and

2. "contractors' equipment" of others in "your" care, custody, or control.

\*\*\*

**PERILS EXCLUDED**

\*\*\*

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

\*\*\*

e. Missing Property -- "We" do not pay of missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

22. In addition to notifying local authorities, Debtor notified Liberty Mutual of the theft on November 8, 2023.

23. Subsequently, Liberty Mutual investigated the theft, which allegedly included a visit to the Manassas, VA lot and interviews with individuals possessing firsthand knowledge, such as former employees of the Debtor, employees of the storage lot, and a detective from the William County Police Department.

24. On March 25, 2024, Liberty Mutual sent a letter to Debtor denying coverage

for this loss. Denial Letter attached as Exhibit 2.

25. Liberty Mutual determined that the stolen equipment fell within the policy's "missing property" exclusion, concluding that the loss constituted an "unexplained or mysterious disappearance."

26. Liberty Mutual has not explained or articulated how, other than an act of theft, the stolen equipment was removed and transported from the storage lot.

27. An inventory of the storage lot was conducted in June 2023, confirming the presence and location of the subject items a few months before they were reported stolen.

28. Because the Debtor ceased its operations in Virginia, the stolen equipment was not being used or transported out of the storage lot after the Debtor filed bankruptcy.

29. The storage yard was consistently contained and secured between June 2023 and October 2023.

30. Many of the subject items consist of large machinery that could not have simply been misplaced or disappeared without explanation.

31. The stolen equipment did not drive away on its own.

32. The stolen equipment did not blow away in the wind.

33. The stolen equipment did not wash away in the rain.

34. The stolen equipment did not evaporate into the air.

35. An affirmative act by an individual, or group of individuals, was necessary to remove the stolen equipment from the storage lot and transport the same to an unknown location.

36. The Debtor did not approve any individuals or a group of individuals to remove and transport the stolen equipment from the storage lot.

37. Further, the automatic bankruptcy stay prohibited any individuals from removing or transporting the stolen equipment from the storage lot absent permission of the Bankruptcy Court.

38. The stolen equipment has never been recovered.

39. All reasonable information that existed at the time—and remains available—supports the conclusion that the equipment was stolen, rather than subject to a "mysterious disappearance" as Liberty Mutual claims.

40. Liberty Mutual knows or reasonably should know that the stolen equipment was in fact a loss covered by the Debtor's policy.

41. Liberty Mutual's decision to deny coverage is bad faith, subjecting it to liability for exemplary and punitive damages, among other things.

42. The Bank is either of or both a loss payee and additional insured on the Insurance Policy.

43. Had Liberty Mutual recognized and paid BDC's claim, and not engaged in bad faith denial, such proceeds of the stolen equipment would have been subject to the Bank's security interests and available to pay down the Bank's claim, which far exceeds the fair value of the stolen equipment.

## COUNT I – DECLARATORY JUDGMENT

44. The Bank repeats the foregoing allegations as if fully set forth here.

45. This is a cause of action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. The Bank seeks a judicial determination of the rights and duties of Liberty Mutual with respect to the Insurance Policy.

46. The Insurance Policy obligated Liberty Mutual to provide coverage for certain

covered losses, including where BDC's equipment was stolen.

47. Liberty Mutual has failed to acknowledge or honor its coverage obligations under the Insurance Policy.

48. Defendant Renee Hanrahan, as Trustee of BDC's Bankruptcy Estate, is interested in this proceeding as the successor to BDC's interests under the insurance policy with Liberty Mutual.

49. An actual and justiciable controversy exists between the parties regarding their rights and other legal relations existing under the Insurance Policy.

50. The Bank and the Trustee have an interest in resolving such controversy, including to obtain appropriate insurance reimbursements for stolen equipment as covered under the Insurance Policy.

## COUNT II – BREACH OF CONTRACT

51. The Bank repeats the foregoing allegations as if fully set forth here.

52. Liberty Mutual has failed to fully pay all amounts due under the Insurance Policy, including for loss incurred as a result of the stolen equipment.

53. Liberty Mutual's failure to make all required payments is a breach of its obligations under the Insurance Policy.

54. The Bank has been harmed and suffered loss as a result of Liberty Mutual's breach.

## COUNT III – BAD FAITH

55. The Bank repeats the foregoing allegations as if fully set forth here.

56. Liberty Mutual has acted in bad faith in ways that include but are not limited to: (i) disregarding the language of the Insurance Policy; (ii) disregarding irrefutable proof that

the stolen equipment did not and reasonably could not mysteriously disappear from the secured lot in Manassas, VA; (iii) failing to in good faith investigate and report the circumstances of the stolen equipment; and (iv) other manners as may be determined through investigation and discovery.

57. There was no reasonable basis for the foregoing conduct by Liberty Mutual.

58. Liberty Mutual knew or had reason to know that there was no reasonable basis for engaging in the foregoing conduct.

59. The Bank has been harmed and suffered loss as a result of Liberty Mutual's actions and conduct.

60. Liberty Mutual was informed of BDC's and the Bank's respective positions, and acted in willful and reckless disregard to their respective rights and directed specifically at them, requiring an award of punitive and exemplary damages.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Keystone Savings Bank, prays that the Court enter relief and judgment as follows:

A. Declaring the relative rights of the parties under the Insurance Policy and to any proceeds, specifically finding that the stolen equipment is a covered loss and not subject to exclusions such that Liberty Mutual has an obligation and duty to provide coverage under the Insurance Policy.

B. Entering judgment against Defendant Liberty Mutual Insurance Company in an amount equal to Plaintiff's actual, consequential, and other damages recoverable on the

claims asserted herein, all interest allowable on such awards at the maximum rate allowed by law, for punitive and exemplary damages, and for the fees and costs associated with this action;

   C. Ordering Defendant Liberty Mutual Insurance Company to pay Plaintiff's expenses incurred in prosecuting this action, including attorneys' fees as allowed by law; and

   D. Granting Plaintiff such other and further relief as requested herein or that may be just and equitable.

Dated: March 25, 2025

Respectfully Submitted,

SIMMONS PERRINE MOYER BERGMAN PLC

/s/ Abram V. Carls
Abram V. Carls, AT0011818
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Phone: 319-366-7641
Facsimile: 319-366-1917
acarls@spmblaw.com
ATTORNEYS FOR KEYSTONE SAVINGS BANK